**SPALDING AND SON, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Cong. Ref. No. 2–86.**

United States Claims Court.

Sept. 16, 1991.

See also 22 Cl.Ct. 678.

Gary G. Stevens, Washington, D.C., attorney of record, for plaintiff.

Anthony H. Anikeeff, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## REPORT OF THE HEARING OFFICER

REGINALD W. GIBSON, Judge:

This is a congressional reference case, and it is before the undersigned Hearing Officer following a trial on the merits. The Senate referred this matter to the United States Claims Court pursuant to Resolution No. 458, which requests a report with appropriate findings of fact and conclusions of law under the statutory standards and applicable court rules sufficient to inform Congress as to whether there are any legal or equitable grounds for the private relief proposed in Senate Bill No. 294. That bill, if enacted, would require the Department of Interior to pay up to $250,000, plus interest and attorney fees, in settlement of claims arising out of a timber sale contract between the Bureau of Land Management (BLM or defendant) and Spalding and Son, Incorporated (Spalding or plaintiff). Our jurisdiction with respect to the foregoing is premised on 28 U.S.C. § 1492 (1988)[1] and 28 U.S.C. § 2509

---

1. This statute provides that:

Any bill, except a bill for a pension, may be referred by either House of Congress to the chief judge of the United States Claims Court

(1988).[2]

Briefly stated, Spalding claims—that a fire burned through part of a previously-contracted timber sale area; that this fire burned the bark on several trees it had previously purchased from the BLM which obliterated the identifying markings thereon; that said fire did not adversely affect the market value of the sold timber; that, due to rising timber prices, the burned timber was worth substantially more *after* the fire than at the time it was initially purchased; that the BLM refused to pursue a contract modification that would have allowed Spalding to harvest the same quantum of burned timber in Subsale A to which it was initially contractually entitled; that it (Spalding) believed in the assurances of BLM that such a modification was not possible under applicable law; and that the defendant instead unduly pressured Spalding into executing a modification of the original contract by selling all of the burned (previously sold) timber back to the BLM at the original contract price, notwithstanding its increased value, by threatening to cancel the entire timber sale contract if Spalding refused to consent.

Therefore, in view of the plain language contained in that modification, Spalding concedes that it surrendered its contractual right to harvest the blackened timber, but nevertheless contends that the contract should be reformed on equitable grounds because said modification was induced by an amalgam of acts consisting of a—mutual mistake of law, overreaching, misrepresentation, and economic coercion. Consequently, Spalding alleges that, if the contract is reformed, it is entitled to damages in the approximate range of $210,072.10, plus interest and attorney fees. The BLM, of course, adamantly denies the foregoing allegations, and raises a plethora of affirmative defenses in response. It asserts that laches, the statute of limitations, waiver, accord and satisfaction, estoppel, and offset foreclose all legal and equitable remedies to which plaintiff may otherwise be entitled.

We conclude, *infra,* that it is doubtful that Spalding has proven the existence of any viable legal claims. Nevertheless, the facts clearly demonstrate the existence of several equitable claims warranting relief, and thus a sum certain is due and owing to Spalding. We so find, in part, because the modification that was in fact executed by the parties, and the record evidence clearly and unequivocally shows that both Spalding and the BLM were mistaken as to the proper interpretation and application of certain contract provisions, and in pursuing its position the BLM plainly engaged in overreaching conduct and economic coercion, which ultimately induced Spalding to surrender valuable contractual rights against its expressed wishes. The affirmative defenses asserted by the BLM, therefore, are found to be inapposite, and thus, they are unavailing. Consequently, and given this record, we recommend that $194,832.25 in equitable relief be paid to Spalding.

## I. FACTS

The relevant facts in this case are complex and voluminous, consequently, we

for a report in conformity with section 2509 of this title.

**2.** In pertinent part, that statute states as follows:

(a) Whenever a bill, except a bill for a pension, is referred by either House of Congress to the chief judge of the United States Claims Court pursuant to section 1492 of this title, the chief judge shall designate a judge as a hearing officer for the case....

\* \* \* \* \* \*

(c) The hearing officer to whom a congressional reference case is assigned by the chief judge shall proceed in accordance with the applicable rules to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy. He shall append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.

have laboriously detailed our findings and referenced the source to the record in the attached Appendix A. Notwithstanding the foregoing, our findings are summarized here in a somewhat abbreviated fashion in order to provide the appropriate factual background to facilitate the reader's understanding of our ensuing discussion and recommendation.

### A. *The Jamison–Harris Sale*

Sometime in 1976, the BLM solicited competitive bids on a tract of timber known as the Jamison–Harris Sale, located near Grants Pass, Oregon. The solicitation was supervised by the BLM Medford District Office,[3] and it released a prospectus informing potential bidders that approximately 13,208 trees were marked for cutting in the Jamison–Harris Sale area. Of those 13,208 trees, 12,407 were identified as merchantable, while the remaining 801 were characterized as non-merchantable.[4] The prospectus further advised that the Jamison–Harris Sale contained an estimated volume of 11,206,000 merchantable thousand board feet (MBF),[5] which in turn was spread over four geographic sections described as Subsales A, B, C, and a right-of-way area for road construction designated as Subsale D. According to the BLM estimates, the timber volume was identified over the sale area as follows:

| Subsale | Douglas Fir | Ponderosa Pine | Sugar Pine | Incense Cedar | All Species |
|---|---|---|---|---|---|
| A | 2,993 | 692 | 221 | 139 | 4,045 |
| B | 1,951 | 400 | 88 | 82 | 2,521 |
| C | 3,018 | 792 | 116 | 85 | 4,011 |
| D | 375 | 212 | 23 | 19 | 629 |
| Totals | 8,337 | 2,096 | 448 | 325 | 11,206 |

Subsale A covered a geographic area of 338 acres, Subsale B covered 282 acres, and Subsale C of the Jamison–Harris Sale covered 161 acres. All three of these units were designated as "partial cut" areas, a phrase used to describe a planned timber harvest in which only certain trees therein are cut. Trees which are sold to a timber purchaser under a "partial cut" harvest plan are called "take" trees, while the trees which are reserved from cutting are described as "leave" trees. The goal of a "partial cut" is to leave some of the trees behind so as facilitate the growth of new trees in the area by providing seed and shelter. In contrast, a "clear cut" sale contemplates the removal of all the trees in that geographic area. With respect to the Jamison–Harris Sale, because Subsales A, B, and C were "partial cut" areas, the "take" trees in those sections were marked with blue paint both above and below stump height to distinguish them from the "leave" trees. Subsale D was a "clear cut" area with designated geographic boundaries, thus the trees in that section were not individually marked.

The Jamison–Harris Sale prospectus notified potential bidders that the BLM would entertain offers at the following minimum prices:

---

3. The Medford District Office is one of ten district offices under the supervision of the BLM Oregon State Office.

4. In the logging industry, the term "merchantable" describes timber that is suitable for manufacturing wood products such as lumber.

5. MBF is the timber industry standard for measuring volume.

| Species | Estimated Volume/MBF | Appraised Price/MBF | Volume Times Appraised Price |
|---|---|---|---|
| Douglas Fir | 8,337 | $109.35 | $ 911,650.95 |
| Ponderosa Pine | 2,096 | 116.70 | 244,603.20 |
| Sugar Pine | 448 | 192.10 | 86,060.80 |
| Incense Cedar | 325 | 120.85 | 39,276.25 |
| Total | 11,206 | | $1,281,591.20 |

At that time in 1976, Spalding and Son, Inc. was a family-run sawmill (a closely held corporation) located in Grants Pass, Oregon, for some 40 years. It employed approximately 170 people, and had a net worth somewhere in the neighborhood of $8,000,000. As general manager and vice president, Mr. Merve Spalding was responsible for day-to-day operations, and therefore was charged with the duty of procuring the 34,000 MBF annual timber raw material required to supply the Spalding sawmill.[6] Moreover, it was also his responsibility to evaluate and bid on federal timber contracts, and it was in the performance of this duty that Merve Spalding learned of the Jamison–Harris Sale.

In fact, Merve Spalding became aware of the Jamison–Harris Sale upon receiving the BLM annual sale plan for 1976, as a consequence of which he instructed Mr. Jim Peckham, a forester employed by Spalding, to inspect the sale area and appraise the quantity and quality of the timber. After evaluating the subsequent report he received from Mr. Peckham, i.e., the amount of timber contained in the sale area, the minimum prices being requested by the BLM, the amount of timber already under contract by Spalding, the required logging methods, the timber species, and the timber quality, Merve Spalding decided to bid on the Jamison–Harris contract. Therefore, at a BLM oral auction on December 30, 1976, Merve Spalding filed the following offer:

| Species | Estimated Volume/MBF | Spalding Oral Bid Price | Volume Times Bid Price |
|---|---|---|---|
| Douglas Fir | 8,337 | $110.00 | $ 917,070.00 |
| Ponderosa Pine | 2,096 | 116.70 | 244,603.20 |
| Sugar Pine | 448 | 192.10 | 86,060.80 |
| Incense Cedar | 325 | 120.85 | 39,276.25 |
| Totals | 11,206 | | $1,287,010.25 |

When the bidding concluded, Spalding was determined to be the high bidder given the above offer, and on February 23, 1977, it executed Contract No. OR110–TS7–8 with the BLM for the timber designated for harvest in the Jamison–Harris Sale area.[7] The contract imposed a time frame for completion, allowing Spalding to commence operations on February 27, 1977, and requiring it to complete the harvesting of all of the designated timber no later than February 23, 1980. With the exception of this 36–month time limit, the contract did not impose any specific removal schedule on Spalding. In connection with the foregoing, Spalding did not consult a lawyer before entering into the Jamison–Harris contract, ostensibly because of its long and relatively trouble-free relationship with the BLM on previous timber sale contracts.

6. Merve Spalding became the president of Spalding and Son, Inc. in 1988 following the death of his father, Eldon Spalding.

7. In accordance with corporate bylaws, the contract was signed by Eldon Spalding as president. He did so pursuant to the instructions and advice of Merve Spalding.

It was not until the summer of 1977 that Spalding began harvesting the timber it purchased under the Jamison–Harris contract. And, by the end of the summer of 1977, it had removed all of the right-of-way timber contained in Subsale D, in addition to completing the road construction required under the contract. During the fall of 1977, and through the early winter months of 1978, Spalding prepared to harvest the timber in Subsales A, B, and C. In this connection, Spalding informed the Oregon State Department of Forestry that it intended to commence operations in the Jamison–Harris Sale area during the next logging season, a notice required under Oregon state law. Thus, during this period, Spalding was ready to begin harvesting the remainder of the timber in the Jamison–Harris Sale area by the beginning of August 1978, but it did not undertake any further operations that summer because of a conflagration known as the Grave Creek Fire, which was ultimately responsible for the events leading to this petition for relief.

B. *The Grave Creek Fire*

The Grave Creek Fire started on August 9, 1978, and it was not extinguished until August 11, 1978. The belief is that it was caused or set by an arsonist on lands adjacent to the Jamison–Harris Sale area, and it eventually burned through 3,150 acres of private, state, and federal lands, including 1,200 acres of BLM lands. The firefighting was undertaken by the Oregon State Department of Forestry, and Mr. Bob Bainbridge, the Rogue River Resource Area Manager in the Medford District Office, acted as the BLM representative on the site. He mapped the course of the fire by helicopter, and observed that the fire was burning through portions of the Jamison–Harris Sale. Mr. Bainbridge did not take any special measures to protect the Jamison–Harris Sale area, insofar as his primary concern was to provide assistance in extinguishing the fire as soon as possible.

In due course, the fire reached the Subsale A area of the Jamison–Harris Sale, and the firefighting crews realized that the logging roads constructed by Spalding the previous summer in the Subsale D area provided an avenue for impeding the spread of the fire. With the tacit or apparent approval of Mr. Bainbridge, the firefighters decided to start "backfires" along that system in an effort to prevent the fire from jumping the boundaries created by those roads. When using the backfiring technique, firefighting crews deliberately burn the undergrowth, brush, lower branches, and other highly combustible debris on or near the ground in the area of the oncoming fire. Of course, these backfires also burned the trees, including the lower portion of the trunks, and Mr. Bainbridge admitted that they may have caused the obliteration of some of the blue paint markings on the "take" trees previously sold to Spalding under the Jamison–Harris contract. Nevertheless, it appears that these backfires allowed the firefighters to stop the fires at the roadways, and thus prevented it burning additional timber in the Jamison–Harris Sale area.

In the end, however, the Grave Creek Fire burned through a significant portion of Subsale A, in addition to parts of Subsales B and C. The latter two sections were only minimally affected, and Spalding eventually harvested the take trees in those two latter subsale areas without incident. Subsale D was not affected in any way because Spalding harvested all of the timber in that area prior to the fire. Subsale A, on the other hand, was somewhat affected by the fire. That is to say, the blaze burned through approximately 208 of the 338 acres contained in that subsale area, and in that region the fire apparently stunted the further growth of most of the trees. Of significant importance, the fire blackened the bark of many of the trees above and below stump height, and consequently, it eradicated more than 90% of the blue paint markings on the estimated 4,849 "take" trees located in Subsale A.[8] Significantly, however, most of these trees were only blackened by the fire while only 2% of them were actually consumed or destroyed.

---

8. These 4,849 take trees in Subsale A contained approximately 4,045 MBF in timber volume.

Thus, while most of the 4,849 "take" trees in Subsale A were only blackened and stunted by the fire, there was no diminution in the value of said timber. In other words, assuming that it could be harvested before it began to deteriorate in value, as a consequence of bug infestation, staining, or other natural causes, the burned timber was still merchantable. Therefore, we find that it is undisputed that the fire did not effect a financial loss in the value of the timber merely because it simply singed or blackened portions of the trees. At worst, the fire created problems only to the extent that the parties could no longer easily identify all of the "take" trees in the Subsale A area previously purchased by Spalding under the Jamison–Harris contract.

## C. The Aftermath Of The Grave Creek Fire

When the Grave Creek Fire was finally extinguished, BLM officials began to plan for rehabilitating the burned and singed areas. It was not long thereafter before the BLM determined that it was essential to remove all of the burned timber as soon as possible, preferably within one year, in order to prevent the loss of merchantability through bug infestation, rotting, staining, or other forms of deterioration. Thus, the fire complicated the original purpose of using a "partial cut" harvest plan in the Jamison–Harris Sale, insofar as it was now most desirable to cut all of the burned trees in the area and not just those trees initially slated for removal by Spalding. In other words, the BLM essentially decided to adopt a "clear cut" strategy in the burned area, leaving behind only those isolated trees therein that were not damaged by the fire. To facilitate a conclusive determination as to which trees were stunted and which were not, and to minimize the possibility of harvesting any living trees, the BLM eventually decided to leave the area in its natural state through the winter before removing the burned timber.

Notwithstanding the foregoing, the Jamison–Harris contract gave Spalding the right to harvest certain identified trees in Subsale A any time prior to February 23, 1980. Consequently, shortly after the fire was extinguished, the BLM realized that it could not cut all of the singed timber in Subsale A without some sort of agreement with Spalding. Moreover, it was not practical to publicly advertise a new timber sale for the immediate removal of the affected timber in Subsale A which was not included in the Jamison–Harris contract, because this would have exacerbated the problem in that it would have required Spalding and the prospective new purchaser of such timber to conduct simultaneous logging operations, which would have created a chaotic and dangerous safety problem. Additionally, in view of the desired one-year time frame, it was not practical to publicly advertise a new timber sale for the removal of the burned timber in Subsale A, not originally included in the Jamison–Harris contract, to commence after Spalding concluded its operations. With these concerns in mind, the BLM entered into discussions with Spalding in an attempt to resolve the problems created by the Grave Creek Fire.

On or about August 17, 1978, Mr. Peckham, acting on behalf of Spalding, and Mr. Bainbridge, acting on behalf of the BLM, met at the Jamison–Harris Sale area to inspect the damage and to discuss the apparent alternatives for resolving the problems created by the Grave Creek Fire. Their inspection of the area was primarily concentrated in Subsale A, insofar as the fire burned heaviest in that area. After completing their inspection, Messrs. Peckham and Bainbridge agreed that the fire burned off most of the blue paint markings on the "take" trees in Subsale A, making it very difficult to distinguish them from the "leave" trees that the BLM reserved from cutting under the Jamison–Harris contract. Consequently, they determined that the contract would have to be modified in some way to adjust for the obliterated blue paint markings which identified the "take" trees, and they proceeded to review three alternatives. Specifically, they discussed (i) a modification deleting only the fire affected portion of Subsale A from the original contract and re-offering it as part of a separate timber sale, (ii) a modification permitting Spalding to harvest *all* of the burned

timber in Subsale A in a scaled sale,[9] and (iii) re-cruising[10] and re-marking a sufficient number of trees to approximate the timber volume initially contemplated by the Jamison–Harris contract.

Both Messrs. Peckham and Bainbridge concurred in principle that the scaled sale option would be the best and fairest solution of the three. If adopted, the gross timber volume would have been measured upon removal, and Spalding would then have paid the contract price for the precise volume of timber it purchased under the Jamison–Harris contract, and, in addition, an agreed fair market price for the timber volume over and above the original amount contained in the contract. Mr. Peckham favored this alternative because Spalding wanted to harvest all of the burned trees, which reflected timber equal in value to the unburned trees it purchased under the original contract. Not surprisingly, Mr. Bainbridge believed that this was the fairest approach, and that it would also be the most practical way to achieve the BLM goal of harvesting all of the burned timber as soon as possible. Nevertheless, Mr. Bainbridge told Mr. Peckham that he was not sure whether that option could be implemented under BLM regulations. Mr. Bainbridge assured Mr. Peckham, however, that he would call the Oregon State Office to inquire whether the scaling option was viable.

Following his meeting with Mr. Peckham on August 17, 1978, Mr. Bainbridge apparently called the BLM at the Oregon State Office, as he promised Mr. Peckham, and also consulted with other BLM personnel in the Medford District Office as to the best course of action. In the course of these discussions, Mr. Bainbridge subsequently learned, however, that the BLM did not favor scaled sales, and that it did not even have any scaled sale contract forms. More importantly, he learned that the applicable

regulations generally required the BLM to publicly advertise all timber sales containing more than 250 MBF.

By this time, therefore, Mr. Bainbridge knew that, if the contract was modified to accommodate a scaled sale, the volume of timber to be sold to Spalding consistent with the Jamison–Harris Sale would greatly exceed the 250 MBF limitation. He also learned that the same regulations allowed for exceptions to this policy if an authorized representative of the BLM determines that a deviation is warranted in the public interest and if competitive bids are impractical. In the fall of 1978, the authority to make such determinations was vested in the BLM Director in Washington, D.C.[11] However, Mr. Bainbridge, along with his colleagues in the Medford District Office and the Oregon State Office, believed that it would take at least four months, and possibly six months, to obtain that waiver, and thus, no attempt was made to obtain that approval. Therefore, in a subsequent telephone conversation on or about August 18, 1978, Mr. Bainbridge informed Mr. Peckham that the law did not permit the BLM to execute a scaled sale modification.

Thereafter, and on or about August 22, 1978, Mr. Bainbridge toured the Jamison–Harris Sale area with Mr. George Francis, the BLM Medford District Manager, and Mr. Bob Anderson, the BLM Resource Area Manager for the adjacent Grants Pass Resource Area. Mr. Bainbridge reported the substance of his discussions with Mr. Peckham, *supra*, to Messrs. Francis and Anderson, and the three of them reviewed the available options. At the time of this meeting, all three men then knew that the value of the timber in Subsale A was higher than the price that Spalding agreed to pay for that timber under the Jamison–Harris contract. They were also aware of the perceived impedi-

---

9. Under the original Jamison–Harris contract, Spalding purchased an estimated volume of timber. Under a scaled sale contract, the parties agree to measure actual volume after the timber is removed from the sale area.

10. "Cruising" is a term used to describe a method of estimating the amount of timber in any given area.

11. Mr. Bainbridge was not precisely certain which officers below the director, if any, had the authority to make such determinations.

ments to instituting a scaled sale, so that option was never seriously addressed.

Consequently, they reviewed the re-cruising and re-marking option and discarded it. This alternative was rejected not because it was impossible to accomplish, but rather, because it would require the BLM to construct another timber sale for the remainder of the burned timber, and that would inhibit a speedy harvest. In order to satisfy this primary objective, and, concomitantly, to prevent the loss of merchantability through deterioration, Messrs. Bainbridge, Francis, and Anderson concluded that the best course of action from the BLM's perspective would be to buy back all of the fire-burned portion of standing timber in Subsale A from Spalding and to re-offer it in one large salvage sale along with the burned timber that was not sold to Spalding as part of the Jamison–Harris contract. This area was subsequently euphemistically styled the Black Eye Salvage Sale. In discussions with other BLM personnel either shortly before or after this meeting, Mr. Bainbridge also raised the possibility of canceling the entire Jamison–Harris contract if Spalding refused to sell back the burned timber in Subsale A.

Following the foregoing, on August 28, 1978, Mr. Francis instructed Mr. Fred Pastori, the Medford District Office Appraiser, to prepare a memorandum advising the BLM Oregon State Office on the viable alternatives for handling the Jamison–Harris contract in the wake of the Grave Creek Fire, and to explain the alternative that the Medford District Office wished to implement. That memorandum outlined three options, and advocated the adoption of the alternative that Messrs. Francis, Bainbridge, and Anderson resolved to pursue. Specifically, it recommended the execution of a modification to the Jamison–Harris contract deleting the burned portion of Subsale A and the related bid costs by Spalding, and re-estimating the volume of timber in Subsale A that would remain in the sale area. In doing so, the memorandum also advised the Oregon State Office that Spalding did not wish to sell all of Subsale A back to the BLM.

After receiving this memorandum, and in the course of advising the Medford District Office on the best way to handle the difficulties created by the Grave Creek Fire, Mr. William Cowan, a forester in the Oregon State Office responsible for all timber sale contracts, sought the counsel of Mr. Donald Lawton, the Assistant Regional Solicitor for the Pacific Northwest Lands and Minerals Division, Department of the Interior. After examining the Jamison–Harris contract, and after being told that the "take" trees in Subsale A could not be identified because the blue paint markings had been burned off, Mr. Lawton concluded that the situation was governed by the risk-of-loss provision contained in § 7 of the Jamison–Harris contract.

That section in 1978 was a standard clause in all BLM timber sale contracts and provided as follows:

Title to timber sold under this contract shall remain in Government and shall not pass to Purchaser until such timber has been paid for and removed from the contract area. Unless cut timber is sold under this contract, risk of loss shall be borne by Purchaser after the timber is cut; *Provided, however,* that if loss results from a fire which was not caused by Purchaser, his contractors, subcontractors, or the employees of any of them, the risk of loss shall be borne by the party holding title. If cut timber is sold under this contract, risk of loss shall be borne by the party holding title. Risk of loss to Government shall not exceed the value of such timber computed at the prices per unit for the species involved as set forth [in this contract]. Nothing herein shall be construed to relieve either party from liability for any breach of contract or any wrongful or negligent act. As used in this section, the term *cut timber* refers only to timber which has been felled, bucked, or otherwise severed by direct human activity prior to the date this contract was entered into.

Although he was never told that the BLM suffered an economic loss as a result of the fire, and in spite of his inability to identify any such economic loss at trial, Mr.

Lawton, nevertheless, concluded that § 7 governed the resolution of this situation. In this regard, he determined that the absence of physical or economic loss was immaterial because the obliteration or "loss" of the blue paint markings on most of the "take" trees in Subsale A made it impossible for either party to identify the subject matter of the contract, and that performance was therefore impossible in the burned section of Subsale A. Consequently, based on an alleged impossibility of performance theory, Mr. Lawton advised Mr. Cowan in the Oregon State Office that the BLM had two options. In his opinion, the BLM had the option of canceling all of Subsale A, or, on the other hand, it had the option of buying back all or part of Subsale A through a mutually-agreeable contract modification. As for compensation to Spalding, Mr. Lawton concluded that the current market price for timber had no bearing on the application of § 7, and that the buy back price was limited to the amount originally paid by Spalding under the Jamison–Harris contract, notwithstanding the increase in timber values.

Subsequently, on September 20, 1978, the BLM Oregon State Office tentatively approved the plan to delete the volume, cost, and area of burned timber in Subsale A from the Jamison–Harris contract, as recommended by the Medford District Office in its August 28, 1978 memorandum. Upon receiving approval for its proposed method of modifying the contract, the Medford District Office continued its efforts to re-cruise the unburned portion of Subsale A, to re-appraise the value of the timber in that area, and to draft a contract modification deleting the burned timber. Once this process was completed, the Medford District Office prepared and sent a proposed modification for the Jamison–Harris contract to the BLM Oregon State Office on or about November 6, 1978, and received approval on November 22, 1978.

Throughout this time, Mr. Peckham had several conversations with Mr. Bainbridge about the course of action that the BLM intended to pursue in resolving the foregoing problems. Mr. Peckham testified that Mr. Bainbridge advised him that the BLM was going to buy back the burned portion of Subsale A, and, moreover, would cancel the *entire* Jamison–Harris contract and buy back all of the timber in the Jamison–Harris Sale area at bid price if Spalding did not voluntarily agree to such a modification under its interpretation of § 7. This conversation purportedly occurred in the BLM Medford District Office sometime between August 19 and November 15, 1978. According to Mr. Bainbridge, the BLM Medford District Office never proposed to cancel the *entire* Jamison–Harris contract in the event Spalding refused to *re-sell* to the BLM the timber at bid price in the burned portion of Subsale A. Instead, he claimed that the BLM proposed to only cancel all of Subsale A at bid price if Spalding refused to voluntarily agree to sell the burned timber in Subsale A back to the BLM at bid price under § 7 of the contract.

Notwithstanding Mr. Bainbridge's denial, both Messrs. Peckham and Spalding were under the impression that the BLM was threatening to cancel the entire contract if Spalding did not agree to sell back the burned timber, and were, therefore, deeply troubled as to any resulting impact on their business. At the time, Spalding required 34,000 MBF in annual timber volume to supply its milling operations. Thus, had plaintiff refused to execute the modification to re-sell to BLM the burned portion of timber in Subsale A at bid price, it would have been forced to sacrifice nearly one-third of its annual timber supply, *i.e.*, the 11,206 MBF of timber contained in the entire Jamison–Harris Sale area. The record is undisputed that, in such an eventuality, the loss of the entire timber volume contained in the Jamison–Harris Sale area was of critical concern to Mr. Spalding because his company would have then been forced to purchase replacement timber at prices *substantially higher* than it paid under the Jamison–Harris contract in order to re-supply its milling operations. Moreover, by the time the Grave Creek Fire burned through the Subsale A area, Spalding had incurred approximately $100,000 in expenditures for appraising and cruising the timber, and constructing roads in the area in

preparation for the harvesting that it expected to complete during the 1978 and 1979 logging seasons. Thus, Spalding feared that, in addition to the lost timber volume, these monetary and time investments would also be lost if the BLM cancelled the *entire* Jamison–Harris contract.

### D. *The Proposal And Execution Of The Jamison–Harris Contract Modification #5*

After receiving the green light from the BLM Oregon State Office on November 22, 1978, the Medford District Office proceeded to prepare a modification deleting the burned timber in the area of Subsale A from the Jamison–Harris contract. In this context, Subsale A initially covered a 338–acre geographic area, contained 4,849 "take" trees with a total timber volume equaling 4,045 MBF. The modification proposed to reduce the area to 130 acres, and to similarly reduce the timber volume to 1,937 MBF. The Medford District Office sent this modification to Spalding on December 15, 1978. Relying on § 7 of the Jamison–Harris contract, the BLM outlined a proposal that deleted the timber in the burned area of Subsale A with a corresponding reduction in the Jamison–Harris contract to the extent of the bid price of the deleted timber volume, and some additional adjustments to compensate Spalding for certain road building expenses and other incidentals.

Under that proposal, Spalding would be allowed to harvest Subsale areas B, C, and D in accord with the original Jamison–Harris contract terms, and the remaining *unburned* timber in the Subsale A area. Spalding agreed with the course of action proposed by the BLM in Modification #5 because it believed that the BLM would cancel the entire Jamison–Harris contract if Spalding did not assent. Moreover, Messrs. Spalding and Peckham also believed that the BLM, with its long experience in executing and administering timber sales such as the Jamison–Harris contract, was in a better position than they were to determine the proper course of action for resolving the problems that confronted them. Consequently, Spalding neither sought legal advice regarding its rights under the Jamison–Harris contract, nor did it retain legal counsel to review the proposed modification.

Thus, it was against this background that Spalding signed Modification #5 on December 28, 1978, and relinquished the right to harvest 2,108 MBF out of the 4,045 MBF of timber that it previously purchased in Subsale A under the Jamison–Harris contract. By species, Modification #5 deleted the following burned timber from Subsale A:

| Douglas Fir | Ponderosa Pine | Sugar Pine | Incense Cedar | Total |
|---|---|---|---|---|
| 1,542 | 264 | 118 | 184 | 2,108. |

The total volume of timber that Spalding was entitled to harvest was consequently reduced from 11,206 MBF to 9,098 MBF, and the contract price was reduced from $1,287,010.25 to $1,041,677.25, a difference of $245,333.00. Additional adjustments for road construction, amortization, and marginal log values, etc. reduced the Jamison–Harris contract price to $1,000,089.92. Subsequently, Spalding harvested all of the timber that it was entitled to remove under the modified contract in Subsale areas A, B, and C in a timely fashion.

### E. *The Black Eye Salvage Sale*

Following their August 22, 1978 survey of the Grave Creek Fire damage, Messrs. Francis, Bainbridge and Anderson decided to construct a new timber sale that became known as the Black Eye Salvage Sale,

which covered 500 acres of burned timber in the Jamison–Harris Sale area as well as on immediately-adjacent BLM lands. The Black Eye Salvage Sale therefore included, but was not limited to, the burned area of Subsale A. Soon after Spalding agreed to Modification # 5 on December 28, 1978, the BLM proceeded to solicit bids, offering the following volume at the corresponding *minimum* prices:

| Species | Estimated Volume/MBF | Appraised Price/MBF | Volume Times Appraised Price |
|---|---|---|---|
| Douglas Fir | 5,649 | $168.05 | $ 949,314.45 |
| Ponderosa Pine | 673 | 167.40 | 112,660.20 |
| Sugar Pine | 563 | 282.80 | 159,216.40 |
| Incense Cedar | 769 | 276.30 | 212,474.70 |
| Totals | 7,654 | | $1,433,665.75 |

The related prospectus advised potential bidders that harvesting operations on the Black Eye Salvage Sale area would have to be completed within 12 months after commencement of the contract. Thereafter, on February 22, 1979, the BLM held an oral auction for the Black Eye Salvage Sale, and the following bid of Boise Cascade was the highest:

| Species | Estimated Volume/MBF | Boise Cascade Bid Price/MBF | Volume Times Bid Price |
|---|---|---|---|
| Douglas Fir | 5,649 | $200.00 | $1,129,800.00 |
| Ponderosa Pine | 673 | 167.40 | 112,660.20 |
| Sugar Pine | 563 | 282.80 | 159,216.40 |
| Incense Cedar | 769 | 276.30 | 212,474.70 |
| Totals | 7,654 | | $1,614,151.30 |

Spalding did not submit a bid on the Black Eye Salvage Sale because, when the proposed volume of 7,654 MBF is combined with the timber volume that it retained under the modified Jamison–Harris contract, the timber volume in the Black Eye Salvage Sale area would cause it to exceed its harvesting, manufacturing, and scheduling capacity. As a consequence, Spalding was not sure that it could process all of the timber in both the Jamison–Harris Sale and the Black Eye Salvage Sale within the time limitations specified in both prospectuses. By contract No. OR110–TS9–33, the BLM awarded the Black Eye Salvage Sale to Boise Cascade on March 2, 1979. The contract commenced on April 3, 1979, and Boise Cascade completed its harvesting operations before April 3, 1980.

### F. *Spalding Relief Efforts*

In November of 1979, Spalding finally employed legal counsel to review its federal timber operations, and it was not long thereafter before the events surrounding the Grave Creek Fire and the December 28, 1978 modification of the Jamison–Harris contract came to light. Based upon their initial review, Spalding was advised by its attorneys that it would be difficult to obtain legal relief in a court of law because of their execution of Modification # 5. However, because their counsel were of the opinion that principles of equity and fair play warranted some remedy, given the totality of the facts and circumstances, they recommended to Spalding the pursuit of relief through private legislation. In accord with this recommendation, Spalding contacted Senator Robert Packwood through its attorneys in the fall of 1980 in its initial attempt to obtain relief under the Jamison–Harris contract. Following this contact, by letter dated March 9, 1981, Spalding asked Senator Packwood to introduce legislation in the Senate recommend-

ing appropriate relief, or in the alternative, to introduce legislation recommending that the matter be referred to the United States Court of Claims, the predecessor to the United States Claims Court, for a full hearing and report. On or about June 10, 1981, Spalding was told to first exhaust all available administrative remedies with the Department of Interior before pursuing any private legislative relief.

Accordingly, Spalding contacted the Solicitor's Office in the Department of Interior on November 3, 1981, and thereafter forwarded a report outlining its claim to the Under Secretary of the Department of Interior, Mr. Donald P. Hodel, on March 15, 1982. In connection with its response to Spalding's letter, the Department of Interior first prepared a draft report that it referred to the BLM Oregon State Office for comment. On April 8, 1982, this report was forwarded to Mr. Lawton for his comments. Because of his familiarity with this matter, Mr. Lawton did not contact anyone in either the Medford District Office or the Oregon State Office. He simply made a few revisions in the draft and returned it to the Oregon State Office on April 19, 1982.

On June 15 and 17, 1982, Spalding called the Director of the BLM in Washington, D.C., to arrange a meeting. Thereafter, on August 4, 1982, attorneys representing Spalding met with Mr. Paul Burford, the Director of the BLM, and Mr. Paul Smythe, an attorney from the Department of Interior Solicitor's Office. Following this meeting, Spalding sent letters to the Director's and the Solicitor's Offices on October 8 and 12, 1982, respectively, further explaining the merits of its claim. The Department of the Interior continued to evaluate the Spalding claim for the next four months. Eventually, by a letter dated December 13, 1982, Director Burford denied all relief. Notwithstanding the foregoing, Spalding pursued its efforts to obtain appropriate legislative relief, but shifted its energies to the office of Senator Mark Hatfield. In this connection, Spalding began drafting proposed legislative relief in February 1983, and sent another report to Senator Hatfield on August 4, 1983. It also forwarded a similar report to Ms. Lisa Hovel-

son, an aide to the Senate Judiciary Committee, on September 8, 1983. After meeting with Ms. Hovelson, Spalding revised its draft of the proposed legislation, and those revisions were forwarded to the office of Senator Hatfield for comments and further review on October 28, 1983, and again on November 29, 1983.

In January 1984, during the 98th Congress, S. 2208, a bill for the relief of Spalding and Son, was introduced by Senator Hatfield. That bill was referred to the Senate Judiciary Committee's Subcommittee on Administrative Practice and Procedure, which, on January 30, 1984, sent a letter to the Department of Interior requesting that it provide a response outlining its views on the proposed legislation within 60 days. Also on January 30, 1984, Senator Hatfield was advised by the Senate Judiciary Committee that the proposed legislation would be scheduled for consideration following receipt of the Department of Interior response and a report on the matter from Senator Hatfield. The latter report was furnished by Senator Hatfield on February 2, 1984, but the Department of Interior failed to respond as requested during the 98th Congress.

The January 30, 1984 letter from the Senate Judiciary Committee to the Department of Interior was referred to Mr. Ralph Hill, an attorney in the Department of Interior Office of Legislative Counsel, on February 3, 1984. Upon receiving this request, which sought the agency's views, Mr. Hill in turn referred the matter to the BLM for review and comments. As a result, in February of 1984, Mr. Roger Nesbit, an attorney in the Pacific Northwest Regional Solicitor's Office, was assigned to assist the BLM in preparing an appropriate response to the proposed legislation contained in S. 2208. Apparently, Mr. Nesbit was already familiar with the Jamison–Harris contract dispute because he assumed that the claimed grounds for relief were the same as those presented by Spalding in its March 15, 1982 letter to Under Secretary Hodel. In particular, he believed—that there was no dispute over any of the material facts; that Spalding was basing its claim on the

alleged mistaken interpretation of the risk-of-loss provision contained in § 7 of the Jamison–Harris contract; and that the key documentary evidence was preserved in the Jamison–Harris official contract file. Consequently, Mr. Nesbit determined that the official contract file for the Jamison–Harris Sale contained sufficient information for him to assist the BLM in responding to the request for comment, and he, therefore, did not seek to contact any of the individuals involved in this matter in the Medford District Office.

Mr. Hill received the BLM comments on or about April 17, 1984. However, because there was no further expression of interest from either the Subcommittee on Administrative Practice and Procedure or the office of Senator Hatfield, and because of the low priority assigned to private relief legislation by the Office of Legislative Counsel, Mr. Hill failed to take any further action to provide the Senate Judiciary Committee with the views of the Department of Interior on S. 2208 within the 60-day time frame specified in the January 30, 1984 letter from the Senate Judiciary Committee. When the 98th Congress adjourned on October 12, 1984, all pending legislation died, and the Office of Legislative Counsel ceased all work on S. 2208.

Work resumed on the Spalding matter in January of 1985, shortly after commencement of the 99th Congress, after Mr. Hill was informally notified that Senator Hatfield intended to introduce legislation substantially the same as S. 2208. Subsequently, on January 24, 1985, Senator Hatfield introduced S. 294, which was indeed virtually identical to S. 2208. On March 13, 1985, Mr. Hill therefore drafted a report advising that the Department of Interior opposed S. 294, which he sent to the Office of Management and Budget (OMB) for clearance on March 13, 1985. Later, on July 17, 1985, the Senate Judiciary Committee requested that the Department of Interior provide its views on S. 294. Mr. Hill received clearance from the OMB for the report he prepared advising against the adoption of S. 294 on July 30, 1985. He sent that report to the Senate Judiciary Committee on August 5, 1985, approximately 16 months after expiration of the initial deadline for submission. Even then, Spalding did not receive a copy of that report until December of 1985, to which it responded in separate letters to the Senate Judiciary Committee and the Department of Interior on February 21, 1986.

The Senate did not enact S. 294, but instead referred the matter to the United States Claims Court for a full report by passing S.R. 458 on October 8, 1986. The matter was docketed on December 10, 1986, and Spalding filed its complaint on March 10, 1987. Following thereon, the United States filed its answer and affirmative defenses on June 10, 1987. Believing that it would be fruitless to file an action at law in the face of Modification # 5, Spalding did not file a complaint in the United States Claims Court pursuant to 28 U.S.C. § 1491. For the same reasons, of course, Spalding has never filed a claim seeking relief with any contracting officer under the relevant provisions of the Contract Disputes Act, 41 U.S.C. §§ 601, *et seq.*

## II. CONTENTIONS

In this action, Spalding essentially contends that equitable relief is warranted because it executed Modification # 5 and agreed to sell the burned timber in Subsale A back to the defendant *at the original contract bid price* against its will as a result of improper conduct by the BLM. In this connection, Spalding alleges—that its decision to execute said modification was induced by a mistaken interpretation and application of the loss provisions contained in § 7 of the Jamison–Harris contract; that it relied on certain erroneous representations by the BLM concerning the proper interpretation and application of § 7; that it relied on the misleading and erroneous representations by the BLM concerning the lack of other available options for dealing with the consequences of the Grave Creek Fire; that it was subject to economic coercion when the BLM threatened to cancel the *entire* Jamison–Harris contract if it refused to agree to proposed Modification # 5; and, finally, that the BLM was unjustly enriched as a result of its overreaching

conduct in unconscionably inducing Spalding to execute said modification against its will.

The defendant, on the other hand, denies all of these allegations. Basically, it contends—that there were no mistakes of law; that the BLM never made any erroneous or incorrect representations on any matter relevant to these proceedings; that Spalding was not entitled to rely on any alleged representations of law in any event because it was a sophisticated operation with substantial federal timber contract experience; that it never threatened to cancel the entire Jamison–Harris contract; and lastly, that it was not unjustly enriched because Modification #5 was the only course of action available under § 7 of the Jamison–Harris contract. In addition, defendant raises numerous affirmative defenses including, but not limited to, the statute of limitations, laches, waiver, accord and satisfaction, estoppel, and offset.

Thus, between the claims asserted by Spalding and the affirmative defenses advanced by the BLM in response to those demands, the parties have raised a plethora of issues. All issues are identified and discussed in detail below, but as a preliminary matter, we will generally review our statutory responsibilities in congressional reference proceedings, the Spalding proposed relief legislation, and then the contents of the Senate request for a report and recommendation on the merits of that bill. In addition, preceding our discussion on the merits of the petition, we also think that it is appropriate, indeed imperative, to generally address the credibility of the witnesses who testified at trial in order to put this case and our ensuing analysis in proper perspective. Consequently, we will review our responsibilities in congressional reference proceedings first, identify the issues presented in this case second, generally discuss the credibility of the witnesses third, analyze each of the Spalding claims fourth, and examine each of the affirmative defenses raised by the BLM fifth. Finally, because we find that relief is warranted in this case, *infra*, the concluding step in our analysis will be to determine the amount of damages, interest, and attorney fees we recommend as compensation.

### III. CONGRESSIONAL REFERENCE PROCEEDINGS

#### A. *The Congressional Reference Process*

Simply stated, the congressional reference process is a unique mechanism that allows persons, natural or artificial, alleging injury at the hands of the federal government to seek through private bills relief in cases where, for various reasons, it appears that there is no viable legal remedy. In this context, any person wishing to pursue private relief must first persuade a member of Congress to propose and introduce private legislation on his behalf. If successful in this endeavor, and if a bill for private relief is introduced for consideration, it must ultimately pass both Houses of Congress, and then obtain Presidential approval. Of course, in some cases, the merits of proposed legislation are sufficiently obvious that Congress is able to act on the bill without assistance. More often, however, it is not so easy for Congress to separate the wheat from the chaff. That is to say, there are cases where the material facts are so complicated, sketchy, antiquated, or subject to substantial question that they can be ascertained only through the rigors of a formal court proceeding. *See* S.Rep. No. 1643, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin.News 3494, 3496–3497 (private bills should be referred "when complex issues of fact must be resolved as a prerequisite for relief").

In such circumstances, either House of Congress may, under the authority of 28 U.S.C. § 1492, *see* note 1, *supra*, refer the bill to the Chief Judge of the United States Claims Court for a full report on the facts and the law, and for a recommendation based on those findings and conclusions. "Congressional reference cases, of which this case is one, are peculiar to the jurisdiction of this court alone and have their origin in those acts ... which authorize either house or a committee of either house of Congress to refer certain bills for a

judicial investigation upon which findings are to be made and reported to the body transmitting the resolution. They are a separate class of cases designed to supply information so full and exact as to leave the legislative body nothing to do but determine the justice of the complaint ... as a legal or equitable demand against the United States...." *Alleman v. United States,* 43 Ct.Cl. 144, 150–51 (1908). Such proceedings on a referred bill are governed by 28 U.S.C. § 2509, *see* note 2, *supra.* In that connection, 28 U.S.C. § 2509(a) instructs the Chief Judge of the Claims Court to appoint a hearing officer to handle the matter, and a three member panel to review the work of the hearing officer.

The responsibilities of the hearing officer are enumerated in 28 U.S.C. § 2509(c), which, in relevant part, states that:

The hearing officer ... shall ... determine the facts, including facts relating to delay or laches, facts bearing on whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy. [The hearing officer] shall append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, legally or equitably due from the United States to the claimant.

In conformity with this statutory scheme, Spalding persuaded Senator Mark Hatfield of Oregon to introduce S. 294 on January 24, 1985, which states as follows:

A BILL

For the relief of Spalding and Sons, Incorporated

*Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury appropriated to the Bureau of Land Management, Department of Interior, and not otherwise obligated, the sum of $250,000, plus interest from March 15, 1982, at the rate established by the Secretary of the Trea-

sury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board, plus attorneys fees, in full settlement of all claims by Spalding and Sons, Inc., against the United States relating to the Jamison–Harris sale.

Sec. 2. No part of the amount appropriated in the first section of this Act in excess of 10 percentum thereof shall be delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.

This bill was referred to the Senate Judiciary Committee for further investigation, and because it was opposed vigorously by the BLM, and because the merit of the Spalding claims was not immediately apparent, the Senate passed S.R. 458 on October 8, 1986. This referring resolution states as follows:

RESOLUTION

*Resolved,* that the bill (S. 294) for the relief of Spalding and Son, Incorporated, of Grants Pass, Oregon, together with all of the accompanying papers is hereby referred to the United States Claims Court pursuant to sections 1492 and 2509 of title 28, United States Code. The Claims Court shall proceed expeditiously with same in accordance with the provisions of said sections, and report to the Senate at the earliest practicable date, giving such findings of fact and conclusions of law as shall be sufficient to inform Congress of the nature and character of the demand as a claim legal or equitable against the United States, and the amount, if any, legally or equitably due from the United States to Spalding and Son, Incorporated.

The matter was thereafter docketed in the Claims Court on December 10, 1986, and Spalding filed its complaint on March 10, 1987. Subsequently, under 28 U.S.C.

2509(a), this court was designated as the hearing officer, and, pursuant to 28 U.S.C. § 2509(c) and Res. 458, is now charged with the duty of making findings of fact and conclusions of law sufficiently detailed to inform Congress whether the Spalding claims outlined in S. 294 are, on the one hand, legal or equitable in nature, or on the other, merely gratuitous. In this respect, we note that the parameters of the duties of the hearing officer are defined by the statutory guidelines contained in 28 U.S.C. § 2509(c), and that the resolution referring the bill cannot *ipso facto* alter those statutory standards. *Paul v. United States*, 20 Cl.Ct. 236, 266–67, *aff'd* 21 Cl.Ct. 758 (1990). Obviously then, the definition that one attaches to each of the statutory terms will necessarily form the foundation of our analysis. Unfortunately, however, the statute does not provide these definitions, and it is therefore imperative for us to ascertain what constitutes a legal claim, an equitable claim, and a gratuity before embarking on our discussion of the demands contained in S. 294. Only then is it possible to determine whether relief is warranted in this case.

B. *Legal Claims And Equitable Claims Defined*

A legal claim, of course, is a demand that is cognizable in a court of law. Consequently, in the traditional sense, legal claims must be based on the Constitution, a statute, a regulation, or some principle of common law. 28 U.S.C. § 1491. In contrast, equitable claims are founded on principles of right, justice, and morality. "The term equity in this context is used in the sense of broad moral responsibility, what the Government ought to do as a matter of good conscience." *B. Amusement Co. v. United States*, 148 Ct.Cl. 337, 342, 180 F.Supp. 386, 390 (1960) (citations omitted). "In its broadest and most general signification, equity denotes the spirit and habit of fairness, justness, and right dealing which would regulate the intercourse of men—the rule of doing to all others as we desire them to do to us; or as it is expressed by Justinian—'to live honestly, to harm nobody, to render every man his due.' It is

therefore the synonym of natural right or justice.... It is grounded in the precepts of the conscience, not in any sanction of positive law." *Gay Street Corp. v. United States*, 130 Ct.Cl. 341, 350 n. 1, 127 F.Supp. 585 (1955). Equitable claims are those "which rest upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against a private individual. The nation, speaking broadly, owes a 'debt' to a [party when its] claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the honor of an individual, although the debt could obtain no recognition in a court of law." *United States v. Realty Co.*, 163 U.S. 427, 440, 16 S.Ct. 1120, 1125, 41 L.Ed. 215 (1896), *cited with approval in Armiger v. United States*, 168 Ct.Cl. 379, 384, 339 F.2d 625, 628 (1964).

Clearly then, equity contemplates a remedy to a claim in a variety of circumstances where relief would be otherwise unavailable in a traditional juridical setting. Thus, while equitable claims, like legal claims, may be founded on the Constitution, a statute, a regulation, or a common law principle, such bases are not absolutely necessary to warrant relief in equity. It is true, nevertheless, that most equitable claims are based on a traditional legal principle, and in such cases, the standards to be applied are those which govern the subject area of the law generally bearing on the claim. *See, e.g., Kochendorfer v. United States*, 193 Ct.Cl. 1045, 1056 (1970) ("[t]o ascertain the proper standard for fixing liability [on an equitable claim], it is helpful to take account of the principles governing the particular area of law bearing on the claims"). In judging whether there is an equitable claim, however, these legal guidelines need not be rigidly applied, but rather may be based on an *ad hoc* examination of the facts to determine whether the defendant assumed some sort of obligation requiring recognition, even though that obligation is not enforceable, for whatever reason, in a court of law.

■ A gratuity, on the other hand, is a wholly different matter. *Webster's Seventh Collegiate Dictionary* 365 (7th ed. 1967), defines a gratuity as "something given voluntarily or beyond obligation," otherwise stated as something acquired without bargain or inducement and is freely given. *Black's Law Dictionary* 631 (5th ed. 1979). Thus, a recommendation of compensation is not warranted for a claim that is nothing more a gratuity because the government has not assumed any sort of underlying commitment. Simply stated then, without any legal or equitable obligation, a recommendation of monetary relief is not justified.

■ To establish a viable equitable claim then, the petitioner must show that the government assumed a moral or honorable obligation, that this obligation was violated, that injury resulted, and that in good conscience, fairness, and justness, relief should be granted. In addition, and perhaps most importantly, the claimant must, under the prevailing view, demonstrate that the federal government engaged in some wrongdoing that caused the alleged injury. *See, e.g., Merchants National Bank of Mobile v. United States,* 7 Cl.Ct. 1, 9 n. 6 (1984), *citing B. Amusement,* 148 Ct.Cl. at 342, 180 F.Supp. at 390 (other citations omitted). *Cf. Burkhardt v. United States,* 113 Ct.Cl. 658, 667, 84 F.Supp. 553, 559 (1949) (petitioner does not need to show fault to establish an equitable claim). As stated in *Shane v. United States,* 3 Cl.Ct. 294, 304 (1983):

> The word "equitable" in a congressional reference case was interpreted originally as meaning a broad moral responsibility on the Government's part..... This view, however, has eroded over the years and more recent cases have adopted the rule that the United States must commit some "wrong" in order to incur liability under an equitable claim.... "An equitable claim in a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrong doing] on the part of governmental employees, any award herein would be a gratuity." ... Thus,

in order to recover under an equitable claim theory the claimant must show that: 1) the government committed a negligent or wrongful act, and 2) this act caused damage to the claimant. (citations omitted).

■ In view of the foregoing, we find that Spalding must, in essence, meet a four-part test in order to obtain a favorable recommendation. It must show (i) that the federal government, acting through the BLM, incurred legal or equitable obligations that should be recognized regardless of any technical legal bar; (ii) that the BLM violated one or more of these obligations; (iii) that these transgressions resulted in the alleged damages; and, if the claim is based on principles of equity, (iv) that these injuries were somehow caused by BLM's negligence or wrongdoing. We now turn to the broad issues presented in this case.

## IV. ISSUES

We must first ask, at the threshold, whether the assertions by Spalding—that it is entitled to relief due to a mistake of law, misrepresentation, economic coercion, unjust enrichment, and overreaching conduct—constitute strict legal claims that would otherwise be cognizable in a court of law. In light of the purported accord and satisfaction in Modification #5, these claims may not warrant relief in a traditional legal sense.

■ An accord and satisfaction operates to terminate existing legal rights if the parties mutually agree to some sort of performance different from the performance originally contemplated. *See, e.g., Brock & Blevins Co., Inc. v. United States,* 170 Ct.Cl. 52, 58–59, 343 F.2d 951, 955 (1965) ("Discharge of a claim by accord and satisfaction 'means a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant as full satisfaction of his claim.'"), *citing* 6 Corbin, *Contracts,* § 1276 (1962). In the case at bar, Spalding surrendered its contractual right

to harvest the burned timber in Subsale A that it previously purchased under the Jamison–Harris contract in exchange for the payment of consideration equal in amount to the original contract bid price, plus minor adjustments, all of which might lead one to logically conclude, in a strict legal sense, at least, that there was an efficacious accord and satisfaction, and that it bars all legal claims here. In our view, however, the doctrine of accord and satisfaction is not a bar against equitable claims based on a mistake of law, misrepresentation, economic coercion, unjust enrichment, and overreaching conduct. *See* Section V(C)(3), *infra.*

In other words, one could reasonably argue that Modification # 5 provides a valid defense against all legal claims in this case, but one cannot plausibly assert it as a defense to the equitable claims raised here, given the egregious facts of record. For this reasons, therefore, we believe that it is most appropriate to analyze the Spalding allegations in the equitable claim context. Indeed, Spalding virtually concedes as much. The record shows, in this regard, that Spalding decided to pursue private relief legislation because it felt there was a high risk that its legal claim would be barred by the purported accord and satisfaction hurdles posed by Modification # 5, and further, because equity was the best forum for its claims. We will examine them in that context, therefore, and determine whether the allegations of mistake of law, misrepresentation, economic coercion, and overreaching conduct warrant equitable relief under the mandate of 28 U.S.C. § 2509 and S.R. 458. We will then address the affirmative defenses raised by the defendant, the proper measure of damages if relief is warranted, whether Spalding is entitled to recover interest, and, finally, whether Spalding is entitled the recover attorney fees.

For the reasons explained below, we conclude that equitable relief is warranted on each of the charges leveled against the BLM. Specifically, we find—that Spalding was mistaken in its interpretation and application of the risk-of-loss provisions contained in § 7 of the Jamison–Harris contract; that the interpretation favored by the BLM was patently erroneous, if not ridiculous; that the BLM essentially mislead Spalding into accepting this absurd interpretation of § 7 by misrepresenting the availability of other options for handling the consequences of the Grave Creek Fire and by threatening to cancel either *all* of Subsale A or *all* of the Jamison–Harris contract if Spalding refused to agree to sign the modification; that this blatant economic coercion induced Spalding into signing the modification; that the BLM was unjustly enriched as a result of its deceptive actions; and that all of these actions necessarily demonstrate the grossest form of overreaching and reprehensible conduct. In summary, we find that the behavior of the BLM on the facts here borders on bad faith, and that such unconscionable conduct should not, indeed cannot, go unremedied. Moreover, there is not one scintilla of merit to any of the affirmative defenses proffered by the BLM.

## V. DISCUSSION

### A. *The Credibility Of The Witnesses*

As a preliminary matter, we think it is important in this fact-intensive case to comment on the credibility of certain witnesses who testified at trial. While the parties stipulated to a variety of facts, each had markedly different perspectives on the operative facts relating to many of the critical issues in this case. The most obvious examples relate to the discussions between Messrs. Peckham and Bainbridge concerning the alternatives for handling the vexing problems created by the Grave Creek Fire. In short, Mr. Peckham testified that Mr. Bainbridge ultimately insisted that the resulting circumstances were governed by § 7 of the Jamison–Harris contract, and, consequently, the only available option was the course of action contained in Modification # 5. More importantly, and critical to plaintiff's case of overreaching and duress, Mr. Peckham testified that Mr. Bainbridge informed him that the BLM would cancel the *entire* Jamison–Harris contract if Spalding failed to agree to said modification. In response, Mr. Bainbridge testified

either that he did not recollect any such conversations, or that Mr. Peckham was mistaken in his own testimony. Obviously, these allegations are central elements in the misrepresentation, economic coercion, and overreaching conduct claims raised by Spalding, and thus, the credibility of these two witnesses is pivotal to this court's recommendation.

▇▇▇ It is well established that the evaluation of the credibility of witnesses is a basic function uniquely within the province of the trial court. Judging credibility involves "an overall evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence." Wright and Miller, *Federal Practice and Procedure* § 2586, p. 737 (1971). *See U.S. Shelter Corp. v. United States*, 13 Cl.Ct. 606, 623 (1987). In that connection, the trial judge may base his ultimate credibility determinations on any number of factors such as intelligence, the ability and opportunity to observe, age, memory, demeanor, or mannerism, along with any apparent interest, bias, or prejudice that the witness may have, and the reasonableness of the testimony in light of all the evidence presented at trial. *R.H. Donnelley Corp. v. Illinois Bell & Telephone Co.*, 595 F.Supp. 1202, 1204 (E.D.Ill.1984). "When the testimony of a witness is not [believable], the trier of fact may simply disregard it." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984). Indeed, if the trial judge determines that the testimony of any given witness is unbelievable, he may disregard it with little or no explanation. *Jones v. DeRobertis*, 766 F.2d 270, 273 (7th Cir.1985), *cert. denied*, 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986).

Given these settled guidelines and principles, we find that all of the witnesses who appeared on behalf of Spalding manifested a creditable demeanor in that they testified in a forthright, honest, and believable manner. In stark contrast, however, the testimony, including the demeanor, of some of the witnesses who appeared on behalf of the BLM was found to be halting, reluctant, cavalier, vague, and generally unbelievable. In particular, some of the testimony that the defendant adduced from its two key witnesses, Messrs. Bainbridge and Lawton, *infra*, was often so transparent, so absurd, and so illogical that it bordered on insulting the dignity of the court. Against this background, therefore, we accord virtually no weight whatsoever to the substantive testimony of either of them. Unfortunately for the defendant, this demonstration by its critical witnesses was sufficiently pervasive and overwhelming that it contaminated the credibility of defendant's entire case.

In this context, therefore, we feel compelled to make a special comment on the conduct and demeanor of Mr. Bainbridge. At trial, he experienced a massive failure of recollection, stating no less than 50 times that he did not remember. As for many of the facts that he averred that he could not recall, at best, one could conclude that Mr. Bainbridge conveniently experienced selective amnesia. He remembered with ease those facts that supported the BLM position, and then provided apparently evasive and non-responsive answers to questions posed by the court and by counsel for Spalding. With respect to documentary evidence, Mr. Bainbridge testified that he destroyed or discarded notebook(s) containing information relevant to the Jamison–Harris contract and the Grave Creek Fire during the Christmas holiday season of 1986, even though the Department of the Interior had been asked to provide its views on the proposed Spalding legislation on no less than two prior occasions. Mr. Bainbridge claimed, in that connection, that he discarded this evidence, and that his memory became hazy, because he was not contacted by any Department of Interior or Department of Justice employee regarding his knowledge of events until February 19, 1987. Nevertheless, in view of his overall general demeanor on the stand, we have substantial misgivings as to the believability of this explanation.

While we are mindful of the oft-stated presumption that a federal official will perform his duties in accord with the law, *see*,

*e.g.*, *Speros v. United States*, 8 Cl.Ct. 422, 425 (1985), we were left with the inescapable feeling that Mr. Bainbridge was attempting to make the resolution of this congressional reference as difficult as possible. In short, he left the court with the uncomfortable feeling that—he failed to testify to the best of his ability; he did not testify fully; he did not testify honestly; and he did not testify in good faith. In that connection, the court observed that he displayed a shocking disregard for the seriousness of the matters under consideration, such that the court felt obligated to admonish him twice on the record for his apparent indifferent attitude.

For example, Mr. Bainbridge was asked whether his superiors commended his performance in the handling of the Grave Creek Fire situation and in the execution of Modification # 5. He responded, as he had on many prior occasions, that he did not recall. The court inquired further into this area, and Mr. Bainbridge, smirking and grinning broadly, merely restated his initial response. As a consequence, the court was forced to admonish Mr. Bainbridge on the record, stating "It's not funny, sir. [This is] very serious." Tr. 421. Subsequently, Mr. Bainbridge was asked by counsel for plaintiff whether he discussed what the BLM would do if Spalding refused to sign Modification # 5. Mr. Bainbridge again exhibited the same cavalier demeanor despite having been previously admonished. This caused the court to state—"for the record, ... [Mr. Bainbridge has] continuously smiled when the Court asked [him] a question.... This is a very serious matter, Mr. Bainbridge, and [the Court] want[s] you to appreciate that.... [The Court] urge[s] you to take this matter quite seriously." Tr. 441. Given the totality of the foregoing circumstances, and our close observation of Mr. Bainbridge throughout the trial, we find that his testimony on the critical issues is not worthy of belief.

### B. *The Spalding Claims*

While all of the claims raised by Spalding are discussed below, as a preliminary matter, we think it to be appropriate, at this posture, to once more sum up the basic theories of the entire case. Spalding is merely seeking to recover the value of what it initially obtained in an above-board, arm's-length, bargained-for exchange, which the BLM subsequently induced it to surrender after the fire through inequitable and aggressive overreaching conduct. At the outset then, we are guided by the principle that " '[j]ust as men must turn square corners when they deal with the government,' ... so must government officials 'walk around the same block' when acting on the government's behalf." *deRochemont v. United States*, 23 Cl.Ct. 80, 84 (1991) (citations omitted). With this enlightening principle in mind, it is crystal clear to us that Spalding is entitled to appropriate equitable relief on every single one of the claims it has averred against the BLM.

#### 1. Mistake of Law

First, Spalding contends that it is entitled to equitable relief because of a critical mistake of law. In this respect, Spalding alleges that it mistakenly believed that the loss provisions in § 7 of the Jamison–Harris contract required or compelled it to sell the burned timber in Subsale A back to the BLM, and that the amount of consideration was limited to the original contract price. It argues that this interpretation and application of § 7 was erroneous because that provision applies only to *economic losses,* and the Grave Creek Fire did not generate any economic losses for either party. Necessarily then, Spalding concomitantly contends that it was mistaken as to the availability of other options for dealing with the aftermath of said fire.[12] Therefore, we must first examine the grounds for recommending recovery on the basis of a mistake of law, and then each of the two alleged mistakes of law averred in this case.

---

12. In this context, Spalding asserts that the BLM then knew—that other fair and equitable options were available; that it neglected to pursue them; and, most importantly, that it failed to inform Spalding that other alternatives were available. The thrust of this allegation is misrepresentation, and that aspect of the claim is discussed more thoroughly *infra.*

### a. *The Availability Of Equitable Relief For Mistakes Of Law*

In a strict juridical sense, relief for a mistake of law is exceedingly difficult to obtain. *See, e.g., C & L Construction Co. v. United States,* 6 Cl.Ct. 791, 798 (1985). The reason for this circumstance is that both parties are generally held to have knowledge of the laws and regulations affecting their business dealings. *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384–385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). This general rule applies in equity as well, where a mistake of law, pure and simple, is often viewed as an inadequate ground for recovery:

Where a party with knowledge of all the material facts, and without any other special circumstances giving rise to an equity in [its] behalf, enters into a transaction affecting [its] interests, rights, and liabilities, under ignorance or error with respect to the rules of law controlling the case, courts will not, in general, relieve him from the consequences of his mistake. The reasons are obvious. The administration of justice, the law itself as a practical system for the regulation of human conduct, require that some fundamental assumptions should be made as postulates. The most important, perhaps, of all these, is the assumption that all persons of sound and mature mind are presumed to know the law. If ignorance of the law were generally allowed to be pleaded, there could be no security in legal rights, no certainty in judicial investigations, no finality in litigations. While this general doctrine prevails in equity as well as at law, its operation is not there universal; it is subject to modifications and limitations; equity *does* sometimes exercise its jurisdiction on the occasion of mistakes of law. If the mistake of law is not pure and simple, but is induced or accompanied by other special facts giving rise to an independent equity on behalf of the mistaken person, such as inequitable conduct of the other party,

there can be no doubt that a court of equity will interpose its aid. Even when the mistake of law is pure and simple, equity *may* interfere. The difficulty is to ascertain any general criterion which shall determine and include all *such* cases.

2 J.N. Pomeroy, *Pomeroy's Equity Jurisprudence* § 842, pp. 1481–1483 (3rd ed. 1905) (emphasis in original) (footnotes omitted).

In attempting to determine the appropriate circumstances for relieving a mistake of law, this eminent scholar of equity goes on to state that, in the absence of fraud, concealment, misrepresentation, undue influence, or some other form of inequitable conduct, "[t]he rule is well settled that a simple mistake by a party as to the legal effect of an agreement which [it] executes, or as to the legal result of an act which [it] performs, is no ground for either defensive or affirmative relief." *Pomeroy* § 843, p. 1485. However, the rule is markedly different where the party understands the legal effect of the transaction, but makes a simple mistake of law because it misunderstood its legal rights at the time it executed the agreement. "[When a party] is ignorant or mistaken with respect to [its] own antecedent and existing private legal rights ... and enters into some transaction the legal scope and operation of which [it] correctly apprehends and understands, for the purpose of affecting such assumed rights ... equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact." *Pomeroy* § 849, p. 1498. Moreover, and most importantly for the purposes of this case, the reason most often cited for relieving a mistake of law is the existence of some inequitable or unconscionable conduct by the other party. In this context, relief is available at law "when affirmative government action is involved." *C & L Construction,* 6 Cl.Ct. at 797 (citation omitted).[13] Similarly, in *Merchants National*

---

**13.** *C & L Construction* involved a set of legal claims that included an alleged mutual mistake of law. In that case, the court concluded that relief was unwarranted on that basis, but it recognized that such relief may be available even in a traditional legal setting if the mistake of law was induced by affirmative government action. As examples of this principle, the court

*Bank of Mobile, supra,* the Claims Court recommended relief in a congressional reference proceeding for injuries that resulted from a mistake of law because the government induced the misunderstanding through inaccurate representations and economic coercion.

Equity is founded on principles of right, justice, and morality, and thus:

> Whatever be the effect of a mistake pure and simple, there is no doubt that equitable relief ... will be granted when the ignorance or misapprehension of a party concerning the legal effect of a transaction in which [it] engages, or concerning [its] own legal rights which are to be affected, is induced, procured, aided, or accompanied by [the] inequitable conduct of the other [party]. It is not necessary that such inequitable conduct should be intentionally misleading ...; it is enough that the misconception of the law was the result of, or even aided or accompanied by, incorrect or misleading statements, or acts of the other party. When the mistake of law is pure and simple, the balance held by justice hangs even; but when the error is accompanied by any inequitable conduct of the other party, it inclines in favor of the one who is mistaken. The scope and limitations of this doctrine may be summed up in the proposition that a misapprehension of the law by one party, of which the others are aware at the time of entering into the transaction, but which they do not rectify, is a sufficient ground for equitable relief. A court of equity will not permit one party to take advantage and enjoy the benefit of an ignorance of mistake of law by the other, which [it] knew of and did not correct....

*Pomeroy* § 847, p. 1492 (footnotes omitted).

cited *Blackhawk Hotels Co.,* ASBCA No. 13333, 68–2 BCA ¶ 7265 *overruled on other grounds in National Line Co.,* ASBCA No. 18739, 75–2 BCA ¶ 11,400; and Comp.Gen. B–180071, February 25, 1974, 74–1 CPD ¶ 101. In both of those cases, the government made representations to the contractor that certain laws, which would

### b. *Mistake of Law Concerning The Interpretation And Application of § 7*

Spalding alleges that it executed Modification # 5 because it was mistaken with respect to its antecedent legal rights under the Jamison–Harris contract following the Grave Creek Fire. In this regard, it asserts that the risk-of-loss provisions contained in § 7 of the Jamison–Harris contract were interpreted and applied incorrectly. That section states as follows:

> *Passage of Title and Risk of Loss*—Title to timber sold under this contract shall remain in Government and shall not pass to Purchaser until such timber has been paid for and removed from the contract area. Unless cut timber is sold under this contract, risk of loss shall be borne by Purchaser after the timber is cut; *Provided, however,* that if loss results from a fire which was not caused by Purchaser, his contractors, subcontractors, or the employees of any of them, the risk of loss shall be borne by the party holding title. If cut timber is sold under this contract, risk of loss shall be borne by the party holding title. Risk of loss to Government shall not exceed the value of such timber computed at the prices per unit for the species involved as set forth [in this contract]. Nothing herein shall be construed to relieve either party from liability for any breach of contract or any wrongful or negligent act. As used in this section, the term *cut timber* refers only to timber which has been felled, bucked, or otherwise severed by direct human activity prior to the date this contract was entered into.

Mr. Lawton, Assistant Regional Solicitor for the Pacific Northwest Lands and Minerals Division in the Department of the Interior, advised the BLM that the consequences of the Grave Creek Fire could be solved *only* through the application of this

have raised the cost of contract performance if they applied, were not pertinent to the contract in each case. These assurances were subsequently determined to be incorrect, costs increased, and the contracts were reformed in both cases based on a mutual mistake of law theory.

provision after he concluded that the Jamison–Harris contract could not be performed as originally contemplated because most of the blue paint markings were burned off of the "take" trees in Subsale A. Based on his impossibility-of-performance theory, Mr. Lawton informed the BLM that § 7 provided it with two options. On the one hand, it could either *unilaterally cancel all of Subsale A*, or, on the other, it could attempt to reach an amicable agreement with Spalding to re-purchase all or a portion of Subsale A. In addition, Mr. Lawton also informed the BLM that, under § 7, it could *not* pay more than the original contract bid price for any timber that it intended to buy back from Spalding, despite the known and undisputed fact that the market value of that timber was substantially higher by that time. The BLM subsequently embraced this interpretation as the bedrock legal authority for inducing Spalding to execute Modification # 5.

Spalding contends, however, that this interpretation of § 7 is grossly erroneous because § 7 applies only to an *economic loss*, not merely to the loss of the blue "take" tree markings. Stated differently, § 7 did not apply to the situation created by the Grave Creek Fire, Spalding avers, inasmuch as the value of the blackened trees in Subsale A was undiminished. Moreover, because the Grave Creek Fire did not cause an economic loss to either party, Spalding asserts that § 7 necessarily did not limit the price of any buy-back arrangement to the original contract amount. In essence then, Spalding seeks to reform the contract to require the payment by BLM of the profit it made regarding the burned timber in Subsale A because § 7 did *not* require it to sell said timber back to the BLM, nor did it limit the price of the buy-back to the Jamison–Harris original contract bid amount. Thus, the issue here is two-fold—first, what is the proper construction of § 7; and secondly, whether § 7 obligated Spalding to resell the burned timber in Subsale A back to the BLM at the *original contract bid price.*

The operative portion of § 7 of the contract provides that *title* shall remain in the government "until such timber has been paid for and removed from the contract area." Moreover, § 7 further provides that:

> ... if loss results from a fire ... the risk shall be borne by the party holding title.... Risk of loss to Government shall not exceed the value of such timber computed at the prices ... set forth [in the contract]....

There is no issue here as to who held title at the time of the fire inasmuch as it is indisputable that no timber had been cut or removed in Subsale A. The critical issue, as we see it, is simply whether the phrase "loss ... from a fire" primarily contemplates an economic loss and not the mere obliteration of the blue paint markings on the take trees, as BLM contends.

 The foregoing is nothing more than a simple matter of contract interpretation, and, following a review of a few basic rules of construction, we find that § 7 does not apply to the loss of the blue paint markings. To the contrary, we find that it clearly applies only to bona fide economic losses caused by fire. Consequently, we conclude that the BLM erroneously informed Spalding—first, that § 7 required it (Spalding) to re-sell the burned timber in Subsale A to the BLM, and secondly, that the maximum price of any buy-back the BLM could pay was limited by § 7 to the original contract bid amount. Because of said erroneous advice dispensed by the BLM regarding § 7, Spalding was, therefore, honestly mistaken with respect to its legal rights under the Jamison–Harris contract when it agreed to execute Modification # 5, a clear mistake of law regarding its legal rights that justifies equitable relief.[14]

The relevant rules of contract construction are simple and straightforward. "Words are to be given their plain and ordinary meanings." *Thanet Corp. v.*

---

14. We also find that this mistake as to its legal rights was affirmatively induced by the inequitable conduct of the BLM. However, we address that issue in the context of the Spalding misrepresentation claim, *infra.*

*United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979) (citations omitted). " 'We follow the established general rules that [the] provisions of a contract must be construed as to effectuate its spirit and purpose, that it must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions, and that an interpretation which gives a reasonable meaning to all parts will be preferred [over] one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' " *Julius Goldman's Egg City v. United States,* 697 F.2d 1051, 1057–1058 (Fed.Cir. 1983) (citations omitted).

After applying these principles of construction, as discussed more thoroughly below, we conclude that Spalding is correct in its contention that § 7 applies only to economic losses, and that it does not limit the price of buy-backs when there are no such economic losses for three reasons. First, the BLM interpretation of a "loss" under § 7 is contrary to the plain and ordinary meaning of that word. Secondly, the doctrine of *contra proferentum* forecloses the BLM interpretation. Thirdly, the BLM interpretation is, in our view, at odds with the spirit of the contract as a whole because it vitiates other express and implied obligations that it assumed under the Jamison–Harris contract. Indeed, we think that the BLM interpretation of § 7 is so unreasonable that it raises serious questions regarding the good faith conduct of the government. We now turn to a more detailed explication of each basis.

### 1). The Plain and Ordinary Meaning of the Word "Loss"

The meaning of the word "loss" is of critical importance in ascertaining the proper interpretation of § 7. Spalding contends that the term means economic losses only, while the defendant argues that it is broad enough to embrace the mere loss of the blue paint markings that distinguished the "take trees" in Subsale A from the "leave trees." Under the plain and ordinary meaning rule of contract interpretation, we agree with Spalding. While the meaning of the word "loss" is not capable of precise definition, the common threads that run through every definition nevertheless embrace an economic loss interpretation of § 7 and exclude the BLM construction. Two common definitions illustrate the point. *Webster's New Collegiate Dictionary* 681 (5th ed. 1977), states that a loss is a "decrease in amount, magnitude, or degree." Similarly, *Webster's Third New International Dictionary* 1338 (17th ed. 1976), describes a loss as "the state or fact of being destroyed or placed beyond recovery." Logically then, a loss generally refers to permanent damage that results in diminished size or value. In this context, we find that § 7 clearly refers to permanent damage to the subject matter of the contract resulting in diminished value, a definition that is synonymous with economic loss interpretation. To this extent, therefore, we agree with Spalding's construction.

### 2). The Doctrine of Contra Proferentum

To accept the BLM interpretation of § 7, we would first have to find that it is ambiguous enough to embrace that construction. However, even under these circumstances, we would be forced to construe that ambiguity against the BLM under the doctrine of *contra proferentum*. "Under the rule of *contra proferentum,* the contract is construed against its drafter if the interpretation advanced by the nondrafter is reasonable." *Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed.Cir.1988). "*Contra proferentum* applies when a contractor's reading of an ambiguous contract provision is reasonable in itself." *United States v. Turner Construction Co.,* 819 F.2d 283, 286 (Fed.Cir. 1987). The economic loss interpretation adopted by Spalding is in all respects rational and, in our view, it is the *only* reasonable interpretation that can be gleaned from that section.

Thus, there is no basis for excepting § 7 from the rule of *contra proferentum. See, e.g., American Bankers Life Assurance of Florida v. United States,* 12 Cl.Ct. 166, 173 (1987) (a contractor must seek to clarify perceived ambiguities prior to exe-

cuting the contract). In order to rise to the level of patent ambiguity, the alleged inconsistency must be blatant and significant, "not subtle, hidden or minor." *S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 130, 546 F.2d 367, 370 (1976). What constitutes a patent ambiguity "cannot be defined generally, but on an ad hoc basis of looking to what a reasonable man would find to be patent and glaring." *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 626, 427 F.2d 1233, 1244 (1970). We find that any ambiguity here is clearly latent and that Spalding's interpretation was thoroughly reasonable under all of the circumstances.

3). Construing The Contract As A Whole

When the parties executed the Jamison–Harris contract, the BLM assumed certain express and implied obligations. First, it expressly agreed to deliver approximately 11,206 MBF of timber in the Jamison–Harris Sale area, 4,045 MBF in Subsale A. Secondly, the BLM planned a partial cut for the Jamison–Harris Sale, and the ensuing contract stated that Spalding was allowed to cut only those trees marked with blue paint above and below stump height. Thus, it assumed an implied obligation to mark enough trees for cutting in the entire sale area, including Subsale A, in a good faith attempt to satisfy the volume requirements of the contract. Moreover, "[t]he obligation of good faith and fair dealing is a covenant which is implied in every contract.... Thus, the government has an ever present obligation to perform its duties under a contract reasonably and in good faith." *Asco–Falcon II Shipping Co. v. United States*, 18 Cl.Ct. 484, 491–492 (1989) (citations omitted).

The Grave Creek Fire did not in any way alter these continuing obligations. The BLM admitted at trial that it could have re-cruised and re-marked enough timber in Subsale A to satisfy the volume requirements of the Jamison–Harris contract. However, it unilaterally decided to ignore its obligation to mark that timber simply because it viewed this course of action as too time consuming. That is, the BLM wanted to harvest all of the timber burned by the fire in one fell swoop, and it did not think this could be accomplished in the desired time frame under the re-cruising and re-marking option. Thus, it discarded that alternative without any serious discussion or consideration of the rights that Spalding obtained under the contract. There is absolutely no credible evidence in the record establishing that the BLM made any serious attempt to provide Spalding with the full benefit of its bargain, either by re-marking enough timber for cutting or paying market value compensation for the timber that it bought back under Modification # 5. To the contrary, the record shows that the BLM consciously decided to recover the burned timber in Subsale A from Spalding at the lowest possible price and to its ultimate benefit. Thus, it adopted its absurd construction of § 7 to further facilitate that objective, contrary to its original contract obligations.

4). The Grave Creek Fire Did Not Result in a § 7 "Loss"

From the foregoing principles of construction, it is plainly evident that § 7 applied to economic losses, not the mere loss of blue paint markings distinguishing "take trees" from "leave trees." In this respect, therefore, it is undisputed, and in fact conceded, that less than 2% of the "take trees" in Subsale A were actually consumed by fire, thus there was very little physical destruction of contract subject matter. There is clearly no economic loss in Subsale A relating to the value of the "take trees" subject to the Jamison–Harris contract. Moreover, the BLM admitted that it could have re-cruised and re-marked enough trees in Subsale A to fulfill the volume requirements of the contract, thus there was no permanent damage. The BLM also admitted that the burned trees in Subsale A were fully merchantable, thus there was clearly no diminution in value.

The following exchange between the court and Mr. Bainbridge corroborates the foregoing, and not only the absence of an economic loss, but also the insupportable position of the BLM:

THE COURT: You knew that if [Spalding] had to replace the timber that they

resold ... to BLM [under the proposed modification] they would have to replace [that timber] at market price? You knew that was a distinct possibility and likelihood, did you not? Yes or no, sir.

MR. BAINBRIDGE: Yes.

\* \* \* \* \* \*

THE COURT: Did you ... know that after the execution of modification 5 that if Spalding had to go the day after out to the market to purchase 2,108,000 board feet of ... [timber] to replace that which ... was sold back to the BLM, they would have had to pay market, isn't that correct?

MR. BAINBRIDGE: That's correct the way you phrased that.

THE COURT: And had they purchased that same 2,108,000 under the ... Blackeye Salvage sale, they would have had to pay market, would they not, as did Boise Cascade?

MR. BAINBRIDGE: That's correct.

THE COURT: All right. And you knew, did you not, that when modification number 5 was executed that ... [the] BLM was getting something back that was of a greater value than that which was sold to Spalding? You knew that too, didn't you, sir?

MR. BAINBRIDGE: A general knowledge of that, yes, as prices were increasing in southern Oregon.

THE COURT: The answer is yes to my question, isn't it?

MR. BAINBRIDGE: That is correct.

\* \* \* \* \* \*

THE COURT: ... Given the fact that Spalding was required, under modification number 5, to resell 2,108,000 board feet of timber back to BLM at ... bid price, and given the fact that you've already testified that you knew that the market, the then market, value of that same timber exceeded the bid price, under what circumstance could BLM realize or experience a loss as a result of the fire relative to the Jamison–Harris overall transaction? Tell the Court how you can calculate or [how you can] factor through an economic loss to BLM? That escapes the Court.

MR. BAINBRIDGE: There are—*there was no loss to BLM.*

Tr. pp. 453–457 (emphasis added).

### c. *Mistake of Law Concerning Availability of Other Alternatives*

■ Spalding mistakenly believed that the BLM's interpretation of § 7 provided the *only* alternative for resolving the problems created by the Grave Creek Fire, and thus, it was necessarily mistaken, as a matter of law, about the availability of other options.[15] First of all, even if Spalding had unilaterally desired to sell the burned timber in Subsale A back to the BLM, there was no clause in the contract that required it to sell that timber back *at the original contract price.* Stated another way, because § 7 applied to economic losses only, Spalding had every right to insist on, and the BLM had a good faith obligation to pay, a price based on the fair market value for that timber.

In this connection, Spalding adduced the expert testimony of Mr. Wayne Gaskins, who was qualified in the areas of timber appraisal and evaluation, and also as an expert in restructuring timber sales impacted by natural catastrophes. Tr. 681–733. Mr. Gaskins identified at least four alternatives available to the BLM to resolve the problems caused by the fire. First, the BLM could have redrawn the boundaries of Subsale A to make sure that Spalding obtained all of the timber volume that it was entitled to receive under the Jamison–Harris contract. Secondly, after selling the burned timber in Subsale A to a third party, the BLM could have made an equitable payment to Spalding substantially equal to the actual gain realized from the resale of that timber. Thirdly, the BLM could have

---

15. Again, Spalding alleges that its mistake was the result of BLM's assurances that there were no other alternatives, and that charge is discussed in the context of the misrepresentation claim, *infra.*

used a comparable sale as a yardstick to measure the value of the burned timber in Subsale A. Fourth and lastly, Mr. Gaskins opined that, under applicable regulations, the BLM could have obtained authorization for a negotiated sale that would have allowed Spalding to harvest *all* of the burned timber in Subsale A in a scaled sale. Indeed, Spalding asserts that the BLM not only failed to explore any of these alternatives, but that it also misrepresented the availability of any option other than its own self-serving interpretation of § 7.

### 2. Misrepresentation

▆ The record evidence shows that, based on its interpretation of § 7, the BLM virtually insisted that Spalding had no alternative but to return the burned timber in Subsale A at the contract bid market price or face cancellation of either the whole of Subsale A or the entire Jamison–Harris contract.[16] However, because we have found that § 7 applied to economic losses only, and because it has no application here, it is plainly evident that the foregoing representation was incorrect as a matter of law. Spalding, on the other hand, claims—that the BLM could have entered into a negotiated scaled sale contract that would have allowed Spalding to harvest all of the burned timber in Subsale A; that this option would have been the most equitable for both parties; that the BLM was aware of this alternative; and that the BLM unilaterally decided to forego this option while at the same time convinc-

ing Spalding that it was not legally possible.

▆ These basic facts form the core of Spalding's misrepresentation claim. In this connection, Spalding must show (i) that the BLM made one or more erroneous representations; (ii) that these representations were material; (iii) that these representations induced the modification; (iv) that it had a legal right to rely on the BLM representations; and (v) that injury resulted from its reliance on those representations. *Edwards v. United States*, 19 Cl.Ct. 663, 670 (1990), *citing* 2 J. McBride & I. Wachtel, *Government Contracts*, § 13.30 (1989); and *Summit Timber Co. v. United States*, 230 Ct.Cl. 434, 445–446, 677 F.2d 852, 857 (1982). After analyzing the facts in this framework seriatim, we conclude that the BLM did indeed misrepresent the availability of a scaled sale, an alternative that certainly would have been more equitable for all concerned.

### a. The BLM Erroneously Represented The Availability of Other Viable Alternatives

As to this element, we must simply determine whether the BLM misrepresented the availability of the negotiated scaled sale option.[17] Following the fire, Spalding continuously expressed its desire to harvest the burned timber in Subsale A as previously purchased under the Jamison–Harris contract. In fact, this desire was so obvious that it was common knowledge in the BLM Medford District Office. Indeed,

---

**16.** Of course, a forced cancellation is hardly an option, and for that reason, this "ultimatum" is also at the center of the Spalding economic duress claim, *see infra.*

**17.** It is perhaps helpful to explain the distinction between a negotiated sale and a scaled sale. A negotiated sale describes a general method of contract procurement that authorizes procurements without formal advertising. Formal advertising, of course, requires the government to issue invitations for bids, open the bids publicly at a specified time, and award the contract to the responsible bidder whose bid conforms to the solicitation and whose bid will be most advantageous to the government. In contrast to this process, the government is not allowed to publicly disclose proposals in a negotiated procurement. Thus, in negotiation, discussions be-

tween the contractor and the government may take place after a proposal is submitted, and the contractor may revise or modify its proposal. Such discussions are strictly prohibited in formal advertising. Finally, procurement officials customarily have a greater degree of discretion in making an award in a negotiated procurement.

A scaled sale describes a method of measuring the timber volume in a given geographic timber sale area. Under this technique, the actual amount of timber in the area is measured after it is removed, thereby allowing the parties to reach a very accurate volume determination. The other method of measuring timber volume is through cruising. Under this technique, the parties base their timber volume calculations on a sampling of the trees in the area.

Spalding was willing, and in fact strongly aspired, to harvest *all* of the burned timber *in Subsale A* if possible, not just the timber therein that it originally purchased under the Jamison–Harris contract. Mr. Peckham expressed this preference to Mr. Bainbridge during their August 17, 1978 meeting, and the BLM actually knew from that time on that the scaled sale option was the alternative that Spalding preferred to pursue.

In fact, Messrs. Peckham and Bainbridge both agreed that this alternative would generate the most equitable results. On the one hand, Spalding would be allowed to remove all of the burned timber in Subsale A, paying fair market value only for the volume *in excess of* the amount it already purchased under the Jamison–Harris contract. On the other hand, a scaled sale would permit the BLM to remove all of the burned timber quickly, and at the same time, to obtain fair market value for that timber in excess of the previously contracted amount. Mr. Neville, a forester in the Rogue River Resource Area who reported to Mr. Bainbridge, also favored the scaled sale approach, but on August 18, 1978, Mr. Bainbridge called Mr. Peckham and advised him that the scaling option was not possible under the law. We will show, first, that this was an erroneous representation, and secondly, that Mr. Bainbridge knew it was an incorrect statement when he made it.

Generally, the BLM must publicly advertise all timber sales. In this regard, 43 C.F.R. § 5401.0–6(a) states, in part, as follows:

All sales other than those specified in § 5402.0–6 shall be made only after inviting competitive bids through publication and posting. . . .

Thus, only as a general rule, the BLM was prevented from entering into negotiated sales, such as would have been required to effectuate a scaled sale for the harvest of all the burned timber in Subsale A.[18] That is, under normal circumstances, the BLM would have been required to advertise the burned timber in Subsale A not already subject to the Jamison–Harris contract in a public sale in order to ensure adequate competition. Nevertheless, as indicated in the plain language of the regulation, there were exceptions to this rule. In this regard, 43 C.F.R. § 5402.0–6 states, in part, as follows:

(a) When it is determined by the authorized officer to be in the public interest, he may sell at not less than the appraised value, without advertising or calling for bids, timber where the contract is for the sale of less than 250 M board feet.

\* \* \* \* \* \*

(c) [N]egotiated sales with no limitations as to volume may be made if:

\* \* \* \* \* \*

(2) The contract is for the disposal of property for which it is impractical to obtain competition.

Thus, under this regulation, an authorized officer may enter into negotiations to dispose of more than 250 MBF of timber without public advertising and without calling for bids. There are only two prerequisites to the exercise of this discretionary authority: first, the timber cannot be sold for anything less than its appraised value; and secondly, a negotiated sale must be in the public interest because it is impractical to obtain competition. Of course, the next question is—whether the substantive exceptions in this regulation apply to the facts of this case. The answer is clearly yes.

A negotiated scaled sale in excess of the 250 MBF would clearly have been in the public interest because the timber in excess of the contract amount could have been

---

**18.** The regulations at issue here, *see infra,* do not in any way prohibit the use of scaled sale contracts as the method for measuring the amount of timber volume in a given area. To the contrary, those regulations relate only to the method of *procurement,* not volume measurement. That is, the regulations here limit the use of the negotiated sale procurement method when the volume of timber in question, as measured by *either* scaling or cruising, is in excess of 250 MBF. Therefore, the use of a scaled sale contract here would have been problematic only because that option necessarily contemplated a negotiated procurement that would have exceeded 250 MBF volume limitation on negotiated procurements by a wide margin.

harvested expeditiously, and sold at fair market value. Indeed, the evidence in this case shows that these were the primary goals of the BLM. On the other hand, competition through a publicly-advertised sale would have been impractical because of the conflict between the rights to timber previously sold to Spalding under the Jamison–Harris contract and those that would have to be granted to the purchaser in any new sale. That is to say, competition was impractical so long as Spalding retained its legal right to harvest 4,045 MBF of timber in Subsale A, in which circumstance the BLM could obtain competition and a resulting sale only by convincing Spalding to release its legal claims in some of that same timber. This was precisely what the BLM intended to, and did, accomplish through Modification # 5. Thus, these concerns would have certainly warranted the use of an objective negotiated scaled sale here, and would have amicably resolved the problems generated by the fire.

Indeed, the BLM now has a policy which permits it to add unlimited timber volume to existing sales, such as here, when the area is overrun by fire:

The [policy is] designed to expedite the salvage of fire-damaged timber.... Our objective is to have salvage operations begin as soon as possible....

&ast; &ast; &ast; &ast; &ast; &ast;

In existing sales, negotiate an unlimited volume when an existing sale having identifiable boundaries has been overrun by fire. Competitive interest in such a situation cannot be obtained because of the conflict between the existing sale and any new sale of adjoining fire-damaged timber. The public's interest is best served by the early harvest of fire-damaged timber; therefore, any amount of additional timber up to the amount necessary to create logical harvest units may be added to existing contracts through bilateral modification. A justification memorandum for making the negotiated sale must be included in the contract file. This does not necessarily mean *all* contiguous fire-damaged timber must be added to the original sale via modification. Where a logical separate unit of fire salvage can be obtained with logical boundaries, this may and often should be advertised as a new salvage sale.

PX # 22, pp. 1, 4–5.

This policy is obviously nothing more than an explanation of the regulatory exceptions in 43 C.F.R. § 5402.0–6, and its application in situations involving fire damage. It seems plainly evident that, had this policy been in effect at the time of the Grave Creek Fire, the BLM would have been required to execute a negotiated sale allowing Spalding to harvest all of the burned timber in Subsale A. The loss of blue paint markings obliterated by the fire is a situation that is analogous to the loss of the geographic boundaries that are similarly overrun by fire. Blue paint markings are used to distinguish "take trees" from "leave trees" in a partial cut, while tract or area markings are used to identify the boundaries of a clear cut. Thus, the loss of one is no different than the loss of the other; they both make it difficult to identify those trees designated for cutting because of a fire in the area. While such markings can be re-constructed, it is easier, more expeditious, and in the public interest to negotiate a sale for the immediate harvest of all burned timber in the area.

From the foregoing discussion, we are constrained to conclude that the negotiated scaled sale option was not impossible under the then existing applicable regulations. Equally important, the evidence shows that the BLM knew that there were no such impediments at the time Spalding was misinformed that a negotiated scaled sale was not legally viable. The evidence shows that following his meeting with Mr. Peckham on August 17, 1978, Mr. Bainbridge called the Oregon State Office to discuss the scaled sale option. At that point, Mr. Bainbridge apparently learned of the 250 MBF limit for negotiated sales, and the requisites for waiving this restriction; however, the Oregon State Office instructed Mr. Bainbridge that it would take too long to obtain approval from the authorized officer. While the defendant did not offer any evidence to establish who the authorized

officer was, it nevertheless maintained that this authority was in the hands of the BLM Director in Washington, D.C. Mr. Bainbridge and the Oregon State Office determined that it would take between four and six months to obtain this authorization.

These findings are supported by the testimony of Mr. Neville, who stated that Mr. Bainbridge informed him that no attempt would be made to obtain the necessary authorization because of the length of time involved. In short, the inference is inescapable that the BLM determined that it was not worth the effort to it to obtain appropriate authorization. Therefore, when he instructed Mr. Peckham that a scaled sale was impossible, Mr. Bainbridge made a knowing misrepresentation of the legal options available to Spalding. The BLM thought that it would be quicker [19] to negotiate a modification to the Jamison–Harris contract, so it embarked on a course of action designed to pry the burned timber away from Spalding in Subsale A at a ridiculously low price on the basis of an absurd interpretation of § 7 in the Jamison–Harris contract.

### b. *These Material Misrepresentations Induced The Modification*

■ That Spalding has established the existence of the second and third elements for a misrepresentation claim can hardly be disputed. The evidence clearly shows that Spalding wished, at the very least, to retain the timber it originally purchased in Subsale A. The BLM, however, assured Spalding that this was not an option notwithstanding its binding contract. Spalding also desired to harvest all of the burned timber in Subsale A (in excess of the previously contracted amount) under a negotiated scaled sale approach, and the BLM again represented that this was not possible. Both of these representations were inaccurate. Based on its convoluted interpretation of § 7, the BLM told Spalding that it could either agree to sell all of the burned timber in Subsale A back to the BLM at the initial contract *bid price* or

that all or part of the contract would be cancelled. Thus, Spalding was lead to believe to its detriment that it had only one true, but essentially unpalatable, option, namely, to sell the burned timber in Subsale A back to the BLM at bid price or lose all of the 11,206 MBF of timber in the Jamison–Harris Sale. In sum then, we find that the BLM made unconscionable misrepresentations concerning the available options, and in turn unfairly induced Spalding into executing the modification.

### c. *Spalding Reasonably Relied On These Misrepresentations*

■ We must next determine whether Spalding had a right to rely on the BLM misrepresentations, which, after all, were misrepresentations of law. Of course, it is well established that it is exceedingly difficult to obtain relief on a misrepresentation theory when the alleged misrepresentation concerns the proper interpretation of the law. *See, e.g., Mills v. United States,* 187 Ct.Cl. 696, 410 F.2d 1255 (1969); *Sanders–Midwest, Inc. v. United States,* 15 Cl.Ct. 345, 350 (1988). This is true because those dealing with the federal government do so at their own peril, and are presumed to know the law. *Federal Crop Insurance Co. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). The reasoning behind this rule is that both parties have equal access to published statutes and regulations, and are equally able to ascertain the meaning of those statutes and regulations for themselves.

However, while this well-established principle of government contract law "is an effective and salutary shield against legal claims, it is and should be less of a shield against an equitable claim in a proper case." *Merchants National Bank,* 7 Cl.Ct. at 9. This is particularly true here—in this "proper case." *See Pomeroy* § 847, p. 1492, quoted *supra.* In this connection, we find the facts of the case at bar remarkably similar to those in *Merchants National*

---

19. Although it was perceived that four to six months was too long to obtain authorization from Washington, D.C. to effect the scaled sale, the fact is indisputable that the BLM did not effect the Black Eye Salvage Sale until more than six months after the Grave Creek Fire was extinguished.

*Bank.* The plaintiff in that case was bank-rolling a government contractor for the Department of Defense. The contractor received a large award to manufacture ready-to-eat meals for the Army, and expected the contract payments to provide sufficient operating capital for the project. However, the contractor's plan turned out to be overly optimistic in that its performance was in part dependent on the delivery of certain materials from the government, which was not timely in performing those obligations. As a consequence, the contractor was saddled with enormous inventory and other operating expenses that it could not afford to carry without additional financing, and thus it turned to the plaintiff for a loan to cover its operating expenses until the contract could be completed.

The loan that the contractor requested was substantially beyond its previous credit limit, and the plaintiff was understandably reluctant to extend that credit. The government intervened, however, and persuaded the plaintiff to make the loan by assuring it that the government would guarantee them. The plaintiff eventually made the loans on the basis of these assurances, but was subsequently left in an untenable position when the government reversed its position and informed the plaintiff that its agents did not have the proper authority to guarantee the loan in the first place. The government then assured the plaintiff that this authority problem could and would be remedied, and further assured it that the government would back the plaintiff on its subsequent loan guarantee application if the plaintiff continued to finance the contractor. The plaintiff did so, and to its chagrin, the government again refused to guarantee the loan. The contractor subsequently defaulted, and the plaintiff, as a result of the previous assurances it received from the government to make additional loans to the contractor

when it would not otherwise have done so, was left holding the bag for $809,609.

After a bill for private relief was referred to the Claims Court, the government argued, in part, that the plaintiff had no right to rely on the assurances from the Defense Department because it was up to the plaintiff to determine, as a matter of law, whether those agents were acting within their authority. The congressional reference panel rejected this argument, concluding that this circumstance, which amounts to a mistake of law, did not preclude relief because the plaintiff acted reasonably in relying on the assurances it received from the government. While the plaintiff did not have a claim cognizable in a court of law, the wrongful conduct by the government warranted a recommendation for full equitable relief.

██ Similarly then, we find that relief is not foreclosed here. In an equitable sense, at least, Spalding had every right to rely on the representations by the BLM, and it did so reasonably and in good faith.[20] Spalding never had occasion to retain a lawyer in more than 40 years of dealing with the BLM on federal timber contract matters. Against this background, Spalding relied on the BLM throughout this period without reservation because of the good working relationship that they developed. Spalding believed that, because the BLM was charged with the duty of administering federal timber contracts in accord with applicable law, it was in a better position than was Spalding to ascertain the legal limits of its authority. Thus, Spalding never found any previous need to retain counsel because, prior to the Grave Creek Fire, it had always been able to work out amicable settlements with the BLM. In addition, as its major supplier, and as the primary timber sale supplier in the area, the BLM wielded extraordinary, if not life and death, influence. Spalding never doubted the accuracy or veracity of BLM representations, and thus, relied on such representa-

**20.** While the defendant has not directly raised the issue, it seems to suggest that Spalding was negligent in relying on the BLM. Where the plaintiff is as much at fault as the government, there may be no grounds for equitable relief.

*O'Donnell v. United States,* 166 Ct.Cl. 107, 118–119 (1964). This is not the case here, as we find that Spalding reasonably relied on the representations of law by the BLM.

tions that § 7 provided the only solution. We conclude, on these facts, that this reliance was warranted, and that it was entirely reasonable and justifiable under the totality of the circumstances.

### d. *Spalding Was Injured By Its Reliance On BLM's Misrepresentations*

■ The BLM assured Spalding that there were no other alternatives, and that § 7 required it to return the previously sold burned timber in Subsale A at *the original contract bid price*. On the basis of this representation, Spalding agreed to sign Modification # 5, even though it is undisputed and admitted that the value of said timber was then substantially higher than the amount that the BLM agreed to pay. By that modification, 2,108 MBF of timber was deleted from the Jamison–Harris contract. Thus, not only did Spalding lose the right to harvest the timber to which it was entitled under the contract, but it also lost without just compensation the significant appreciation in said timber occurring between the date of the purchase (February 23, 1977) and the date of the fire (August 9, 1978). We find, therefore, that Spalding was injured as a result of its reliance on the BLM assertion that § 7 provided the only viable alternative, and its representation that a negotiated sale was impossible under applicable law. The full extent of the injury is illustrated, *infra*, under the "Damages" section.

### 3. Economic Duress

■ With an argument closely related to the misrepresentation claim, Spalding next asserts that the BLM improperly coerced it to execute the modification subject to the pains of cancelling the entire Jamison–Harris contract if it refused to agree to return the burned timber in Subsale A at the original contract bid price. Given these circumstances, the issue here is—whether Spalding signed Modification # 5 under economic duress as a result of threatened coercive acts by the BLM. In order to establish actionable duress, at least under traditional legal principles, Spalding must show (i) that it involuntarily

accepted the terms put to it by the BLM; (ii) that it had no alternative under the circumstances; and (iii) that the situation was the result of coercive acts by the BLM. *Louisiana–Pacific Corp. v. United States,* 228 Ct.Cl. 363, 367, 656 F.2d 650, 652 (1981), *citing Fruhauf S.W. Garment Co. v. United States,* 126 Ct.Cl. 51, 111 F.Supp. 945 (1953). We observe at the outset that economic pressure does not constitute illegal duress unless there are no reasonable alternatives to the proposed modification. *David Nassif Assoc. v. United States,* 226 Ct.Cl. 372, 385, 644 F.2d 4, 12 (1981).

> Economic pressure and "even the threat of considerable financial loss" are not duress. . . . "Economic duress may not be implied merely from the making of a hard bargain." . . . The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions. . . . "Some wrongful conduct must be shown, to shift to defendant the responsibility for bargains made by plaintiff under the stress of financial necessity."

*Johnson, Drake & Piper, Inc., et al. v. United States,* 209 Ct.Cl. 313, 321–322, 531 F.2d 1037, 1042–1043 (1976) (citations omitted).

■ In spite of this rigorous burden, we think it is clear beyond cavil that plaintiff can make a case for economic duress on the facts here. Sometime after repudiating the negotiated scaled sale approach, Mr. Bainbridge told Mr. Peckham that § 7 provided the only method for solving the problems created by the Grave Creek Fire. According to Mr. Peckham, he was advised that Spalding would have to re-sell the burned timber back to the BLM at bid price, otherwise the entire Jamison–Harris contract would be cancelled. Corroborative of the foregoing, Mr. Neville testified that within two weeks after the fire was extinguished, he recalled a conversation in which Mr. Bainbridge discussed the possibility that the BLM could and would cancel the *entire* Jamison–Harris contract if Spalding refused to surrender the burned timber in Subsale A. Of course, having a choice between returning the burned por-

tion of Subsale A at the bid price, on the one hand, and the cancellation of the *entire* contract on the other, is no real choice at all.

In other words, by this threatened action of the BLM, Spalding was placed in an untenable position. Euphemistically speaking, it was between a rock and a hard place. This is evident because Spalding required 34,000 MBF of timber annually to supply its milling operations, and the 11,206 MBF supplied by the Jamison–Harris contract constituted one-third of its annual requirement. Timber prices were substantially higher following the fire, and thus Spalding would incur a great deal of additional expense if it were forced to go into the market to purchase 11,206 MBF of replacement timber. Moreover, Spalding scheduled the timber in the Jamison–Harris Sale for harvest in the 1978 and 1979 logging seasons, and prior to the fire had incurred substantial time and expense in making provision for such activities. In view of these adverse circumstances, Spalding grudgingly agreed to sign Modification #5 because otherwise it would have incurred a substantial loss upon replacing *all* of the timber volume (11,206 MBF) in the Jamison–Harris Sale in an inflated timber market. And, moreover, there would probably have been a delay cost factor stemming from the requirement to go to the market for replacement timber.

All of these adverse facts point to a valid claim by Spalding for economic duress. Here, Modification #5 was not the result of hard arm's-length bargaining, but rather, it was the result of an unconscionable ultimatum that left Spalding with little, if any, choice in view of the BLM's failure and refusal to comply in good faith with then existing contract obligations. Thus, Spalding agreed to the modification because it felt that that was the only real alternative available. Spalding simply could not afford to stand its ground and sue for breach, nor could it afford to go into the open market in view of the substantial price increases for replacement timber. Going into the market place would have left its mill idle for some significant period of time, and to then sue would have

taken an extraordinary amount of time as well as substantial resources. All of these indicia of duress exacerbate the overall circumstances when we consider the reprehensible conduct of the BLM. It misrepresented the availability of the scaled sale option. It insisted that its absurd interpretation of § 7 provided the only solution. It assured Spalding that there were no other options other than the resale of the burned timber in Subsale A to the BLM. It assured Spalding that § 7 made it impossible to negotiate a price for that timber beyond the bid amount, and at that time it admittedly knew that timber prices had risen. It threatened to cancel the entire Jamison–Harris sale, which again was a misrepresentation of its legal authority. On this indisputable evidence, the BLM must, therefore, bear responsibility for the choice that Spalding was forced to make under the stress of financial necessity because the situation was created by its knowing wrongful conduct. For all of these reasons, we find that Spalding has established a claim of economic duress.

### 4. Unjust Enrichment

Also, Spalding claims that it is entitled to relief because the defendant was unjustly enriched when it induced and coerced it (Spalding) to sell the burned timber in Subsale A back to the BLM at the original contract price, which same timber was resold to Boise Cascade for an amount substantially in excess of plaintiff's bid price, *infra*. "A claim based upon unjust enrichment is derived from notions of fairness...." *Penn Towne Builders, Inc. v. United States*, 4 Cl.Ct. 677, 681 (1984) (citation omitted). Some courts have equated it with a *quantum meruit* theory, stating that "the claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider." *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3rd Cir.1987) (citation omitted). "[T]here may exist a right to restitution [based on a theory of unjust enrichment] where money

has been paid by mistake, where a [party] has conferred benefits other than money, or where benefits have been conferred under a mistake of law." 66 Am.Jur.2d, § 13, pp. 956–957 (1973) (footnotes omitted). Naturally, unjust enrichment is particularly appropriate where there is an element of fraud, coercion, economic duress, or undue influence. 66 Am.Jur.2d § 14, pp. 957–958 (1973). Based on similar reasoning, the predecessor Court of Claims recommended compensation in a congressional reference context where the federal government obtained benefits through misleading representations and overreaching conduct by its agents. *Gay Street Corp. v. United States*, 130 Ct.Cl. 341, 127 F.Supp. 585 (1955), *cited with approval in Paul v. United States*, 20 Cl.Ct. 236, 268–269 (1990).

Here it is clear that the BLM wrongfully secured a substantial monetary benefit, and that it would be unconscionable for the BLM to retain that benefit without providing appropriate compensation. Reduced to its simplest form, the record shows that Spalding essentially agreed to sign the modification for three reasons. First, based upon a series of representations by Mr. Bainbridge and others, it mistakenly believed that the BLM's interpretation required it to re-sell the burned timber back to the defendant, and to do so at the original contract bid price. Secondly, the BLM mislead Spalding into believing that there were no other alternatives that would have allowed Spalding to retain the burned timber, or to sell said timber at fair market value. Thirdly, the BLM induced Spalding into executing the modification by threatening to cancel *all* of the Jamison–Harris Sale. Obviously, there was a benefit conferred on the BLM, and on these grounds, we conclude that Spalding has adequately established that the BLM was unjustly enriched as a result of its unconscionable conduct.

5. Overreaching Conduct

At this posture, given the aggregate findings made, it is redundant to say that the BLM engaged in overreaching con-

duct. Certainly one can reasonably conclude that the misrepresentation, economic duress, and unjust enrichment in the aggregate constitute overreaching conduct by the BLM. We are convinced that the BLM took unfair advantage of Spalding, so much so that its behavior raises grave questions of propriety. Sometime following the Grave Creek Fire, the BLM realized that it could have obtained authorization for a negotiated scaled sale with Spalding for all of the burned timber in Subsale A. It, nevertheless, unilaterally decided not to pursue that approach because it thought that that would take too long to obtain, and further, because it wanted to harvest all of the burned timber and not just the burned timber in Subsale A of the Jamison–Harris Sale. Not only did the BLM decline to pursue that approval, but it pointedly told Spalding that such was legally impossible. It was thereafter that the BLM proffered its absurd interpretation of § 7, and advised Spalding that it had to sell the burned timber back to the BLM at bid price in spite of its increased value.

To exacerbate matters, as well as to make sure that Spalding did not refuse to sign the contract modification to its benefit, the BLM made known that it had the right to cancel, and that it would cancel, the entire contract if Spalding did not agree to the proposed modification. All this time the BLM was aware—that Spalding wanted to retain the timber; that Spalding wanted to harvest all of the burned timber if possible; that Spalding was willing to pay fair market value for the additional timber over the previously contracted MBF; and that the fair market value of the timber in Subsale A had a much higher value than on the day that Spalding purchased it. In addition, the BLM was aware that Spalding was not represented by counsel, and that Spalding relied heavily on its advice. Based on all of these facts, it is clear, and we are convinced, that the BLM's conduct was so overreaching that it did indeed border on bad faith. As the Court of Appeals for the Federal Circuit stated not too long ago in somewhat similar circumstances, "To say to [plaintiff], 'The joke is on you. You

shouldn't have trusted us,' is hardly worthy of our great government." *Maxima Corp. v. United States,* 847 F.2d 1549, 1556 (Fed. Cir.1988) (citations omitted). Thus, because we have determined that Spalding has met its burden of proof with respect to its mistake of law, misrepresentation, economic duress, unjust enrichment, and overreaching claims, we conclude that equitable relief is warranted in this case in the absence of a valid defense. *See infra.*

### C. *The Affirmative Defenses*

In addition to contesting the merits of the Spalding demands, the defendant raised a plethora of affirmative defenses. It alleges that all of the Spalding claims are barred by one or all of the following defenses—to wit, the statute of limitations, laches, accord and satisfaction, waiver, estoppel and offset. The defendant, of course, bears the burden of proving that one or more of these affirmative defenses bars relief.

### 1. The Statute Of Limitations

Spalding executed Modification # 5 on December 12, 1978, and did not file its complaint here until March 10, 1987. Predictably, the defendant points to this eight-year gap and alleges that all of the Spalding claims are barred by the six-year statute of limitations contained in 28 U.S.C. § 2501. That section states that:

> Every claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

In response, Spalding argues that the six-year statute of limitations has no application to this case because the Jamison–Harris contract falls within the purview of the Contract Disputes Act (CDA). In that regard, Spalding contends that it could still elect to file a claim with the contracting officer under 41 U.S.C. § 605, and that it would have 12 months to file suit in the Claims Court following its receipt of a decision by the contracting officer under 41 U.S.C. § 609(a)(3). *See Pathman Construction Co., Inc. v. United States,* 817

F.2d 1573, 1580 (Fed.Cir.1987) ("the [twelve month] limitations period for filing suit [in the Claims Court under 41 U.S.C. § 609(a)(3) ] does not begin to run until the contracting officer renders a decision on the claim and the contractor has received the decision"). Of course, Spalding has never filed a claim with the contracting officer under the CDA because it believed that legal action would be fruitless in view of the apparent accord and satisfaction in Modification # 5. Thus, it has never obtained any decision from the contracting officer, and therefore insists that its legal claims are not time barred under the CDA.

Consequently, we must first determine whether claims on the Jamison–Harris contract are governed by the statute of limitations in 28 U.S.C. § 2501 or 41 U.S.C. § 609(a)(3), and secondly, whether the applicable standard operates to bar any of the claims asserted here. With respect to the first issue, it is now well established that, if a contract is cognizable under the CDA, the general six-year statute contained in 28 U.S.C. § 2501 has no application whatsoever. *Pathman,* 817 F.2d at 1580; *La Coste v. United States,* 9 Cl.Ct. 313, 315 (1986); *Kasler/Continental Heller/Fruin Colnon v. United States,* 9 Cl. Ct. 187, 189–190 (1985); *Z.A.N. Co. v. United States,* 6 Cl.Ct. 298, 303 (1984). The CDA was enacted on November 1, 1978, and became effective on March 1, 1979. With respect to the effective date, the notes following 41 U.S.C. § 601 explain that "[n]otwithstanding any provision in a contract made before the effective date of this Act, *the contractor may elect to proceed under this Act with respect to any claim ... initiated thereafter*" (emphasis added). Here, the Jamison–Harris contract was executed on February 23, 1977, and Spalding was in the course of performance when the CDA became effective on March 1, 1979. Thus, we conclude that the Jamison–Harris contract was, and still is, cognizable under the CDA; and it would still have the option of electing to proceed under its provisions. Consequently, the 12–month statute of limitations in 41 U.S.C. § 609(a)(3) would apply if Spalding ever

filed a legal claim with the contracting officer. No claims have been filed, however, and we, therefore, conclude that the Spalding claims here are not barred by any statute of limitations.

### 2. Laches

■ The defendant next alleges that the Spalding claims are barred by laches, which is an equitable defense that forecloses a party from prosecuting stale claims. To succeed, the burden is on the BLM to show (i) that Spalding delayed in pursuing its claim, (ii) that the delay was both unreasonable and inexcusable, and (iii) that the delay resulted in prejudice to the defendant. *Muse v. United States*, 13 Cl. Ct. 372, 378 (1987), *citing Brundage v. United States*, 205 Ct.Cl. 502, 505, 504 F.2d 1382, 1384 (1974), and *Pepper v. United States*, 8 Cl.Ct. 666, 672 (1985), *aff'd*, 794 F.2d 1571 (Fed.Cir.1986). If the BLM falls short in its burden on any one of these three elements, the defense of laches fails. *Muse*, 13 Cl.Ct. at 378. Pursuant to this standard, the BLM asserts that the claims here in issue accrued on December 28, 1978, the day after Spalding executed the modification, and that its claims should be barred because a complaint was not filed in the Claims Court until March 10, 1987, more than eight years later. Not surprisingly, it contends that this delay was unreasonable, inexcusable, and that it was severely prejudiced because pertinent evidence was lost, memories have faded, and certain BLM employees have retired from service.

■ After analyzing the facts, *infra*, we find that the defendant has failed to establish any of the three obligatory elements to support a laches defense. First, Spalding did not delay in pursuing any legal claims. We have no doubt that Spalding would have filed a legal claim in this court pursuant to 28 U.S.C. § 1491 if not for the apparent insurmountable legal hurdles created by Modification # 5,[21] which in

turn was the result of abominable conduct by the BLM. Thus, it had no choice but to pursue time-consuming legislative relief, on the advice of its counsel, which it did within two years after the execution of the modification by contacting Senator Robert Packwood in the fall of 1980.

Secondly, under the overall circumstances, the passage of time here was neither unreasonable nor inexcusable. It is common knowledge in the legal area, at least, that the legislative process is slow and deliberate. The record clearly shows that, as detailed chronologically in Appendix C, Spalding laboriously pursued its claims following its initial contact with Senator Packwood. In view of the overwhelming evidence in the record indicating that Spalding pursued its legislative claims with diligence and vigor, we think it would be most inappropriate to deny relief on a laches theory, particularly in view of the unconscionable conduct of the BLM. In other words, we find, on the peculiar facts at bar, that the laches period was tolled on the day that Spalding first contacted Senator Packwood in the fall of 1980, and continued so long as it pursued private relief legislation with reasonable dispatch as was the case here. After Spalding's initial contact with Senator Packwood, it was *directed* to exhaust all available administrative avenues of relief with the BLM and the Department of the Interior before his office would consider proposing private legislation.

Thus, Spalding had no choice but to pursue its claim with the agency, a situation identical in all material respects to a mandatory administrative remedy. Pursuant to the foregoing directive, Spalding did as it was told. It contacted the Department of Interior on November 3, 1981, and subsequently provided Under Secretary Donald P. Hodel with a written summary of its position and claims on March 15, 1982. Spalding then had a meeting with the Director of the BLM on August 4, 1982, followed by further written communication on October 8, 1982. The BLM subsequently

---

**21.** Clearly, Modification # 5 was justifiably perceived as an efficacious accord and satisfaction. *See, e.g., Brock & Blevins Co., Inc. v. United States,* 170 Ct.Cl. at 58–59, 343 F.2d at 955.

Spalding's officer believed this to be true and, moreover, this position was later confirmed by their outside attorneys.

denied the Spalding claims on December 13, 1982, after which Spalding resumed its legislative efforts on January 28, 1983, this time with the assistance of Senator Mark Hatfield.

Between January of 1983 and January of 1984, Spalding continued to pursue legislative relief in a diligent manner under the circumstances. It drafted proposed relief legislation, which was subject to frequent review and comment by staff members with Senator Hatfield and with the Senate Judiciary Committee. Finally, in January of 1984, Senator Hatfield introduced S. 2208, a bill for the relief of Spalding and Son, which was promptly referred to the Senate Judiciary Committee for consideration. From this day forward, Spalding had no control *whatsoever* over the time involved in the pursuit of relief through the legislative process. Indeed, the evidence shows that Spalding provided all possible assistance, and that it repeatedly inquired on the progress of the bill. In fact, the record shows that a good part of the time that passed in this case, beginning on February 3, 1984, when the matter was initially referred to the Department of the Interior's Office of Legislative Policy, and concluding on August 5, 1985, when the Office of Legislative Policy informed the Senate Judiciary Committee of its opposition to any relief for Spalding, was due to dilatory actions by the Department of the Interior and the BLM. This is so because the matter was referred to the BLM for its views in February of 1984, apprising it of the fact that Spalding was seeking legislative relief.

However, even after the BLM filed its report with the Office of Legislative Policy on April 17, 1984, no further action was taken before the 98th Congress adjourned. There was no further activity until January of 1985, when the Office of Legislative Policy was advised that a new bill was going to be introduced as soon as the 99th Congress commenced. Subsequently, the report that was *requested by the Senate Judiciary Committee* no later than the end of February, 1984, *was not furnished by the Department of the Interior until August 5, 1985.* The Senate did not act on the bill until October 8, 1986, when it finally referred the matter to the Claims Court for consideration. The reference was docketed in the Claims Court on December 10, 1986, and Spalding filed a timely complaint on March 10, 1987.

We are satisfied that these facts and the reasonable inferences deducible therefrom clearly show that Spalding pursued its administrative claims, given the nuances involved, with the utmost diligence, and in fact, exhibited an extraordinary amount of perseverance in the process. It was aggressively opposed every step of the way by the Department of the Interior in general and the BLM in particular. The BLM learned that Spalding was seeking legislative relief no later than April 8, 1982, and from that time forward there was no basis whatsoever for it to assume that Spalding abandoned its efforts. As Spalding aptly notes, the very essence of the congressional reference procedure is equitable in nature, and it would be inequitable to deny compensation because of laches based on the amount of time involved in the administrative and legislative processes.

Finally, we do not believe that the lapse of time between the execution of Modification # 5 in December of 1978 and the filing of the complaint in March of 1987 resulted in any prejudice to the defendant. While the BLM contends that it was prejudiced by the loss of relevant evidence, the retirement of crucial employees with knowledge of the facts, and by the faded memories of other BLM employees, we find that these problems were primarily the result of its own dilatory conduct and failure to preserve relevant evidence. That is to say, to the extent the defendant was prejudiced, it was not caused by or the result of any actions by Spalding. In this regard, we observe that the BLM never made any attempt to interview those employees with first-hand knowledge after it was first contacted about this matter in the spring of 1982. Similarly, it failed to make any effort to contact those same employees when it was contacted again in the early spring of 1984. The matter was further compounded by the fact that, even after Spalding filed its complaint in the Claims Court,

the BLM made no immediate efforts to contact the key witnesses in this case. Similarly, it failed to make any immediate attempts to preserve relevant documentary evidence for the ensuing litigation. These facts lead us to conclude that any prejudice that may have resulted here was not caused by Spalding, and as such, it would be inequitable to charge it with responsibility for certain events for which the defendant is to blame.

In summary then, we find no merit in the laches defense. We find that Spalding tolled the laches period within two years after it executed Modification # 5 by initiating the process for legislative relief through the office of Senator Packwood. Thus, it did not unreasonably delay in pursuing its claim. In this context, we further find that the laches period was tolled up through the time that Spalding filed its complaint in this court on March 10, 1987. With respect to the second laches element, Spalding exhausted its quasi-mandatory administrative remedies and pursued its legislative relief with appropriate diligence. Thus, the eight-year delay between the execution of Modification # 5 and the filing of the complaint was *neither* inexcusable nor unreasonable. Finally, we find that, to the extent the defendant was prejudiced as a result of this passage of time, it was more than a substantial contributing factor.

### 3. Accord And Satisfaction

 The BLM alleges next that the Spalding claims are barred by the doctrine of accord and satisfaction, which operates to extinguish, discharge, or terminate an existing right. *King Fisher Marine Service, Inc. v. United States*, 16 Cl.Ct. 231, 236 (1989) (citation omitted). As the phrase indicates, there must be evidence of both an accord and satisfaction in order to bar a legal claim. *E.g., Grad Partnership v. United States*, 4 Cl.Ct. 359, 360 (1984). "An accord is an agreement by one party to supply or perform and by the other party to accept, in settlement or satisfaction of an existing claim, something other than what was actually due.... Satisfaction is the execution [or] performance of the agreement, the actual giving or taking of some agreed upon item or service." *Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 92 (1989) (citations omitted). Thus, to prove that there was an efficacious accord and satisfaction, the BLM must affirmatively prove (i) proper subject matter, (ii) competent parties, (iii) a meeting of the minds, (iv) consideration, and (v) the acceptance of payment or performance in satisfaction of a claim or demand which is a bona fide dispute. *E.g., Brock & Blevins*, 170 Ct.Cl. at 59, 343 F.2d at 955 (citation omitted). Of course, if the defendant fails to establish the existence of any of these basic elements, the defense fails. Most importantly in this vein, we observe that, if the parties are mutually mistaken in some respect, there can be no meeting of the minds, and thus no accord and satisfaction. *First National Bank, Lexington, Tenn. v. United States*, 12 Cl. Ct. 719, 724 (1987), *rev'd on other grounds*, 846 F.2d 740, *cert. denied*, 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 221 (1988).

 Pursuant to these principles, the defendant contends that Spalding voluntarily agreed to surrender all of the rights it had in the burned portion of Subsale A in return for valuable consideration. This assertion may be true in a hyper-strict *legal* sense, but, on the facts here, it is clear to us that the doctrine of accord and satisfaction does not bar any of the equitable claims that have been established here. This is true because the record as a whole warrants a finding that the parties *mistakenly* concluded that § 7 of the Jamison–Harris contract provided the only solution to the problems created by the Grave Creek Fire, and as a result, there was no actual or true meeting of the minds when Spalding, out of perceived compulsion, agreed to execute Modification # 5. We observe that "[a]n accord and satisfaction may be set aside in a court of equity on the ground that the parties were mutually mistaken as to the material facts." 1 Am. Jur.2d § 24, p. 323 (1962), *citing Horn v. Detroit Dry Dock Co.*, 150 U.S. 610, 627, 14 S.Ct. 214, 219, 37 L.Ed. 1199 (1893).

As we have already noted, "[when a party] is ignorant or mistaken with respect to [its] own antecedent and existing private legal rights ... and enters into some transaction the legal scope and operation of which [it] correctly apprehends and understands, for the purpose of affecting such assumed rights ... equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact." *Pomeroy* § 849, p. 1498. Here we find that Spalding was mistaken with respect to its legal rights, a mistake akin to a mistake of fact, *supra,* and these grounds are sufficient in and of themselves to vitiate an accord and satisfaction defense in equitable proceedings. In addition to the foregoing, we have a number of additional circumstances which warrant, and indeed require, us to ignore any alleged accord and satisfaction. In this connection, we have noted, at some length, *supra,* that the BLM induced the modification by proposing a "take it or leave it" ultimatum. We can hardly say that there was an uncoerced meeting of the minds where the evidence further establishes that the BLM threatened to cancel all or a significant portion of the Jamison–Harris Sale if Spalding refused to sign the modification. Consequently, on this record, we find that the accord and satisfaction defense carries no weight here, inasmuch as the modification was the end result of a pattern of vexatious and overreaching conduct by the BLM.

### 4. Waiver

In an argument related to the accord and satisfaction defense, the BLM next contends that Spalding waived any rights that it may have had in relation to the burned timber in Subsale A when it signed Modification # 5. It is well established that "[w]aivers of rights must be voluntary, knowing, and intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Krzeminski v. United States,* 13 Cl.Ct. 430, 438 (1987) (citation omitted). The record evidence in this case clearly shows that there was no waiver here because Spalding did not, in the true spirit of the word, voluntarily agree to Modification # 5. As we have already observed on several occasions, Spalding agreed to sign the modification *only* because of its mistaken belief that the BLM interpretation of § 7 was the only available option, and, moreover, because the BLM threatened to cancel the entire Jamison–Harris Sale. Because of these various misrepresentations, and because of the economic coercion, Spalding concluded that it had no choice but to execute the modification. Stated simply, Modification # 5 cannot, in any sense, be characterized as the result of a truly voluntary act. Similarly, because Spalding was not fully apprised of its rights under the Jamison–Harris contract, did not know that there were other alternatives that would have allowed it to retain the burned timber, did not know that it could have negotiated to sell the timber back at fair market value, or that the BLM had no authority to cancel any part of the Jamison–Harris Sale, it is reasonably inferable and plainly evident, on this record, that Spalding was not sufficiently aware of the circumstances so as to require a finding that it "voluntar[ily], knowingly, and intelligently" executed the modification. On these facts, we find that Spalding did not waive any of its equitable claims here.

### 5. Estoppel And Offset

Next, the defendant contends that no relief is warranted here because, after Congress enacted the Federal Timber Contract Payment Modification Act (FTCPMA), 16 U.S.C. § 618 et seq., in the fall of 1984, Spalding applied for and received a release from substantial financial obligations under *other* federal timber contracts. By 1984, the market value of timber in the United States had dropped precipitously, and timber contractors such as Spalding faced ruinous losses on timber contracts bid a few years earlier. Thus, the FTCPMA was passed to remedy the grave economic consequences posed by this situation. In this respect, the parties have stipulated that Spalding avoided substantial losses that it would have incurred in 1984

and later, but for the release that it obtained pursuant to the FTCPMA.

Accordingly, the defendant argues that, because Spalding received substantial debt relief by the grace of Congress under the FTCPMA, it should be equitably estopped from seeking additional relief on the unrelated Jamison–Harris contract. In the alternative, it contends that the forgiveness that Spalding obtained under the FTCPMA should be offset against any contemplated award here. After analyzing the FTCPMA in light of the facts in this case, *see infra,* we find it has no relevance whatsoever to these proceedings. Therefore, we see no reason to offset the debt forgiveness that Spalding obtained under that legislation against the relief that it is entitled to receive on the Jamison–Harris contract. Moreover, even if the FTCPMA was somehow relevant, it does not support an equitable estoppel defense.

We start with 16 U.S.C. § 618(a)(1), which explains the purpose and scope of the legislation. In pertinent part, it states that:

> [I]n order to retain jobs, to preserve free competition, to utilize the potential productive capacity of plants, to preserve small communities dependent on a single economic sector to assure an open and competitive market for future sales of Government timber, and to lessen the impact of unemployment, the Secretary of Agriculture for national forest lands and the Secretary of the Interior for public lands under their respective jurisdictions are authorized and directed to permit a requesting purchaser to return to the Government a volume of the purchaser's timber contracts as determined under paragraph (2) upon payment of a buy-out charge from such purchaser in an amount as determined under paragraph (3). The purchaser shall be released from further obligation to cut, remove, and pay for timber under such contract upon payment, or arrangement for payment ... of such buy-out charge....

The legislative history further explains that:

> Most small to mid-sized timber companies, particularly those in the Western States, are heavily dependent on timber from public lands. They purchase timber, by contract, from the U.S. Forest Service or the Bureau of Land Management; cut the trees, truck the logs to their mills, and process the logs into lumber, wood products, or plywood. The interim period between signing the contract for the standing trees and marketing the finished product is frequently 3 to 5 years.
>
> During the late 1970's and early 1980's rampant inflation, optimistic predictions of housing demand, intense competition among buyers, and the fear of future constriction of the timber supply, caused many timber companies to contract for timber from the Government at prices well above today's market value. That means that, at current market prices, the raw material cannot be converted by the companies holding contracts into marketable products, i.e. lumber and plywood, without incurring substantial losses.
>
> It is estimated that if all the timber purchasers were to go ahead and log the timber under contract and produce the timber and plywood, they would lose nearly $4 billion. Such losses will be considered unacceptable, and many of the companies will let the trees stand uncut in the forest and let the contracts expire. The Federal Government policy in that instance is to resell the timber and bill the original purchaser for damages, which are calculated as the difference between the original price and the new price. With the downturn in the market those damages will be [so] overwhelming to small and medium sized businesses [that they] could face bankruptcy. The Government could not collect its damages from bankrupt companies, workers would lose their jobs, and timber dependent communities already in precarious situations, would lose the main employer.

S.Rep. No. 596, 98th Cong., 1st Sess. 4, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3796, 3797–3798.

Thus, in order to qualify for a buy-out under the FTCPMA, timber contractors needed to meet a number of criteria. First, they were required to show that the timber contracts in question were bid prior to January 1, 1982, and that performance on those contracts was still uncompleted as of June 1, 1984. 16 U.S.C. § 618(a)(2)(A). Secondly, contractors had to demonstrate that losses were anticipated on those contracts, and that those losses, as calculated under special provisions contained in 16 U.S.C. § 618(a)(3)(A), would exceed 50% of its net worth. 16 U.S.C. § 618(a)(2)(A).

Spalding applied for relief under these FTCPMA provisions. In this respect, the parties have stipulated that, under the FTCPMA formula contained in 16 U.S.C. § 618(a)(3)(A), Spalding would have incurred $11,217,796 in losses on six Forest Service and three BLM timber contracts that it bid prior to January 1, 1982, and which were not performed prior to June 1, 1984.[22] The $11,217,796 that Spalding would have lost was more than 50% of its net worth, and it therefore qualified for a buy-out under the FTCPMA. Consequently, the parties executed an agreement whereby the federal government agreed to release Spalding from its obligations under all nine of those sales in exchange for the return of those contracts and $644,272 in buy-out charges. The parties have stipulated that the terms of the release have been fully performed.

We think it is crystal clear that the FTCPMA is completely irrelevant to the issues in this case, and for two reasons we find that it affords no basis for an offset. First, the FTCPMA did not affect the Jamison–Harris contract. According to its plain language, relief under the FTCPMA was available only for those timber sales "held as of June 1, 1984." *See* 16 U.S.C.

§ 618(a)(2)(A). This obviously did not cover the Jamison–Harris contract, which was fully completed sometime prior to February 23, 1980, more than four years earlier. Moreover, the FTCPMA was general legislation that was intended to remedy the grave economic conditions facing the entire timber industry. It was not in any way concerned with Spalding as an individual entity, nor did it address any of the Spalding claims on the Jamison–Harris contract. As outlined in 16 U.S.C. § 618(a)(1), Congress hoped to provide relief to any and all timber sale purchasers that could satisfy the requirements set forth in the legislation, and this goal bears no relationship to the individual claims that Spalding was entitled to pursue on the Jamison–Harris contract. As noted at trial, Tr. 1291, the claims here emanate from allegations by Spalding that it was the victim of inequitable conduct at the hands of the BLM, and we do not believe that Congress intended to deprive litigants of their right to pursue such claims by filing for relief generally available to all timber sale purchasers under the FTCPMA. To hold otherwise would in itself be inequitable.

Secondly, we find that the FTCPMA is irrelevant because, when the federal government agreed to release Spalding from its obligations on the nine timber sale contracts that it was holding in exchange for a return of those sales and $644,272 in buy-out charges, there was a full accord and satisfaction. By executing the release, the defendant voluntarily surrendered its right to pursue damage claims on those nine contracts in return for the timber sales and the buy-out charge. This agreement to substitute one form of performance is an excellent example of what constitutes an efficacious accord and satisfaction, and can be readily contrasted with the spe-

22. The court ruled during the course of trial that the FTCPMA was wholly irrelevant to these proceedings, Tr. 1291–1293, 1301–1302, 1307, a ruling that is discussed more thoroughly here. As a consequence of that ruling, the defendant was not allowed to introduce proffered evidence regarding the circumstances surrounding the Spalding FTCPMA application and the amount of relief it obtained. Tr. 1289–1290, 1302, 1307. We nevertheless note that all of the material

facts regarding the relief that Spalding obtained under the FTCPMA, particularly the $11,217,796 in losses that Spalding would have suffered but for that legislation, were stipulated by the parties in DX # 41. Thus, it would appear that all of the salient facts regarding the FTCPMA are before the court, and the defendant was not in any way harmed by the exclusion of this additional evidence.

cious accord and satisfaction that the BLM attempted to execute by virtue of Modification # 5.

As already noted "[a]n accord is an agreement by one party to supply or perform and by the other party to accept, in settlement or satisfaction of an existing claim, something other than what was actually due.... [s]atisfaction is the execution [or] performance of the agreement, the actual giving or taking of some agreed upon item or service." *Spirit Leveling*, 19 Cl. Ct. at 92. Clearly, with respect to the timber sales on which Spalding sought to obtain a release under the FTCPMA, there was a meeting of the minds, consideration, and performance of the new agreement, the essential elements of an accord and satisfaction. *See, e.g., Brock & Blevins*, 170 Ct.Cl. at 58–59, 343 F.2d at 955. Insofar as the defendant agreed without reservation to surrender all of the rights it had on those timber sales, there is no reason to offset any of that forgiveness against an award on the Jamison–Harris contract. Again, we feel that it would be inequitable to do so.

Nevertheless, the defendant contends that Spalding should be equitably estopped from pursuing relief on the Jamison–Harris contract insofar as it obtained forgiveness on $11,217,796 in anticipated losses. There is no merit in this argument. Equitable estoppel is sometimes used to bar a party from initiating an action that it would otherwise be entitled to institute, *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir.1981), but in order to do so, the following four elements must be established:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Emeco Industries, Inc. v. United States*, 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973), *citing United States v. Georgia–Pacific Co.*, 421 F.2d 92, 96 (9th Cir.1970).

Obviously, if any one of these four elements is missing, the estoppel defense fails, and such is the case here. First, Spalding did not know the facts in the sense typically required for the purposes of estoppel. By the time Spalding filed its FTCPMA application, it was generally aware of the facts surrounding the Jamison–Harris contract and the consequences of the Grave Creek Fire. There is no evidence, however, showing that it suspected that its rights under that contract were in any way related to its rights under the FTCPMA. That is to say, Spalding did not know that it might be jeopardizing its rights under the Jamison–Harris contract by applying for debt forgiveness under the FTCPMA. Secondly, there is no indication that Spalding acted in a way intended to induce the sort of reliance contemplated under the second prong of the estoppel test. Apparently because it never even suspected that the two could be related, Spalding did not manifest any willingness to surrender or waive its right to pursue relief on the Jamison–Harris contract by filing a FTCPMA application. Indeed, the defendant did not ask Spalding to surrender such rights before signing the FTCPMA release. To the contrary, by the very terms of that agreement, the defendant asked for, and received, nothing more than the return of the timber sale and buyout charges.

The defendant also fails on element three. In this respect, as referenced in Appendix C, the record shows that the Department of Interior and the BLM both knew that Spalding was seeking private relief on the Jamison–Harris contract when it applied for forgiveness under the FTCPMA, and thus, the Department of Interior and the BLM were not ignorant of the facts when they agreed to the FTCPMA buy-back. In this regard, the Department of the Interior was aware that Spalding was seeking administrative relief on the Jamison–Harris contract no later than March 15, 1982, and on February 3, 1984, after it denied that administrative claim, it learned that Spalding was pursuing legislative relief. Similarly, the BLM learned that Spalding was seeking adminis-

trative relief on the Jamison–Harris contract no later than April 8, 1982, and no later than April 17, 1984, it was notified that Spalding was pursuing legislative relief. Thus, the Department of Interior and the BLM both knew that Spalding was pursuing legislative relief on the Jamison–Harris contract, and they never told Spalding that any right to that relief would be vitiated by the FTCPMA buy-out agreement that they executed shortly afterwards.

Finally, there is absolutely no evidence of injury. True, the defendant did not collect the damages that it might have been entitled to collect in the event of a breach on any one or all of the nine contracts subject to the FTCPMA agreement with Spalding. As the legislative history shows, however, the federal government decided to forego its right to pursue damages on such contracts due to the high probability of bankruptcy, which in turn would have made it virtually impossible to collect anything at all. In light of this situation, it agreed to obtain what it could, the return of the timber sales and $644,272 in additional consideration, which is certainly more than pocket change. Indeed, we think Congress implicitly deemed this amount of consideration exchanged to be fair and adequate, insofar as the terms of the buy-back agreement were determined under the explicit guidelines of the FTCPMA. We therefore conclude that the defendant has failed to establish even one of the four necessary elements for estoppel. Since the defendant has also failed to establish the propriety of an offset, we find no basis whatsoever to deny the equitable relief that Spalding is so obviously entitled to receive on the Jamison–Harris contract.

### D. *Damages*

 In view of the fact that we find, on this record, that Spalding is clearly entitled to relief, we must next determine the proper measure of damages. Spalding seeks to recover the appreciated value of the timber in Subsale A under the Jamison–Harris contract that it was forced to surrender in Modification # 5 because of wrongful conduct by the BLM. To properly and fairly measure the amount of that increase in value, Spalding contends that we should simply subtract the bid prices that it paid under the original Jamison–Harris contract from the fair market value, and multiply the result by the volume of timber in each species deleted under Modification # 5.[23] The defendant apparently agrees with this basic method of calculating any damages that may be due. Of course, there is no dispute over the original contract bid price; however, the parties vigorously disagree over how to determine the fair market value of the timber deleted from the Jamison–Harris contract.

Spalding proposes five different methods to calculate fair market value, four based on purportedly comparable timber sales and one based on appraisal techniques that the BLM applied to other timber deleted from the Jamison–Harris contract under a subsequent modification.[24] Thus, based on the following five different determinations of fair market value, Spalding alleges that any of them may provide a reasonable measure of damages: (i) the difference between Jamison–Harris bid prices and the prices that the BLM subsequently received for that same timber in the Black Eye Salvage Sale equals $191,470.20; (ii) the difference between the pond values for the Jamison–Harris Sale and the pond values for the Black Eye Salvage Sale equals $194,560.48; (iii) the difference between the realization values for the Jamison–Harris Sale and the Black Eye Salvage Sale equals $237,758.90; (iv) the difference between the Jamison–Harris bid prices and the fair market value unit prices that the BLM used for the purposes of Modification # 10 equals $181,411.00; and (v) the difference between the bid prices for the Jamison–Harris Sale

---

23. In terms of a mathematical formula, the damage calculation would be as follows: (fair market value—Jamison-Harris bid prices) × deleted volume = increase in value of timber deleted.

24. Each of the five damage calculations proffered by Spalding and the damage calculations proffered by the defendant are outlined more thoroughly in the attached Appendix B.

and the unit prices that the BLM received on a comparable solicitation called the Julie Creek Sale equals $245,161.20.

Because all five provide a reasonable measure of the injury caused by the BLM, Spalding simply asks for the average, a total of $210,072.34, under the "jury verdict method" of calculating damages:

> This approach, most often employed when damages cannot be ascertained by any reasonable computation from actual figures, however, is not favored and may be used only when other, more exact, methods cannot be applied. . . . Before adopting the "jury verdict method," the court must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages. . . .
>
> \* \* \* \* \* \*
>
> "[It] is equally well-settled that the amount of the recovery can only be approximated in the format of a 'jury verdict' where the claimant can demonstrate a *justifiable inability to substantiate* the amount of his resultant injury by direct and specific proof." . . .
>
> [T]he contractor bears the burden of establishing that no more reliable method is available than the "guesstimate" of the "jury verdict method," *i.e.,* a method that would more precisely *calculate* the [amount of damages]. . . .

*Dawco Construction, Inc. v. United States,* 930 F.2d 872, 880–881 (1991) (citations omitted) (emphasis in original).

Therefore, before reaching the issue of quantum, we must determine whether Spalding has established that the jury verdict method is an appropriate means of calculating damages in this case. There is no doubt that Spalding has satisfied the first part of the test, insofar as we find the evidence of injury at the hands of the BLM overwhelming. With respect to the second element, Spalding cannot prove its damages by the "actual cost method" because the injury was in the loss of appreciated value and because, by agreeing to sell back the burned timber instead of suffering the loss of the entire Jamison–Harris Sale, Spalding did not incur a loss subject to measurement by replacement cost,[25] which would have provided a more accurate measure of the loss. We are satisfied, therefore, that Spalding could not have proven its damages by any more direct and specific proof.

Finally, the evidence that Spalding relied on to calculate its damages was, for the most part, evidence that was already contained in the record. It involved nothing more than selecting the appropriate numbers and including them in the equation. In this regard, we note that the defendant does not object to the accuracy of the numbers or the formula employed by Spalding. To the contrary, defendant argues only that the damages should be determined by reference to another comparable sale at approximately the same time as Modification # 5 was executed, and that none of the five methods employed by Spalding meets this criteria. Thus, it contends that the difference between the Jamison–Harris bid prices and the unit value on a comparable solicitation called the Walpole Sale shows that the amount of damages is equal to $118,631.80. From this, we conclude that the evidence in the record is sufficient for the purpose of making a fair and reasonable approximation of the damages.

Turning to the quantum issue, we think that all five of the damage calculations by Spalding are reasonable. Indeed, the defendant did little, if anything, of substance, in our view, to refute any of them. Thus,

---

**25.** We also note that Spalding attempted to amend its complaint to show that it would have had to pay more than $250,000 if it had been forced to replace the deleted timber on the open market. As we understand it, Spalding was not proposing to adduce actual evidence of its replacement costs, but intended to show only what those replacement costs would have been. In any event, we concluded that this motion to amend was untimely, and that the defendant would have been unduly prejudiced. Thus, we denied the motion to amend, *Spalding & Son, Inc., v. United States,* 22 Cl.Ct. 678 (1991), and Spalding had no choice but to proceed solely on the damage theories alleged in its complaint.

at first blush, we would be inclined to recommend $210,072.43 in compensation, as requested by Spalding. On the other hand, there is no compelling basis for entirely rejecting the $118,631.80 damage calculation proffered by the defendant. Given such, we think it is most appropriate to average this into the equation as well. When all five of the calculations adduced by Spalding are averaged along with the one calculation proffered by the defendant, the most reasonable measure of damages factors to $194,832.25. We strongly recommend this amount to be thoroughly reasonable and fair.

### E. *Interest And Attorney Fees*

The proposed private relief legislation under consideration here states, in part, that "the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury appropriated to the Bureau of Land Management, Department of the Interior, and not otherwise obligated, the sum of $250,000, *plus interest from March 15, 1982, at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board, plus attorneys fees*, in full settlement of all claims by Spalding and Sons, Inc., against the United States relating to the Jamison–Harris contract." S. 294 (emphasis added). As a result of the foregoing, Spalding argues that the bill clearly authorizes the Hearing Officer to recommend the payment of interest and attorney fees in addition to any award for damages. The defendant opposes both, even though we have determined that there are compensable equitable claims here that warrant relief on the merits. We will examine each in turn.

### 1. Interest

 Spalding seeks all interest that has accrued since March 15, 1982, as calculated under the interest provisions of the CDA. In this respect, the interest language of S. 294 is identical to the corresponding interest provisions of the CDA, which states that:

Interest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim ... until payment thereof. *The interest provided for in this section shall be paid at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board.*
41 U.S.C. § 611 (emphasis added).

The defendant contends, however, that there is no independent statutory basis for an interest award, and thus we have no authority to recommend compensation for that purpose. In this connection, it alleges that the CDA does not independently support an interest award here simply because Spalding never filed a claim with the contracting officer. To bolster this specious argument, the defendant relies on *Gay Street Corp., supra.* In that congressional reference case, the predecessor Court of Claims determined that plaintiff had no legal claim, but that it was nevertheless entitled to some relief under the equitable principle of unjust enrichment. However, the court refused to award interest, stating that:

It is well established that in the absence of a statute or contract provision to the contrary, interest is not allowable on claims against the United States for breach of contract....

In light of the above authority it is clear that this court in the present case would have no jurisdiction to award interest even if the plaintiff had a legal claim based upon the contract. It would naturally follow that plaintiff would not be entitled to interest on a claim which is not a legal obligation, and which, if it were, would not entitle it to interest.
130 Ct.Cl. at 350 (citations omitted).

Based on this passage, the defendant argues that interest cannot be awarded on an equitable claim. We find, however, that this argument will not pass muster. First of all, we have already determined that Spalding could have elected to proceed under the relevant provisions of the CDA, but was forced to seek legislative relief instead because of the inequitable conduct by the

BLM. In other words, we would have had the authority to award interest under 41 U.S.C. § 611 if Spalding had been able to establish a legal claim, and *Gay Street Corp.* is inapposite to that extent. That Spalding cannot do so because of the egregious and inequitable conduct of the BLM does not bar us from recommending the payment of compensation for interest on equitable grounds. This is particularly true in view of the enabling language of S. 294, *supra.* We must assume that the Senate, for this very reason, incorporated the interest language of 41 U.S.C. § 611 into S. 294 to ensure that Spalding would be able to recover all sums that it would have otherwise been entitled to recover in a traditional legal setting. Moreover, we note that the proposed relief legislation in *Gay Street Corp.* failed to authorize interest, another circumstance at odds with the facts of this case. For all of these reasons, we recommend the payment of appropriate interest, as calculated in similar circumstances under 41 U.S.C. § 611.

### 2. Attorney Fees

■ In the first section of S. 294, Congress also authorized compensation for the payment of attorney fees. The second section goes on to state, in part, that "[n]o part of the amount appropriated in the first section of this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim...." Pursuant to this authority, Spalding seeks $239,136.85 in attorney fees. The defendant, again claiming that attorney fees can be awarded only if there is independent statutory authority, asserts that no such authority exists under the Equal Access to Justice Act, 28 U.S.C. § 2412, because the United States was "substantially justified" in its position. We reject this argument for two reasons.

First, 28 U.S.C. § 2509(c) simply instructs the hearing officer to make findings and conclusions sufficiently detailed to inform Congress whether the claims in the referred bill are legal, equitable, or merely gratuitous. If equitable, they do not need independent statutory authority. Thus, S.

294 does not run afoul of 28 U.S.C. § 2509, and we may recommend the payment of attorney fees if they are supported by the equities. We think that this is true in the case at bar. Moreover, even if we were constrained by 28 U.S.C. § 2412, as the defendant contends, our recommendation would not be any different because we would find that the position of the United States on the facts at bar was clearly not substantially justified. Thus, we recommend that attorney fees be paid to Spalding to the maximum extent provided by S. 294.

### VI. CONCLUSION

Spalding has established the existence of equitable claims based on the theories of mistake of law, misrepresentation, economic coercion, unjust enrichment, and overreaching conduct. On that basis, we recommend that Congress enact S. 294, and that it direct the Secretary of the Treasury to pay out of monies appropriated to the Bureau of Land Management, Department of the Interior the principal sum of $194,832.25. In addition, we also recommend the payment of interest and attorney fees to the fullest extent provided by S. 294. Finally, we conclude that the payment of said aggregate sum would not constitute a gratuity.

### APPENDIX A

### FINDINGS OF FACT

The following findings of fact are based on the revised joint stipulations of fact admitted into evidence as DX # 41, the transcript of the proceedings, and the trial exhibits:

*Background*

1. This action stems from a federal timber sale, known as the Jamison–Harris contract, between plaintiff, Spalding and Son, Incorporated (Spalding), and the United States, acting through the Department of Interior, Bureau of Land Management (BLM). Stip ¶ 1.

2. Spalding is a family-run sawmill located in Grants Pass, Oregon. It has been in business for 40 years, and it depends

primarily on federal contracts for its timber supply. Stip. ¶ 2. At the time relevant to these proceedings, Spalding employed approximately 170 people, and had a net worth in the neighborhood of $8,000,000. Tr. 77 (Spalding).

3. Eldon Spalding was president of Spalding and Son until his death in 1988, when that position passed to his son, Merve Spalding. Tr. 89 (Spalding). From 1948 through 1988, Merve Spalding was the vice president; moreover, from 1962 through 1988, he was also the general manager. As general manager, Merve Spalding directed the day-to-day operations of the sawmill, and was also responsible for bidding on federal timber contracts. Tr. 68–69 (Spalding).

4. The BLM is headed by a Director located in Washington, D.C. The Director controls 12 state offices, one of which is located in Salem, Oregon. The Oregon State Office oversees ten district offices in the States of Oregon and Washington. Each District Office controls anywhere from two to seven resource areas. Each resource area is staffed by an area resource manager, an assistant area resource manager, a forest manager, a forest engineer, and a silviculturist. DX # 45; Tr. 1009–1019 (Bainbridge).

5. The timber contract in issue here (No. OR110–TS7–8) was under the general jurisdiction of the Medford District Office, located in Medford, Oregon, and it was directly managed by the Rogue River Resource Area. *See* DX # 45. At the time relevant to these proceedings, George Francis was the Medford District Manager, Tr. 1020 (Bainbridge), Robert (Bob) Bainbridge was the Rogue River Resource Area Manager, Tr. 348 (Bainbridge), Gerald Nilles was the Rogue River Assistant Resource Area Manager, Tr. 567 (Nilles), and George Neville reported to Mr. Bainbridge as the Rogue River Resource Area Forest Manager, Tr. 462 (Neville). The Rogue River Resource Area personnel, including Messrs. Bainbridge, Nilles, and Neville were all officed in the same building as was the Medford District Office staff.

*The Jamison–Harris Timber Sale Contract*

6. Sometime in 1976, the BLM Medford District Office solicited competitive bids on certain timber located in an area described as the Jamison–Harris Timber Sale. Stip. ¶ 3.

7. The prospectus advised potential bidders that the Jamison–Harris Sale was divided into four geographic sections described as Subsale Areas A, B, C, and a right-of-way area for road construction designated as Subsale D. DX # 6; Stip. ¶ 7.

8. The BLM estimated that the Jamison–Harris Sale area contained a total of approximately 12,407 merchantable and 801 non-merchantable trees, totaling 13,208 trees marked for harvesting. Stip. ¶ 11. The phrase "merchantable thousand board feet" (MBF) is a timber industry standard for measuring volume, and "merchantable" describes trees that are suitable for manufacturing timber products such as lumber. The volume of timber contained in the Jamison–Harris Sale was estimated at 11,206,000 MBF. DX # 6.

9. The volume in each of the four subsale areas was estimated as follows:

| Subsale | Douglas Fir | Ponderosa Pine | Sugar Pine | Incense Cedar | All Species |
|---|---|---|---|---|---|
| A | 2,993 | 692 | 221 | 139 | 4,045 |
| B | 1,951 | 400 | 88 | 82 | 2,521 |
| C | 3,018 | 792 | 116 | 85 | 4,011 |
| D | 375 | 212 | 23 | 19 | 629 |
| Totals | 8,337 | 2,096 | 448 | 325 | 11,206 |

DX # 6; Stip. ¶ 11.

10. The timber in the Jamison–Harris Sale was *offered* at the following minimum prices:

| Species | Estimated Volume/MBF | Appraised Price/MBF | Volume Times Appraised Price |
|---|---|---|---|
| Douglas Fir | 8,337 | $109.35 | $ 911,650.95 |
| Ponderosa Pine | 2,096 | 116.70 | 244,603.20 |
| Sugar Pine | 448 | 192.10 | 86,060.80 |
| Incense Cedar | 325 | 120.85 | 39,276.25 |
| Total | 11,206 | | $1,281,591.20 |

DX # 6; Stip. ¶ 3; *see* PX # 4, 11; DX # 5.

---

11. Subsale A covered 338 acres, Subsale B covered 282 acres, and Subsale C of the Jamison–Harris Sale covered 161 acres. DX # 6. All three of these subsale areas were designated as "partial cut" areas. PX # 4; DX # 5. The phrase "partial cut" is used to describe a planned timber harvest in which some trees are left behind to provide seed and shelter for facilitating the growth of new trees. Stip. ¶ 10.

12. The BLM marked those trees included in the partial cut areas on Subsales A, B, and C with blue paint both above and below stump height. PX # 1; DX # 6. To be precise, the prospectus advised that all timber in the Jamison–Harris Sale area was reserved from cutting except for the "approximately thirteen thousand, two hundred and eight (13,208) trees which have been marked for cutting heretofore by the Government with blue paint above and below stump height in the approximate area in which individual trees have been marked for cutting ..." DX # 6; *see* PX # 1, § 40; DX # 11, § 40. This marking system is designed to assist the seller and the purchaser in determining which trees are to be cut and which are not under the timber sale contract.

13. The Subsale D area was designated as a "clear cut" area. *See* DX # 6; PX # 4; DX # 5. Clear cutting is a phrase used to describe a planned timber harvest in which all trees are removed from a defined geographic area.

14. Merve Spalding became aware of the Jamison–Harris Sale as a result of inspecting the BLM annual sale plan. Tr. 120 (Spalding).

15. Prior to bidding, Jim Peckham, a forester employed by Spalding through 1986, Tr. 146–147 (Peckham), visited the Jamison–Harris Sale area to "cruise" the timber, Tr. 123 (Spalding). Cruising is a forestry technique used to estimate the volume of standing merchantable timber in a particular geographic region.

16. After evaluating the appraisal submitted by Mr. Peckham, the amount of timber contained in the Jamison–Harris Sale area, the amount of timber already under contract, the required logging methods, the timber species, and the timber quality, Merve Spalding decided to bid on the Jamison–Harris Sale. Tr. 69, 123 (Spalding).

17. On December 30, 1976, the BLM held an oral auction for the Jamison–Harris Sale, and Merve Spalding submitted the following bid:

| Species | Estimated Volume/MBF | Spalding Oral Bid Price | Volume Times Bid Price |
|---|---|---|---|
| Douglas Fir | 8,337 | $110.00 | $ 917,070.00 |
| Ponderosa Pine | 2,096 | 116.70 | 244,603.20 |
| Sugar Pine | 448 | 192.10 | 86,060.80 |
| Incense Cedar | 325 | 120.85 | 39,276.25 |
| Totals | 11,206 | | $1,287,010.25 |

PX # 11; DX # 8, # 9; Stip. ¶ 5.

---

18. Spalding was the high bidder, and on February 23, 1977, it executed Contract No. OR 110–TS7–8 with the BLM for the timber designated for harvest in the Jamison–Harris Sale area. PX # 1, § 41; DX # 11, § 41; Stip. ¶ 6.

19. The Jamison–Harris contract was signed by Eldon Spalding, but he did so in accord with the advice of his son, Merve Spalding, and only because the corporate bylaws required the president to sign the contract. Tr. 70 (Spalding); PX # 1, § 41; DX # 11, § 41.

20. The contract commenced on February 27, 1977, and it required Spalding to harvest the designated timber within all four subsale areas no later than February 23, 1980. With the exception of this 36–month time limit, the contract did not impose any other specific removal schedule on Spalding. PX # 1, § 4; DX # 11, § 4; Stip. ¶ 12.

21. Spalding did not consult a lawyer before entering into the Jamison–Harris contract, nor did it consult a lawyer for advice on any of its dealings with the BLM. Tr. 83 (Spalding); Stip. ¶ 32.

22. During the summer of 1977, Spalding harvested all of the right-of-way timber contained in the Subsale D area, in addition to completing the road construction required under the contract. Stip. ¶ 13.

23. Thereafter, on January 3, 1978, Spalding informed the Oregon State Department of Forestry that it intended to commence logging operations during the 1978 logging season; however, it did not engage in any further harvesting activities before September of 1978. PX # 10; Tr. 647–649 (Watson); Stip. ¶ 14.

*The Grave Creek Fire*

24. From August 9 through August 11, 1978, a conflagration known as the Grave Creek Fire, burned through 3,150 acres of private, state, and federal lands, including 1,200 acres of BLM lands. Tr. 1114 (Bainbridge); Stip. ¶ 14.

25. The Grave Creek Fire was caused by an arsonist on lands adjacent to the Jamison–Harris Sale area. Said fire was not in any respect caused by either Spalding or the BLM, nor was it caused by any of their employees or agents. Stip. ¶ 15.

26. The firefighting was handled by the Oregon State Department of Forestry, and Bob Bainbridge, the Rogue River Resource Area Manager, acted as the BLM representative on the site. Tr. 1058 (Bainbridge).

27. Mr. Bainbridge mapped the course of the fire by helicopter, and observed that the fire burned through a portion of the Jamison–Harris Sale area. At that time, however, his primary concern was to provide assistance in extinguishing the fire, not to protect the Jamison–Harris Sale area in any particular way. Tr. 1057–1059 (Bainbridge).

28. In an effort to control the progress of the fire, the firefighting crews started "backfires" along roads that passed through Subsale A of the Jamison–Harris Sale. These backfires were deliberately set to burn the forest undergrowth, brush, lower branches, and other debris on or near the ground. Tr. 1254–1258 (Bainbridge). Obviously, the underbrush, etc., includes the area where the BLM placed blue paint markings to

distinguish "take trees" from "leave trees" under the Jamison–Harris contract. Tr. 1257–1258 (Bainbridge). Mr. Bainbridge was on the scene when these backfires were started; however, there is no evidence indicating that he considered their impact on the Jamison–Harris contract. Tr. 1253 (Bainbridge).

29. With respect to the Jamison–Harris Sale area, the Grave Creek Fire burned through a significant portion of Subsale A and parts of Subsales B and C. The right-of-way timber in Subsale D was harvested prior to the fire, and thus was not affected. Stip. ¶ 17.

30. Subsale A was the area most seriously affected by the fire. Stip. ¶ 17. The fire burned through approximately 208 of the 338 acres contained in Subsale A. DX # 11, p. 9, and DX # 21, p. 4. In the burned Subsale A area, the fire curtailed the growth of most of the trees. Equally important for the purposes of this dispute, the fire blackened the bark above and below stump height, and consequently, it obliterated most of the blue paint markings distinguishing the "take trees" from the "leave trees." Stip. ¶ 16.

31. Mr. Bainbridge admitted that the backfires set by the Oregon State Department of Forestry may have burned off some of the blue paint markings on the trees in Subsale A. Tr. 1258 (Bainbridge).

*The Immediate Consequences Of The Grave Creek Fire*

32. In Subsale A, the Grave Creek Fire burned off most of the blue paint markings distinguishing "take" trees from "leave" trees. Thus, after the fire, the blue paint markings could be located on less than 10% of the trees that had been marked for cutting. Stip. ¶ 16.

33. For the most part, the trees were only blackened by the fire, thus they were neither consumed nor destroyed. Prior to the fire, the BLM estimated that Subsale A contained 4,849 trees marked for

cutting with blue paint, and of those only 50 (1.03%) to 100 (2.06%) were actually devoured by the fire. Stip. ¶ 17.

34. While most of the trees in the Jamison–Harris Sale that burned were blackened by the fire, there was no diminution in the value of the timber. Stip. ¶ 16. In other words, the burned timber was still merchantable, assuming that it could be harvested before it began to deteriorate in value as a consequence of bug infestation, staining, or other natural causes. Tr. 232–234 (Peckham).

35. Thus, the fact that the timber was burned and blackened by fire, standing alone, was not enough to create a financial loss for either Spalding or the BLM because the standing trees were not in any way diminished in value by the fire. Tr. 456–457 (Bainbridge), Tr. 232–234 (Peckham); Stip. ¶ 16. The fire only created problems to the extent that the parties could no longer easily identify by the blue paint markings all of the 4,849 trees in Subsale A that the BLM sold to Spalding under the Jamison–Harris contract.

36. The fire also encroached into parts of Subsales B and C, but the blue paint markings were reconstructed, and the trees therein were harvested by Spalding within the stipulated time allowed under the Jamison–Harris contract. Stip. ¶ 17.

37. Spalding was not aware that the Grave Creek Fire had burned through parts of the Jamison–Harris Sale area, and, therefore, did not participate in efforts to extinguish the fire. Tr. 87 (Spalding).

38. Following the Grave Creek Fire, BLM officials began to plan for rehabilitating the burned areas. Tr. 580 (Neville), 1114–1115 (Bainbridge); DX # 13, # 14.

39. With respect to the areas burned in the Jamison–Harris Sale area and adjacent federal timber lands, the BLM determined that it was essential to remove the burned timber as soon as possible, preferably within one year, apparently because they hoped to prevent the loss of merchantability through bug infestation,

rotting, staining, or other natural forms of deterioration. *See* Tr. 1238–1240 (Bainbridge), 232–234 (Peckham).

40. The BLM also determined that the Grave Creek Fire modified the original purpose of using a partial cut harvest plan in the burned areas of the Jamison–Harris Sale, and that cutting all of the burned trees in the fire-affected area was now the most desirable. Only those isolated trees whose growth was not truncated by the fire would be left standing. In order to prevent the harvesting of any living trees on the burned lands, the BLM eventually decided to leave the area in its natural state through the winter before removing the burned timber. *See* DX # 16; *see also* DX # 13, # 14.

41. However, the Jamison–Harris contract gave Spalding the right to harvest 4,849 trees in Subsale A any time prior to February 23, 1980. Thus, soon after the Grave Creek Fire was extinguished on August 11, 1978, the BLM realized that it could not cut all of the burned timber in Subsale A in the contemplated time frame without some collateral agreement with Spalding. Tr. 1240 (Bainbridge).

42. In the same context, the BLM also determined that it could not simply allow Spalding to harvest the burned timber in Subsale A that it purchased under the Jamison–Harris contract while proceeding to construct a new timber sale for that unsold burned timber in Subsale A. Such a circumstance would have required Spalding and the new purchaser to conduct operations simultaneously. Spalding and the new purchaser would have had to use the same logging roads, which would have created a chaotic and dangerous situation. Tr. 452–453, 1124, 1241–1242 (Bainbridge). Thus, this solution was not feasible.

*The Post–Fire Meetings Between Spalding And The BLM*

43. On or about August 17, 1978, Jim Peckham, a forester employed by Spalding, and Bob Bainbridge, the Rogue River Resource Area Manager, met at the Jamison–Harris Sale area to inspect the damage and to discuss the alternatives for resolving the problems caused by the Grave Creek Fire. Stip. ¶ 18.

44. Their tour was primarily concentrated in Subsale A inasmuch as the fire burned heaviest in that area. After completing their inspection, Messrs. Peckham and Bainbridge concurred that the fire burned off most of the blue paint markings on the 4,849 "take" trees that the BLM previously marked for cutting in Subsale A, making it impossible to distinguish those "take" trees from the "leave" trees. Stip. ¶ 18.

45. Thus, Messrs. Peckham and Bainbridge concluded that the Jamison–Harris contract would have to be modified in some way in view of the obliterated blue paint markings. *See* Tr. 1096 (Bainbridge).

46. Over the course of their meeting, Messrs. Peckham and Bainbridge reviewed at least three alternatives for dealing with the aftermath of the fire. Stip. ¶ 19.

47. They discussed (i) modifying the Jamison–Harris contract by deleting the fire-affected portion of Subsale A from the original sale agreement and re-offering it as part of a separate timber sale, (ii) modifying the Jamison–Harris contract by permitting Spalding to harvest all of the burned timber in Subsale A in a negotiated "scaled" sale, meaning that the actual volume would be measured after cutting the trees, and (iii) re-estimating the volume of timber by re-cruising Subsale A and remarking a sufficient number of trees to approximate the amount initially included in the Jamison–Harris contract. Stip. ¶ 19.

48. Subsales B and C were not seriously affected by the fire, consequently Messrs. Peckham and Bainbridge agreed that Spalding should harvest the timber as originally provided under the Jamison–Harris contract. *See* Stip. ¶ 17.

49. As for Subsale A, Messrs. Peckham and Bainbridge determined that the best solution, if feasible, would be to permit Spalding to harvest all of the burned timber in Subsale A under the scaled sale approach. Tr. 184–187 (Peckham), 353–354, 1096 (Bainbridge).

50. The Jamison–Harris contract contained a provision titled "Sales of Additional Timber," and it stated that:

> If the Authorized Officer and Purchaser agree that additional timber should be removed and the Authorized Officer determines that the sale will not be detrimental to the interests of Government and is within the provisions of 43 CFR 5402.0–6, the Authorized Officer shall grant written permission to Purchaser to cut and remove such timber. If permission is granted, Purchaser shall pay for such timber at a price determined by the Authorized Officer in accordance with the Bureau of Land Management prescribed procedures. The value and volume of such timber ... shall be added to total purchase price....

PX #1, § 8; DX #11, § 8; Stip. ¶ 23. For the relevant text of 43 C.F.R. § 5402.0–6, *see* Finding of Fact No. 60, *infra.*

51. Under the scaled sale approach first discussed by Messrs. Bainbridge and Peckham on August 17, 1978, Spalding would have been allowed to harvest all of the burned timber in Subsale A, which in turn would have been measured upon removal to determine the total volume. Tr. 173–174 (Peckham), 353–354, 1096–1098 (Bainbridge).

52. As for payment under the scaled sale approach, Spalding would have paid the initial contract price for that volume of timber purchased under the Jamison–Harris contract, and an agreed upon fair market value price for that volume of timber over and above that quantity. Tr. 398–399, 1096–1098 (Bainbridge).

53. When he met with Mr. Peckham on August 17, 1978, Mr. Bainbridge felt that the scaled sale option was the fairest approach, and that it would also be the most practical way to achieve the BLM goal of harvesting all of the burned timber as soon as possible. Tr. 1098–1099 (Bainbridge).

54. Also in the course of their meeting at the Jamison–Harris Sale area, Messrs. Peckham and Bainbridge also discussed the possibility of having the BLM buy back all of Subsale A because of the inability to identify the take trees marked with blue paint, but Mr. Bainbridge viewed this option as one of last resort. Tr. 1105–1106 (Bainbridge).

55. While Mr. Bainbridge expressed his initial preference for a scaled sale approach to the problem during the August 17 meeting, he was not sure whether that option could be implemented under BLM regulations. In this regard, Mr. Bainbridge did not make any affirmative representations concerning which option he would recommend to his superiors at the BLM. Tr. 1112 (Bainbridge). However, Mr. Bainbridge left Mr. Peckham with the impression that the scaling option was the most favorable, and to that end, Mr. Bainbridge informed Mr. Peckham that he would call the Oregon State Office to inquire whether the scaling option was viable. Tr. 244–245 (Peckham).

56. George Neville, a BLM Forester in the Rogue River Resource Area, toured the burned area in Subsale A and also preferred to use the scaled sale approach. Mr. Neville did not attend the August 17 meeting, but he recognized the merits of the scaled sale approach and independently recommended this option to Mr. Bainbridge either shortly before or shortly after Mr. Bainbridge met with Mr. Peckham at the Jamison–Harris Sale area. Tr. 468–469 (Neville).

57. Unbeknownst to Messrs. Bainbridge and Neville, the BLM did not, as a matter of general policy, engage in scaled sales in the years before and immediately after the Grave Creek Fire raged through Subsale A. As a result, it did not have any

scaled sale contract forms. Tr. 945 (Lawton), 985–986 (Marshall), 1368 (Pastori).

58. However, according to Merle Marshall, a BLM forester in the Oregon State Office responsible for developing special timber contract provisions, this policy was not completely inflexible. Tr. 985–986 (Marshall).

59. Following his meeting with Mr. Peckham on August 17, 1978, Mr. Bainbridge apparently called BLM personnel in the Oregon State Office, as he promised Mr. Peckham, and consulted with them about the propriety of modifying the contract to accommodate a scaled sale. Mr. Bainbridge was unable to recollect whether he made such a call to the Oregon State Office, but he did not deny that it occurred. Tr. 408–409 (Bainbridge). Indeed, Mr. Bainbridge admitted that it would have been his responsibility to consult with appropriate personnel in the Oregon State Office, and that he probably did so in relation to this case. Tr. 409 (Bainbridge). Mr. Peckham testified that, on August 18, 1978, Mr. Bainbridge informed him in a telephone conversation that the Oregon State Office vetoed the scaled sale option because it was not legally possible, Tr. 188–191 (Peckham), and Mr. Peckham recorded the substance of this discussion in some contemporaneous notes. PX # 18, p. 5. Given the foregoing circumstances, we find that Mr. Bainbridge did in fact call the Oregon State Office on either the 17th or 18th of August, 1978.

60. 43 C.F.R. § 5401.0–6 generally required the BLM to publicly advertise all timber sales. In this respect, 43 C.F.R. § 5401.0–6 provides, in part, that:

(a) All sales other than those specified in § 5402.0–6 shall be made only after inviting competitive bids through publication and posting. . . .

61. 43 C.F.R. § 5402.0–6 authorized the BLM to engage in negotiated sales under certain limited circumstances. In this re-spect, 43 C.F.R. § 5402.0–6 provides, in part, as follows:

(a) When it is determined by the authorized officer to be in the public interest, he may sell at not less than the appraised value, without advertising or calling for bids, timber where the contract is for the sale of less than 250 M board feet.

\* \* \* \* \* \*

(c) [N]egotiated sales with no limitations as to volume may be made if:

\* \* \* \* \* \*

(2) The contract is for the disposal of property for which it is impracticable to obtain competition.

62. On August 17, 1978, when Messrs. Bainbridge and Peckham visited the Jamison–Harris Sale and discussed the option of adding all of the burned timber in Subsale A to the Jamison–Harris contract in a negotiated, scaled sale, Mr. Bainbridge knew that the volume of additional timber would exceed 250 MBF. Tr. 355–356, 1096 (Bainbridge). At the time, however, he was not sure under what circumstances the BLM could waive that limitation. Tr. 1112 (Bainbridge). However, Mr. Bainbridge indicated that he consulted the Jamison–Harris contract and the relevant regulations, and thereafter provided his superior with the options discussed from his knowledge of the contract and regulations. Tr. 370 (Bainbridge). Based on these facts, and the presumption that federal officers are presumed to know the law and discharge their duties accordingly, we find that Mr. Bainbridge learned that, because the burned timber in Subsale A over and above the contracted amount therein exceeded the 250 MBF limitation for negotiated sales, 43 C.F.R. § 5402.0–6 would have generally required the BLM to dispose of that timber in a publicly-advertised sale. Also, given his admission that he consulted the contract and the regulations, and further, because of the presumption that federal officials know the law and will discharge their duties

accordingly, we find that Mr. Bainbridge knew that the 250 MBF limitation on negotiated sales, such as a scaled sale, could be waived with proper authorization under the circumstances outlined in § 8 of the Jamison–Harris contract, *see* Finding of Fact No. 50, and 43 C.F.R. § 5402.0–6(c). *See* Tr. 403, 405–406, 411–413 (Bainbridge). Thus, we find that, sometime after his meeting with Mr. Peckham, Mr. Bainbridge knew that the Jamison–Harris contract could have been administratively modified to allow Spalding to harvest all of the burned timber in Subsale A in a negotiated, scaled sale in excess of the 250 MBF limitation under § 8 of the Jamison–Harris contract and 43 C.F.R. § 5402.0–6. *See* Tr. 403, 405–406, 411–413 (Bainbridge).

63. Mr. Bainbridge was not precisely certain which BLM employees were "authorized officers" within the meaning of 43 C.F.R. § 5402.0–6 and § 8 of the Jamison–Harris contract, but nevertheless stated that the authority to waive the 250 MBF limitation on negotiated sales, at the very least, was vested in the BLM Director located in Washington, D.C. Tr. 411–414 (Bainbridge). No later than October 16, 1987, the BLM instituted a policy permitting the negotiated sale of unlimited timber volume to an existing sale when a sale area with identifiable boundaries is overrun by fire. If these prerequisites are satisfied, BLM personnel may now execute negotiated sales in excess of 250 MBF by preparing a justification memorandum instead of seeking the approval of the BLM Director in Washington, D.C. PX # 22, p. 4, ¶ 8.

64. Mr. Bainbridge stated that the BLM did not pursue the scaled sale option in that it was "not possible" for several reasons—first, because of the 250 MBF volume limitation on negotiated sales; secondly, because the BLM did not have any contract forms; and, finally, because the BLM did not have the personnel to scale the timber upon removal. *See* Tr. 401–403 (Bainbridge). However, Mr.

Bainbridge admitted that he did not know of any legal impediments that would have prevented the BLM from engaging in a scaled sale. Tr. 405–406.

65. In any event, with respect to the 250 MBF volume limitation for negotiated sales, Mr. Bainbridge or his superiors decided not to pursue a waiver from the Director of the BLM in Washington, D.C. In this regard, Mr. Bainbridge told his subordinate, Mr. Neville, that it would take too long to obtain this authorization, insofar as he believed that it would take from four to six months for approval. Tr. 510–513 (Neville). As for the lack of scaled sale contract forms, Mr. Bainbridge admitted that there were no impediments against drafting appropriate contract forms, and further admitted that no such efforts were undertaken. Tr. 405–408 (Bainbridge).

66. On or about August 18, 1978, the day after his meeting with Mr. Bainbridge, Mr. Peckham toured the Jamison–Harris Sale area with Merve Spalding and Bob Watson. Tr. 87 (Spalding), 188 (Peckham). Mr. Watson is Merve Spalding's son-in-law and was employed in the Spalding timber operations. Tr. 188 (Peckham).

67. Mr. Spalding learned that the blue paint markings on many of the take trees had been obliterated by the fire, and was informed that it would be necessary to develop another way of identifying the timber purchased by Spalding under the Jamison–Harris contract. Tr. 125–126 (Spalding).

68. After conferring, Messrs. Spalding, Peckham, and Watson concluded that Spalding should attempt to retain the burned timber and harvest it through whatever arrangement might be worked out with the BLM. Tr. 88 (Spalding). The three of them favored the scaling option. Tr. 188 (Peckham). Mr. Spalding never became personally involved in any negotiations with the BLM, but rather instructed Mr. Peckham to do the best that he could under the circumstances. Tr. 133 (Spalding).

69. However, in a telephone conversation on or about the evening of August 18, 1978, Mr. Bainbridge called to inform Mr. Peckham that the BLM was "legally prevented" from executing a scaled sale contract. Tr. 188–191, 246 (Peckham); *see* PX #18, p. 5. Although he eliminated the scaled sale option, Mr. Bainbridge told Mr. Peckham that the BLM was still exploring other options. Tr. 190, 195, 245 (Peckham).

70. Mr. Bainbridge did not tell Mr. Peckham that a scaled sale was possible, and that it could have been executed with special authorization by the Director of the BLM. Tr. 259 (Peckham).

71. Spalding did not retain any legal representation to deal with the BLM in resolving these matters, and Mr. Spalding relied on the statements of Mr. Bainbridge as related to him by Mr. Peckham. *See* Tr. 83–84 (Spalding); Stip. ¶ 32.

### The Post–Fire Actions Of The BLM

72. On or about August 22, 1978, Mr. Bainbridge toured the Jamison–Harris Sale area with George Francis, the BLM Medford District Manager, and Bob Anderson, the BLM Resource Area Manager for the adjacent Grants Pass Resource Area. Tr. 1115 (Bainbridge).

73. Mr. Bainbridge reported the substance of his discussions with Mr. Peckham to Messrs. Francis and Anderson, and the three of them reviewed the available options. Tr. 1118–1121 (Bainbridge).

74. At the time of this August 22, 1978 meeting, Mr. Bainbridge then knew that the value of the burned timber in Subsale A was higher than the bid price that Spalding initially agreed to pay for that timber under the Jamison–Harris contract. Notwithstanding this knowledge, he failed to discuss the subject of increasing timber prices or values with Messrs. Francis and Anderson. Tr. 1125 (Bainbridge).

75. Also at the time of this meeting, Messrs. Bainbridge, Francis, and Anderson were aware of the perceived impediments for instituting a scaled sale so they apparently did not seriously discuss it as an option due to the lack of a scaled sale contract form and the lack of personnel capable of performing the scaling operations. Tr. 401–403 (Bainbridge). They discussed the possibility of re-cruising and re-marking the area, but discarded this option, not because it was impossible to do, but rather because they thought all of the burned trees should be harvested at the earliest possible time, and because any burned timber that Spalding did not harvest under the Jamison–Harris contract would have to be removed by another purchaser under a separate timber sale contract. Thus, they vetoed the idea of re-marking the area for a partial cut as originally contemplated under the Jamison–Harris contract. Tr. 1120 (Bainbridge).

76. The BLM desired to harvest all of the burned timber within one year, including both the timber purchased by Spalding under the Jamison–Harris Sale and the timber initially retained by the BLM, in order to avoid an economic loss through bug infestation, staining, and general deterioration. Tr. 1238–1240 (Bainbridge).

77. At the conclusion of their meeting, Messrs. Bainbridge, Francis, and Anderson determined that the best course of action from BLM's perspective would be to have Spalding sell the burned portion of Subsale A back to the BLM at the original bid price. Tr. 1122 (Bainbridge). They also decided to offer all of the BLM timber that was burned by the Grave Creek Fire, including the burned portion of Subsale A, in one large salvage sale. Tr. 1123 (Bainbridge). This area was subsequently called the Black Eye Salvage Sale.

78. In this process, and prior to August 22, 1978, Messrs. Bainbridge and Neville discussed the option of cancelling the entire Jamison–Harris contract if Spalding refused to sell the burned portion of the standing timber in Subsale A back to the BLM. Tr. 494–497 (Neville).

79. Shortly after the August 22, 1978 meeting between Messrs. Francis, Bainbridge, and Anderson, Mr. Francis instructed Fred Pastori, the Medford District Office Appraiser, to prepare a memorandum advising the BLM Oregon State Office of the perceived alternatives for handling the Jamison–Harris contract in the wake of the Grave Creek Fire, and to further explicate the alternative that the Medford District Office wished to pursue. Tr. 1148–1150 (Pastori). The final version of this memorandum has been lost, but the draft prepared by Mr. Pastori was presented at trial. DX # 16.

80. This memorandum was sent to the BLM Oregon State Office on August 28, 1978. *See* DX # 17. It outlined the following three options: (i) modify the Jamison–Harris contract by buying back all of the timber in Subsale A, (ii) modify the Jamison–Harris contract by making Subsale A into a clear cut area, cruising the area to determine the total volume, and by adding that extra volume to the contract at fair market value, and (iii) modify the Jamison–Harris contract by deleting only the burned portion of Subsale A and by re-estimating the volume of timber in Subsale A that would remain in the sale area. DX # 16.

81. The August 28, 1978 memorandum advised the Oregon State Office that Spalding did not wish to sell all of Subsale A back to the BLM. Accordingly, the Medford District Office recommended the partial Subsale A buy-back option that the memorandum outlined as the third alternative. DX # 16. Mr. Bainbridge concurred in the proposed adoption of this alternative. Tr. 1132–1133 (Bainbridge).

82. Shortly after this memorandum was sent to the Oregon State Office, Mr. Pastori was instructed to re-cruise the unburned portion of Subsale A to determine the volume of the timber that would remain in the Jamison–Harris Sale under the partial Subsale A buy-back option. Mr. Pastori accomplished this task sometime before September 4, 1978. Tr. 1352–1356 (Pastori).

83. The Medford District Office had decided not to pursue the scaling option by the time Mr. Pastori prepared the memorandum to the Oregon State Office. *See* Findings of Fact Nos. 57–65.

84. In the course of attempting to advise the Medford District Office on the proper course to pursue in resolving the perceived problems created by the Grave Creek Fire, William Cowan, a forester in the Oregon State Office who was responsible for all timber sale contracts, sought the advice of Donald Lawton, the Assistant Regional Solicitor for the Pacific Northwest Lands and Minerals Division, Department of the Interior. Tr. 927–928 (Lawton).

85. Mr. Lawton thereafter contacted the Medford District Office to obtain more information regarding the impact of the Grave Creek Fire on the Jamison–Harris Sale area. He was told that all of the blue paint markings had been burned off and that it was no longer possible to identify most of the trees in Subsale A that Spalding purchased under the Jamison–Harris contract. Stip. ¶ 43; Tr. 929–930 (Lawton).

86. Thereafter, Mr. Lawton examined the Jamison–Harris contract in light of this information, and concluded that the situation was governed by the risk-of-loss provision contained in § 7. Tr. 931–933 (Lawton).

87. Section 7 of the Jamison–Harris contract, a standard clause included in all BLM timber sale contracts, was captioned "Passage of Title and Risk of Loss." It stated that:

> Title to timber sold under this contract shall remain in Government and shall not pass to Purchaser until such timber has been paid for and removed from the contract area. Unless cut timber is sold under this contract, risk of loss shall be borne by Purchaser after the timber is cut; *Provided,*

*however*, that if loss results from a fire which was not caused by Purchaser, his contractors, subcontractors, or the employees of any of them, the risk of loss shall be borne by the party holding title. If cut timber is sold under this contract, risk of loss shall be borne by the party holding title. Risk of loss to Government shall not exceed the value of such timber computed at the prices per unit for the species involved as set forth [in this contract]. Nothing herein shall be construed to relieve either party from liability for any breach of contract or any wrongful or negligent act. As used in this section, the term *cut timber* refers only to timber which has been felled, bucked, or otherwise severed by direct human activity prior to the date this contract was entered into.

PX # 1, § 7; DX # 11, § 7; Stip. ¶ 22.

88. In the legal opinion of Mr. Lawton, § 7 was applicable notwithstanding the fact that timber sale prices were going up but rather because the loss of the blue paint markings allegedly made it impossible to identify the subject matter of the contract. Tr. 940 (Lawton).

89. Thus, Mr. Lawton concluded that it would be impossible to perform that portion of the contract of Subsale A where fire had burned away the blue paint markings. Tr. 932 (Lawton).

90. Consequently, based on an impossibility of performance theory, Mr. Lawton advised Mr. Cowan in the Oregon State Office that the BLM had two options. On the one hand, Mr. Lawton stated that the BLM could cancel all of "unit" Subsale A on the theory of impossibility of performance, or on the other hand, it could attempt to reach an amicable agreement with Spalding for a buy-back of the burned portion of Subsale A. Tr. 932 (Lawton).

91. Mr. Lawton also concluded that § 7 limited the buy-back bid price to the price paid by the purchaser under the original contract. Tr. 941 (Lawton). He believed that the market price for timber had no bearing on the application of that provision. Tr. 940–941 (Lawton).

92. At the time he was consulted in 1978, Mr. Lawton was not told that the BLM would suffer an economic loss on the Jamison–Harris contract as a result of the Grave Creek Fire. Moreover, he admitted that he could not identify any such economic loss to BLM or to Spalding resulting from the fire. Tr. 935 (Lawton).

93. On September 20, 1978, the BLM Oregon State Office responded to the August 28, 1978 memorandum from the Medford District Office, approving the recommended plan to delete the volume, value, and area of burned timber in Subsale A from the Jamison–Harris contract. DX # 17. It then requested an opportunity to review the re-cruise of Subsale A, the reappraisal of Subsale A, and the proposed contract modification for the Jamison–Harris contract. DX # 17.

*The Resolution Of The Jamison–Harris Contract Problems Caused By The Grave Creek Fire*

94. Sometime during September 1978, Mr. Bainbridge had an informal discussion with Mr. Watson, a Spalding employee, on the subject of the Jamison–Harris contract in the lobby of the BLM Medford District Office. Tr. 1185–1187 (Bainbridge); 1571–1572 (Watson). According to Mr. Bainbridge, he informed Mr. Watson that Spalding would be allowed to retain the unburned timber and the timber that bore the blue paint markings in Subsale A, but that the BLM would buy back the burned timber in Subsale A under § 7 of the Jamison–Harris contract because the trees purchased by Spalding could no longer be identified as a result of the Grave Creek Fire. Tr. 1186–1187 (Bainbridge).

95. Upon receiving approval for its proposed method of modifying the Jamison–Harris contract from the BLM Oregon State Office on September 20, 1978, the

Medford District Office continued its efforts to re-cruise the unburned portion of Subsale A, to re-appraise the value of the timber in that area, and to draft a contract modification deleting the burned timber. Tr. 1181–1182 (Bainbridge).

96. Once the re-cruising and re-appraisal process was completed, the Medford District Office prepared and sent a proposed modification for the Jamison–Harris contract to the BLM Oregon State Office on or about November 6, 1978. DX # 17, 18, and 19.

97. On November 22, 1978, the BLM Oregon State Office noted its review and revision of the Jamison–Harris contract modification proposed by the Medford District Office which was returned to said office with minor comments and additional suggested revisions. DX # 19; Tr. 1183–1184 (Bainbridge).

98. Mr. Peckham had several conversations with Mr. Bainbridge about the Jamison–Harris contract throughout the fall of 1978. Finally, according to Mr. Peckham, Mr. Bainbridge told him that the BLM would cancel the *entire* Jamison–Harris contract and buy back *all* of the timber in the Jamison–Harris Sale area at bid price if Spalding refused to voluntarily agree to sell the burned timber in Subsale A back to the BLM at bid price under its interpretation of § 7. This conversation purportedly occurred in the BLM Medford District Office sometime between August 19 and November 15, 1978. Tr. 194–195, 258–259, 272 (Peckham).

99. Mr. Bainbridge did not recall this conversation, but stated that the BLM Medford District Office never proposed to cancel the entire Jamison–Harris contract in the event Spalding refused to sell the timber in the burned portion of Subsale A back to the BLM at bid price. Instead, Mr. Bainbridge stated that the BLM proposed to cancel only *all* of Subsale A at bid price if Spalding did not voluntarily agree to sell the burned timber in Subsale A back to the BLM at bid

price under § 7 of the contract. Tr. 442–444, 1240–1241 (Bainbridge).

100. Mr. Peckham was the only Spalding employee who had direct contact with the BLM with respect to the Jamison–Harris contract. Mr. Spalding did not deal directly with Mr. Bainbridge or anyone else from the BLM, but he stated that, based on his conversations with Mr. Peckham, it was his understanding that the BLM proposed to cancel the entire Jamison–Harris contract if Spalding did not return the timber in the burned area of Subsale A and that they were "very unhappy" with this requirement. Tr. 90–93, 129–130 (Spalding). His understanding of the options being offered by the BLM was circumstantially corroborated at trial by the testimony of Mr. Peckham, *see* Tr. 194, 258–259 (Peckham), and Mr. Neville, who admitted that he and Mr. Bainbridge discussed the possibility of cancelling the *entire* Jamison–Harris contract if Spalding refused to sell back to the BLM the burned timber in Subsale A. Tr. 494–497 (Neville).

101. Spalding required 34,000 MBF in annual timber volume to supply its milling operations. Tr. 77 (Spalding). Thus, if it had been forced to remit all of the 11,206 MBF of timber contained in the *entire* Jamison–Harris Sale area, which Messrs. Spalding and Peckham perceived as the only alternative being offered in lieu of an agreement to sell the timber in the burned portion of Subsale A back to the BLM, Spalding would have been forced to sacrifice nearly one-third of its annual timber supply. *See* Tr. 93–94 (Spalding). The loss of the entire timber volume contained in the Jamison–Harris Sale area was of critical concern to Mr. Spalding because his company would have been forced to purchase replacement timber at prices substantially higher (*i.e.*, at market value) than what it paid under the Jamison–Harris contract in order to re-supply its milling operations. Tr. 94–95 (Spalding).

102. In addition, by the time of the Grave Creek Fire, Spalding had incurred approximately $100,000 in expenses for appraising and cruising the timber, and constructing roads in the area in its planning and preparation for the harvesting that it expected to complete during the 1978 and 1979 logging seasons. *See* Tr. 93 (Spalding), 261–270 (Peckham). Thus, Spalding feared that, in addition to the lost timber volume, these monetary investments would also be lost if the BLM cancelled the entire Jamison–Harris contract. *See* Tr. 93 (Spalding).

103. All of the key personnel in the Medford District Office knew that Spalding opposed the adoption of any alternative requiring it to sell any timber back to the BLM as a consequence of the Grave Creek Fire. That is, the BLM knew that Spalding did not want to lose either the burned timber in Subsale A, all of the timber in Subsale A, or the entire Jamison–Harris Sale. *See* Tr. 90–91 (Spalding), 272 (Peckham), 395 (Bainbridge), 491–492 (Neville). Moreover, from the very outset, Mr. Bainbridge was aware that Spalding did not wish to sell back any timber at the contract price, Tr. 395 (Bainbridge), but rather wanted fair market value for the timber it was entitled to in the burned area of Subsale A. Tr. 492 (Neville).

104. Spalding wanted to harvest not only all of the timber it purchased under the Jamison–Harris contract, but all of the remaining burned timber in Subsale A. Tr. 234 (Peckham). The BLM was cognizant of this desire. Tr. 395 (Bainbridge).

*The Proposal And Execution Of The Jamison–Harris Contract Modification # 5*

105. After the BLM Oregon State Office reviewed and revised the modification proposed by the BLM Medford District Office in its memorandum of November 22, 1978, DX # 19, the Medford District Office proceeded to prepare a modification deleting the timber in the burned area of Subsale A from the Jamison–Harris contract.

106. Subsale A initially covered a 338–acre geographic area, and the total volume of timber in Subsale A that Spalding was entitled to harvest under the Jamison–Harris contract before the Grave Creek Fire was 4,045 MBF. PX # 4; DX # 5.

107. On December 15, 1978, the Medford District Office sent contract modification # 5 to Spalding. Pursuant to the perceived authority of § 7 of the Jamison–Harris contract, the BLM Medford District Office outlined a proposal that would delete the timber in the burned area of Subsale A with a corresponding reduction in the Jamison–Harris contract at the bid price of the deleted timber volume, with some additional adjustments to compensate Spalding for certain road building expenses and other incidentals. Spalding would be allowed also to harvest the timber in Subsale Areas B, C, and D in accord with the original Jamison–Harris contract terms, and the remaining unburned timber in Subsale A. DX # 21; Stip. ¶ 24.

108. Spalding did not agree with the course of action proposed by the BLM in Modification # 5, and was very unhappy, but it believed that the BLM would cancel the entire Jamison–Harris contract if Spalding did not assent. *See* Tr. 194, 258 (Peckham), 90–93, 129–130 (Spalding).

109. Although the BLM relied on § 7 of the contract as the critical authority for the terms of the modification, this was the first time that the BLM had occasion to interpret or apply that provision in this manner. PX # 24, p. 3.

110. Fearing that the BLM would cancel the entire Jamison–Harris contract if Spalding did not assent, Mr. Peckham felt that Spalding should agree to the proposed modification. For the same reason, Mr. Spalding agreed with the recommendations of Mr. Peckham. Messrs. Spalding and Peckham believed that

the BLM, with its long experience in executing and administering timber sales such as the Jamison–Harris contract, was in a better position than they were to determine the proper course of action for resolving the problems that confronted them. *See* Tr. 90–91 (Spalding).

111. However, Spalding did not seek any legal advice regarding the extent of its rights under the Jamison–Harris contract, nor did it retain any legal counsel to review the proposed modification. Tr. 83–84, 1266 (Spalding); Stip. ¶ 32 and 33. In fact, while it did from time to time employ an attorney for other purposes, Spalding did not retain any legal counsel for its federal timber contract operations before and through the Jamison–Harris contract because it never had any serious differences with the BLM. Tr. 82–84 (Spalding).

112. Modification # 5 reduced the geographic size of Subsale A from 338 acres down to 130 acres. DX # 21. By signing the modification, Spalding relinquished its right to harvest 2,108 MBF out of the 4,045 MBF of timber that it originally purchased in Subsale A. DX # 21. By species, Modification # 5 deleted the following burned timber from Subsale A:

| Douglas Fir | Ponderosa Pine | Sugar Pine | Incense Cedar | Total |
|---|---|---|---|---|
| 1,542 | 264 | 118 | 184 | 2,108. |

*See* DX # 21; Stip. ¶ 25.

---

113. As a result of Modification # 5, the volume of timber that Spalding was entitled to harvest under the entire Jamison–Harris contract was reduced from 11,206 MBF to 9,098. *See* PX # 15 and DX # 21.

114. As a result of Modification # 5, the Jamison–Harris contract price was reduced from $1,287,010.25 to $1,041,677.25, a difference of $245,333.00. *See* DX # 11, # 21. Additional adjustments for road construction, amortization, and marginal log values deleted because of the fire reduced the Jamison–Harris contract price to $1,000,089.92. DX # 21; PX # 15; Stip. ¶ 26.

115. Spalding harvested all of the timber that it was entitled to remove in a timely fashion and in accord with the modified version of the Jamison–Harris contract. Stip. ¶ 27.

*The Black Eye Salvage Sale*

116. When Messrs. Francis, Bainbridge and Anderson surveyed the damage caused by the Grave Creek Fire on August 22, 1978, they decided to assemble a salvage sale containing all of the BLM timber damaged by the fire. This salvage sale included 500 acres of old growth timber on the Jamison–Harris Sale area and immediately adjacent BLM lands. This sale was later styled the Black Eye Salvage Sale. It included, but was not limited to, the burned area of Subsale A. Tr. 1123 (Bainbridge). *See* DX # 22.

117. Thus, after Spalding agreed to Modification # 5, the timber in the Black Eye Salvage Sale was offered at the following minimum prices:

| Species | Estimated Volume/MBF | Appraised Price/MBF | Volume Times Appraised Price |
|---|---|---|---|
| Douglas Fir | 5,649 | $168.05 | $ 949,314.45 |
| Ponderosa Pine | 673 | 167.40 | 112,660.20 |
| Sugar Pine | 563 | 282.80 | 159,216.40 |
| Incense Cedar | 769 | 276.30 | 212,474.70 |
| Totals | 7,654 | | $1,433,665.75 |

PX # 13, # 37; DX # 23; Stip. ¶ 29.

118. The prospectus advised potential bidders that harvesting operations on the Black Eye Salvage Sale area would have to be completed within 12 months after commencement of the contract. PX # 37.

119. On February 22, 1979, the BLM held an oral auction for the Black Eye Salvage Sale, and Boise Cascade made the following bid:

| Species | Estimated Volume/MBF | Boise Cascade Bid Price/MBF | Volume Times Bid Price |
|---|---|---|---|
| Douglas Fir | 5,649 | $200.00 | $1,129,800.00 |
| Ponderosa Pine | 673 | 167.40 | 112,660.20 |
| Sugar Pine | 563 | 282.80 | 159,216.40 |
| Incense Cedar | 769 | 276.30 | 212,474.70 |
| Totals | 7,654 | | $1,614,151.30 |

PX # 13; DX # 23; Stip. ¶ 30.

120. Spalding did not participate in the bidding for the Black Eye Salvage Sale. *See* Stip. ¶ 28. Spalding explained that it did not submit a bid for the Black Eye Salvage Sale because, when combined with the timber volume that it retained under the modified Jamison–Harris contract, the timber volume in the Black Eye Salvage Sale area exceeded its harvesting, manufacturing, and scheduling capacity. Tr. 96–100 (Spalding).

121. By contract No. OR110–TS9–33, the BLM awarded the Black Eye Salvage Sale to Boise Cascade on March 2, 1979. The contract commenced on April 3, 1979, and required Boise Cascade to complete harvesting no later than April 3, 1980. DX # 24; Stip. ¶ 29 and 31.

*Spalding Relief Efforts*

122. Thereafter, Spalding finally sought legal advice on its federal timber operations in November of 1979. Stip. ¶ 32. At this time, the impact of the Grave Creek Fire on the Jamison–Harris contract came to light. Spalding instructed its attorneys to investigate the situation and to provide advice regarding its legal options. Stip. ¶ 34.

123. Spalding was advised by its attorneys that it would be difficult to obtain relief in a court of law because of Modification # 5. However, because they believed that principles of equity and fair play warranted some remedy, its attorneys recommended the pursuit of relief through private legislation. Stip. ¶ 35.

124. Consequently, through its attorneys, Spalding contacted the Office of United States Senator Robert Packwood in the fall of 1980 in its first attempt to obtain congressional relief on the Jamison–Harris contract. Stip. ¶ 35. By letter dated March 9, 1981, Spalding asked Senator Packwood to introduce legislation in the Senate recommending relief, or in the alternative, to introduce legislation recommending that the matter be referred to the United States Claims Court for a full hearing and report. Stip. ¶ 36. Following a round of discussions with Senator Packwood's staff, on or about June 10, 1981, Spalding was told to exhaust all of its administrative remedies before pursuing the proposed private relief legislation. Stip. ¶ 37.

125. Accordingly, Spalding made its first contact with the Department of the Interior by placing a telephone call to Ms. Pat Patterson in the Solicitor's Office on November 3, 1981. Stip. ¶ 38. As a

result of this conversation, Spalding prepared a full report on its position, which it submitted to the Under Secretary of the Department of the Interior, Donald P. Hodel, on March 15, 1982. Spalding also requested a meeting with Under Secretary Hodel in hopes of resolving the matter amicably and definitively. Stip. ¶ 40.

126. In drafting a response to this letter, the Department of the Interior prepared a preliminary report that it referred to the BLM Oregon State Office for comment. On April 8, 1982, this draft report was then forwarded to Mr. Lawton, the Assistant Regional Solicitor for the Pacific Northwest Lands and Minerals Division in Portland, Oregon, for his comments because he was already familiar with the Jamison–Harris situation. Stip. ¶ 41. The legal interpretation of § 7 that Mr. Lawton provided to the BLM Oregon State Office and the BLM Medford District Office was used as the legal authority for Modification # 5 in the fall of 1978. Stip. ¶ 43. Mr. Lawton made some revisions in the draft report by the office of Under Secretary Hodel, and returned it to the BLM Oregon State Office on April 19, 1982. Stip. ¶ 44.

127. On June 15 and 17, 1982, Spalding called the Director of the BLM in Washington, D.C., to arrange a meeting to discuss the matter. On August 4, 1982, attorneys representing Spalding met with Paul Burford, the Director of the BLM, members of his staff, Paul Smythe, an attorney from the Department of Interior Solicitor's Office, and David Spencer, a legislative assistant to Senator Packwood. Stip. ¶ 45 and 46. Following this meeting, Spalding sent letters to the Director and the Solicitor's Office on October 8 and 12, 1982, respectively, further explaining the merits of its claims. Stip. ¶ 47.

128. The Department of the Interior continued to evaluate the Spalding claim for the next four months. On December 13, 1982, Director Burford sent a letter denying all relief. Stip. ¶ 48.

129. Spalding resumed its efforts to obtain legislative relief, but shifted its energies to the office of Senator Mark Hatfield. In this regard, Spalding met with Tom Winn, a legislative assistant to Senator Hatfield, to discuss legislative strategy on January 28, 1983. Consequently, Spalding began drafting proposed legislative relief in February 1983. Stip. ¶ 49, 50, 51, and 52.

130. Spalding made a written presentation of its claims to Mr. Winn by letter dated August 4, 1983. On September 8, 1983, it sent a report outlining its claims to Ms. Lisa Hovelson, an aide with the Senate Judiciary Committee. After a meeting with Ms. Hovelson, Spalding revised its draft of the proposed legislation, and those revisions were submitted to Mr. Winn for comments and further review on October 28, 1983, and again on November 29, 1983. Stip. ¶ 53, 54, 55, and 56.

131. In January 1984, during the 98th Congress, S. 2208, a bill for the relief of Spalding and Son, was introduced by Senator Hatfield, and it was then referred to the Senate Judiciary Committee, Subcommittee on Administrative Practice and Procedure. On January 30, 1984, Senator Charles Grassley, chairman of the Subcommittee on Administrative Practice and Procedure, sent a letter to William Clark, Secretary of the Department of the Interior, requesting a report on the agency response to the proposed legislation contained in S. 2208. The Department of the Interior was directed to respond with 60 days. PX # 43(b); Stip. ¶ 57 and 58.

132. Also on January 30, 1984, Senator Hatfield received a letter from Senator Grassley stating that the legislation contained in S. 2208 would be scheduled for consideration after receipt of the Department of the Interior's response and a report from the office of Senator Hatfield. PX # 43(c). Senator Hatfield provided the requested report on February 2, 1984. PX # 43(d). Stip. ¶ 59 and 60.

133. The January 30, 1984 letter from Senator Grassley to Secretary Clark was referred to Ralph Hill, an attorney in the Department of the Interior Office of Legislative Counsel on February 3, 1984. Tr. 860, 863 (Hill).

134. Among other things, the Department of the Interior Office of Legislative Counsel is responsible for providing reports on agency views relating to private relief legislation. The Office of Legislative Counsel typically assigned private relief legislation a low level of priority due to staffing limitations and because they involved only limited interests. Tr. 855–856, 859 (Hill). Essentially, upon receipt of a request for agency views on private relief legislation, the Office of Legislative Counsel referred the matter to the appropriate bureaus and offices in the Department of the Interior, and then deferred action until it received notice that a hearing was going to be scheduled or an indication of interest from the sponsor. Tr. 859–860 (Hill). At that time, the Office of Legislative Counsel would prepare the necessary reports.

135. Thus, in accord with this policy and upon receipt of the January 30, 1984 letter from Senator Grassley to Secretary Clark, Mr. Hill referred the matter to the BLM, the Energy and Resources Office of the Solicitor, the General Law Office of the Solicitor, and the Office of Policy Analysis. Tr. 865–866 (Hill).

136. In February of 1984, Roger Nesbit, an attorney in the Pacific Northwest Regional Solicitor's Office, was assigned to assist the BLM in preparing a response to the request for comment from the Office of Legislative Counsel. Stip. ¶ 62. Apparently Mr. Nesbit was already familiar with the Jamison–Harris contract dispute because he assumed that the claimed grounds for relief were the same as those presented by Spalding in its March 15, 1982 letter to Under Secretary Hodel. Stip. ¶ 62–63. In particular, Mr. Nesbit believed that there was no dispute over any of the material facts, that

Spalding was basing its claim on the alleged mistaken interpretation of the risk-of-loss provision contained in § 7 of the Jamison–Harris contract, and that the key documentary evidence was preserved in the Jamison–Harris official contract file. Official contract files are maintained on a permanent basis. Stip. ¶ 64.

137. Mr. Nesbit determined that the official contract file for the Jamison–Harris Sale contained enough information for him to assist the BLM in responding to the request for comment from the Office of Legislative Counsel. Stip. ¶ 63. There is no indication that Mr. Nesbit contacted any of the individuals involved in this matter in either the BLM Oregon State Office or the BLM Medford District Office. Moreover, he did not consult the field file relating to the Jamison–Harris contract. Stip. ¶ 63.

138. Mr. Hill received the BLM comments on April 17, 1984. Tr. 866–867 (Hill). However, because there was no further expression of interest from either the Subcommittee on Administrative Practice and Procedure or the office of Senator Hatfield, and because of the low priority assigned to private relief legislation by the Office of Legislative Counsel, Mr. Hill did not take any further action to provide the Senate Judiciary Committee with the views of the Department of the Interior on S. 2208 within the 60–day time frame specified in the January 30, 1984 letter from Senator Grassley. Tr. 867–868, 881–882 (Hill). When the 98th Congress adjourned on October 12, 1984, all pending legislation died, and the Office of Legislative Counsel stopped all work on S. 2208. Tr. 868–869 (Hill).

139. Mr. Hill resumed working on the Spalding matter in January of 1985, shortly after commencement of the 99th Congress, upon being informally notified that Senator Hatfield intended to introduce legislation substantially the same as S. 2208. Tr. 869 (Hill). Subsequently, on January 24, 1985, Senator Hatfield introduced S. 294, which was indeed virtually identical to S. 2208. PX # 39.

140. S. 294 states as follows:

## A BILL

For the relief of Spalding and Sons, Incorporated

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury appropriated to the Bureau of Land Management, Department of the Interior, and not otherwise obligated, the sum of $250,000, plus interest from March 15, 1982 at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board, plus attorneys fees, in full settlement of all claims by Spalding and Sons, Inc., against the United States relating to the Jamison–Harris timber sale.

Sec. 2. No part of the amount appropriated in the first section of this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.

141. Mr. Hill drafted a report advising that the Department of the Interior opposed S. 294, which he sent to the Office of Management and Budget for clearance on March 13, 1985. Tr. 870–871 (Hill). On July 17, 1985, the Senate Judiciary Committee requested that the Department of the Interior provide its views on S. 294. Stip. ¶ 67. Mr. Hill received clearance for the report he prepared advising against the adoption of S. 294 from OMB on July 30, 1985. Tr. 871 (Hill). Subsequently, that report was sent to Senator Grassley on August 5, 1985, approximately 16 months after the initial deadline for submission. Tr. 872 (Hill). Mr. Hill treated the matter in the same way that he handled other similar matters. After August 5, 1985, Mr. Hill had no further involvement with the Spalding relief legislation. Tr. 874 (Hill).

142. Although Mr. Hill forwarded the Department of the Interior's views to Senator Grassley on August 5, 1985, Spalding did not receive a copy of that report until December of 1985. Stip. ¶ 68; *see* PX # 43(a). Spalding responded to that report by letter on February 21, 1986, which was sent to Senator Grassley, Senator Hatfield, and the Department of the Interior. Stip. ¶ 69.

143. The Senate did not enact S. 294. Instead, on October 8, 1986, it passed S.R. 458, a resolution which states, in part, as follows:

## RESOLUTION

Referring the bill for the relief of Spalding and Son, Incorporated, to the chief judge of the United States Claims Court.

*Resolved,* That the bill (S. 249 [sic]) for the relief of Spalding and Son, Incorporated, of Grants Pass, Oregon, together with all of the accompanying papers, is hereby referred to the United States Claims Court pursuant to sections 1492 and 2509 of title 28, United States Code. The Claims Court shall proceed expeditiously with the same in accordance with the provisions of said sections, and report to the Senate at the earliest practicable date, giving such findings of fact and conclusions of law as shall be sufficient to inform Congress of the nature and character of the demand as a claim legal or equitable against the United States, and the amount, if any, legally or equitably due from the United States to Spalding and Son, Incorporated.

144. This matter was docketed in the United States Claims Court on December 10, 1986, and Spalding was given 90 days to file a complaint, which it did on March 10, 1987. The United States filed its answer and affirmative defenses on June 10, 1987.

145. Feeling that it would be fruitless to file an action at law in the face of Modification # 5, Spalding has never filed a complaint in the United States Claims Court pursuant to 28 U.S.C. § 1491.

146. For the same reasons, Spalding has never filed a claim seeking relief with any contracting officer under the relevant provisions of the Contract Disputes Act, 41 U.S.C. §§ 601, *et seq.*

*The Loss Of Relevant Evidence And The Failure Of Recollection*

147. The BLM maintained the official Jamison–Harris contract file, but destroyed the field file in 1985 or 1986. Stip. ¶ 72.

148. George Francis, the BLM Medford District Manager and the contracting officer for the Jamison–Harris contract retired from government service and was unavailable to testify at trial. Tr. 552–553 (Neville), 991 (Marshall), 1162 (Pastori).

149. William Cowan, a forester in the BLM Oregon State Office who was responsible for all timber sale contracts and who sought the advice of Mr. Lawton in relation to the appropriate method for resolving the problems caused by the Grave Creek Fire, retired from government service and was unavailable to testify at trial. Tr. 990 (Marshall).

150. Sometime during the 1986 Christmas holiday season, Bob Bainbridge, the BLM Rogue River Resource Area Manager in the Medford District Office, destroyed or discarded notebooks containing personal notes covering events surrounding the Grave Creek Fire, the Jamison–Harris contract, and the Black Eye Salvage Sale. Tr. 1230 (Bainbridge); Stip. ¶ 73.

151. Although Spalding pursued administrative relief with the Department of the Interior between March 15, 1982, when it forwarded a letter outlining its claims to Under Secretary Hodel, and December 13, 1982, when BLM Director Paul Burford rejected those claims, and although the Department of the Interior was aware that Spalding was pursuing legislative relief no later than February 3, 1984, when the Office of Legislative Counsel received a request for comment from Senator Grassley of the Subcommittee on Administrative Practice and Procedure, the Department of the Interior did nothing to preserve documentary evidence or the memories of those involved in the matter. For example, although Mr. Bainbridge was intimately involved in the subject matter of this dispute, he was not contacted by any Department of the Interior or Department of Justice employee regarding his knowledge of events surrounding the Jamison–Harris contract and the Grave Creek Fire until he was contacted by Mr. Nesbit from the Pacific Northwest Regional Solicitor's Office on February 19, 1987. Stip. ¶ 74.

152. Even then, Mr. Bainbridge was not instructed to refresh his memory of events. As a cumulative consequence of these events, Mr. Bainbridge was unable to thoroughly refresh his recollection before trial. In this regard, we observe that Mr. Bainbridge experienced a massive failure of recollection at trial, averring on at least fifty occasions that he could not recall facts relevant to these proceedings.

*The Federal Timber Contract Payment Modification Act*

153. Congress, on October 16, 1984, enacted the Federal Timber Contract Payment Modification Act (FTCPMA), 16 U.S.C. § 618, Pub.L. No. 98–478, 98 Stat. 2213. Stip. ¶ 76.

154. Under the terms of the FTCPMA all purchasers of Forest Service and Bureau of Land Management timber sales were

permitted to return to the government a volume of that purchaser's federal timber contracts in return for payment by the purchaser of a specified buy-out charge. In order to qualify, both the purchaser and the sales in question had to meet a number of specified requirements set forth in this legislation. Among other requirements, timber sales subject to the FTCPMA must have been bid prior to January 1, 1982, and must have been held (not completed) by the purchaser as of June 1, 1984. Further, in order to participate in the buy-out authorized by the FTCPMA a purchaser's "anticipated losses" on all of its qualifying timber sale contracts, as determined under the special procedures indicated in the FTCPMA, had to be in excess of 50% of the net worth of the purchaser. The determination of the purchaser's "anticipated losses" under the FTCPMA was based upon Forest Service or Bureau of Land Management estimates of operating costs for a hypothetical purchaser of average efficiency and were not based upon the actual books and records of any particular purchaser. Stip. ¶ 77.

155. Spalding qualified under the FTCPMA and subsequently executed a buy-out agreement with the government which permitted it to return six Forest Service timber sales and three BLM timber sales in return for paying buy-out charges totalling $644,272. The "purchaser's anticipated losses" determined as prescribed by the FTCPMA for Spalding were approximately $11,217,796. These "anticipated losses" were based upon Forest Service and BLM appraisal estimates based upon a hypothetical purchaser of average efficiency and not upon the actual books and records of Spalding. Stip. ¶ 78.

156. In all of Spalding's dealings with the government, including the BLM, relating to Spalding's FTCPMA buy-out agreement, no one from the government ever mentioned the Jamison–Harris Sale. Spalding was never orally or in writing, directly or indirectly, asked to compromise or to relinquish its claims on the Jamison–Harris Sale in connection with the FTCPMA buy-out agreement. Stip. ¶ 79.

157. Spalding's FTCPMA buy-out applications received no special treatment from the government. Spalding's applications were processed in the same manner and under the same standards as were all other purchasers' applications. Spalding neither asked for nor received additional benefits or more favorable treatment than that afforded to all other FTCPMA buy-out applicants. Stip. ¶ 80.

158. At no time prior to the filing of defendant's offset claim in this congressional reference action has anyone at the BLM ever indicated to Spalding that Spalding had any liability to the BLM other than the agreed buy-out charge, arising out of its FTCPMA buy-out agreement. All amounts due to the government from Spalding in connection with Spalding's FTCPMA buy-out agreement have been fully paid. Stip. ¶ 81.

159. In its FTCPMA buy-out applications, Spalding sought no relief whatsoever with regard to the Jamison–Harris Sale, and in fact had long since substantially completed the remaining operations on the Jamison–Harris Sale before filing its buy-out applications. Stip. ¶ 82.

160. In submitting its buy-out applications pursuant to the FTCPMA, Spalding made no representations to the government that it would waive or release any of its rights under the Jamison–Harris Sale if the government favorably acted upon its applications. Stip. ¶ 83.

## APPENDIX B

### DAMAGE CALCULATIONS

### LEGEND

Timber volume deleted from Subsale A by species as a result of Modification # 5

| Species | Volume Deleted In MBF |
|---|---|
| Douglas Fir (DF) | 1,542 |
| Ponderosa Pine (PP) | 264 |
| Sugar Pine (SP) | 118 |
| Incense Cedar (IC) | 184 |
| TOTAL | 2,108 |

## SPALDING DAMAGE CALCULATIONS

1. The difference between the Jamison–Harris Sale bid prices and the prices that the BLM subsequently received for the same timber in the Black Eye Salvage Sale equals $191,470.20.

| Species | Black Eye Bid Prices | minus | Jamison–Harris Bid Prices | equals | Appreciation Per MBF |
|---|---|---|---|---|---|
| DF | $200.00 | — | $110.00 | = | $ 90.00 |
| PP | 167.40 | — | 116.70 | = | 50.70 |
| SP | 282.80 | — | 192.10 | = | 90.70 |
| IC | 276.30 | — | 120.85 | = | 155.45 |

| Volume Deleted By Modification | | times | Appreciation Per MBF | equals | Total Appreciation |
|---|---|---|---|---|---|
| DF | 1,542 | × | $ 90.00 | = | $138,780.00 |
| PP | 264 | × | 50.70 | = | 13,384.80 |
| SP | 118 | × | 90.70 | = | 10,702.60 · |
| IC | 184 | × | 155.45 | = | 28,602.80 |
| TOTAL | | | | | $191,470.20 |

2. The difference between the pond values for the Jamison–Harris Sale and the Black Eye Salvage Sale equals 194,560.48.

| Species | Black Eye Pond Values | minus | Jamison–Harris Pond Values | equals | Appreciation Per MBF |
|---|---|---|---|---|---|
| DF | $301.07 | — | $218.73 | = | $ 82.34 |
| PP | 295.66 | — | 226.34 | = | 69.32 |
| SP | 428.49 | — | 313.45 | = | 115.14 |
| IC | 425.40 | — | 231.35 | = | 194.05 |

| Volume Deleted By Modification | | times | Appreciation Per MBF | equals | Total Appreciation |
|---|---|---|---|---|---|
| DF | 1,542 | × | $ 82.34 | = | $126,968.28 |
| PP | 264 | × | 69.32 | = | 18,300.48 |
| SP | 118 | × | 115.14 | = | 13,586.52 |
| IC | 184 | × | 194.05 | = | 35,705.20 |
| TOTAL | | | | | $194,560.48 |

3. The difference in the realization values for the Jamison–Harris Sale and the Black Eye Salvage Sale equals $237,758.90.

| Species | Black Eye Realization Values | minus | Jamison–Harris Realization Values | equals | Appreciation Per MBF |
|---|---|---|---|---|---|
| DF | $421.68 | — | $317.70 | = | $103.98 |
| PP | 381.16 | — | 303.68 | = | 77.48 |
| SP | 516.02 | — | 393.53 | = | 122.49 |
| IC | 541.33 | — | 310.28 | = | 231.05 |

184

| Volume Deleted By Modification | times | Appreciation Per MBF | equals | Total Appreciation |
|---|---|---|---|---|
| DF 1,542 | × | $103.98 | = | $160,337.16 |
| PP 264 | × | 77.48 | = | 20,454.72 |
| SP 118 | × | 122.49 | = | 14,453.82 |
| IC 184 | × | 231.05 | = | 42,513.20 |
| TOTAL | | | | $237,758.90 |

---

4. The difference between the Jamison–Harris bid prices and the fair market value unit prices that the BLM used for Modification # 10 equals $181,411.00.

| Species | Modification # 10 Unit Prices | minus | Jamison–Harris Bid Prices | equals | Appreciation Per MBF |
|---|---|---|---|---|---|
| DF | $190.00 | — | $110.00 | = | $ 80.00 |
| ·PP | 221.00 | — | 116.70 | = | 104.30 |
| SP | 254.00 | — | 192.10 | = | 61.90 |
| IC | 247.00 | — | 120.85 | = | 126.15 |

| Volume Deleted By Modification | times | Appreciation Per MBF | equals | Total Appreciation |
|---|---|---|---|---|
| DF 1,542 | × | $ 80.00 | = | $123,360.00 |
| PP 264 | × | 104.30 | = | 27,535.20 |
| SP 118 | × | 61.90 | = | 7,304.20 |
| IC 184 | × | 126.15 | = | 23,211.60 |
| TOTAL | | | | $181,411.00 |

---

5. The difference between the Jamison–Harris bid prices and the unit prices that the BLM received on a comparable sale called the Julie Creek Sale equals $245,161.20.

| Species | Julie Creek Unit Prices | minus | Jamison–Harris Bid Prices | equals | Appreciation Per MBF |
|---|---|---|---|---|---|
| DF | $261.00 | — | $110.00 | = | $151.00 |
| SP | 296.50 | — | 192.10 | = | 104.40 |

| Volume Deleted By Modification | times | Appreciation Per MBF | equals | Total Appreciation |
|---|---|---|---|---|
| DF 1,542 | × | $151.00 | = | $232,842.00 |
| SP 118 | × | 104.40 | = | 12,319.20 |
| TOTAL | | | | $245,161.20 |

\* This damage calculation does not include any compensation for the Ponderosa Pine and the Incense Cedar that was deleted from Subsale A by Modification # 5.

## BLM DAMAGE CALCULATION

1. The difference between the Jamison–Harris bid prices and the unit prices that the BLM received on a comparable sale called the Walpole Sale equals $118,631.80.

| Species | Walpole Sale Unit Prices | minus | Jamison–Harris Bid Prices | equals | Appreciation Per MBF |
|---------|--------------------------|-------|---------------------------|--------|----------------------|
| DF | $171.00 | — | $110.00 | = | $61.00 |
| PP | 133.30 | — | 116.70 | = | 16.60 |
| SP | 215.20 | — | 192.10 | = | 23.10 |
| IC | 215.75 | — | 215.75 | = | 94.90 |

| Volume Deleted By Modification | times | Appreciation Per MBF | equals | Total Appreciation |
|--------------------------------|-------|----------------------|--------|--------------------|
| DF 1,542 | × | $61.00 | = | $ 94,062.00 |
| PP 264 | × | 16.60 | = | 4,382.40 |
| SP 118 | × | 23.10 | = | 2,725.80 |
| IC 184 | × | 94.90 | = | 17,461.60 |
| TOTAL | | | | $118,631.80 |

---

## APPENDIX C

### CHRONOLOGICAL LISTING OF LEGISLATIVE RELIEF EFFORTS BY SPALDING

1. In the fall of 1979, Spalding contacted an attorney, and it was subsequently advised to pursue legislative relief in view of the perceived legal impediments inherent in Modification # 5.
2. In the fall of 1980, Spalding contacted the office of Senator Robert Packwood regarding private relief legislation.
3. On March 9, 1981, Spalding asked Senator Packwood to introduce legislation recommending relief, or in the alternative, recommending referral to the United States Claims Court for a full hearing and report.
4. On June 10, 1981, Senator Packwood instructed Spalding to exhaust all of its administrative remedies before pursuing legislative relief.
5. On November 3, 1981, Spalding called Ms. Pat Patterson in the Solicitor's Office at the Department of the Interior.
6. On March 15, 1982, Spalding filed a full report on its position with Donald P. Hodel, Under Secretary of the Department of the Interior.
7. Sometime between March 15 and April 8, 1982, the Department of the Interior requested comments from the BLM Oregon State Office.
8. On April 8, 1982, the BLM Oregon State Office referred its preliminary draft report to Mr. Donald Lawton, Assistant Solicitor for the Pacific Northwest Lands and Minerals Division in the Department of the Interior for additional comment.
9. On April 19, 1982, Mr. Lawton returned the report to the BLM Oregon State Office with minor revisions.
10. On June 15 and 17, 1982, Spalding telephoned Mr. Paul Burford, Director of the BLM, to arrange a meeting to discuss the matter.
11. On August 4, 1982, Spalding met with Director Burford and Mr. Paul Smythe, an attorney in the Department of the Interior Solicitor's Office.
12. On October 8 and 12, 1982, Spalding sent follow-up letters to Director Burford and Mr. Smythe, respectively.
13. On December 13, 1982, Spalding received a letter from Director Burford denying all relief.

14. On January 28, 1983, Spalding resumed its efforts to obtain legislative relief, this time through the office of Senator Mark Hatfield.

15. In February of 1983, Spalding began drafting proposed legislation.

16. On August 4, 1983, Spalding filed a report on its claim and a draft of the proposed legislation with the office of Senator Hatfield.

17. On September 8, 1983, Spalding filed a similar submission with Ms. Lisa Hovelson, an aide with the Senate Judiciary Committee.

18. Sometime between September 8 and October 28, 1983, Spalding met with Ms. Hovelson to discuss the proposed legislation.

19. On October 28 and again on November 29, 1983, Spalding revised its proposed legislation and submitted it to the office of Senator Hatfield for further review and comments.

20. In January of 1984, Senator Hatfield introduced S. 2208, a bill for the relief of Spalding and Son, Inc.

21. In January of 1984, S. 2208 was referred to the Senate Judiciary Committee, Subcommittee on Administrative Practice and Procedure, for further consideration.

22. On January 30, 1984, Senator Charles Grassley, Chairman of the Subcommittee on Administrative Practice and Procedure, sent a letter to Mr. William Clark, Secretary of the Department of Interior, requesting the views of the agency on S. 2208 within 60 days.

23. On February 3, 1984, the letter from Senator Grassley was referred to Mr. Ralph Hill, an attorney in the Department of Interior Office of Legislative Counsel.

24. Sometime after February 3, but before April 17, 1984, Mr. Hill referred the matter to the BLM and requested its views on S. 2208.

25. On April 17, 1984, the BLM filed a report outlining its opposition to S. 2208 with Mr. Hill in the Office of Legislative Counsel.

26. Mr. Hill did not take any further action on S. 2208 because he did not receive any expression of interest from the office of Senator Hatfield, and the matter was not scheduled for hearing before the Senate Judiciary Committee.

27. On October 12, 1984, Congress adjourned and work on all pending legislation, including S. 2208, died.

28. In January of 1985, Mr. Hill resumed work on the matter after being notified that Senator Hatfield intended to propose legislation substantially the same as S. 2208.

29. On January 24, 1985, Senator Hatfield introduced S. 294, a bill for the relief of Spalding and Son, Inc.

30. On March 13, 1985, Mr. Hill sent a report in opposition to S. 294 to the Office of Management and Budget for clearance.

31. On July 17, 1985, the Senate Judiciary Committee requested that the Department of Interior provide its views on S. 294.

32. On July 30, 1985, the Office of Management and Budget approved the report by the Office of Legislative Counsel advising against the adoption of S. 294.

33. On August 5, 1985, Mr. Hill sent that report to the Senate Judiciary Committee.

34. In December of 1985, Spalding was finally furnished with a copy of the adverse report from the Department of Interior Office of Legislative Counsel.

35. On February 21, 1986, Spalding sent letters to both the Senate Judiciary Committee and the Department of Interior contesting the adverse report from the Department of Interior Office of Legislative Counsel.

36. On October 8, 1986, the Senate referred S. 294 to the United States Claims Court for a full hearing and report by passing S.R. 458.

37. On December 10, 1986, S.R. 458 and S. 294 were docketed in the United States Claims Court.

38. On March 10, 1987, Spalding filed a timely complaint.